# EXHIBIT A

## PART 1

MORGAN, BROWN & JOY LLP
ATTORNEYS AT LAW
200 STATE STREET
BOSTON, MASSACHUSETTS 02109-2605
TELEPHONE (617) 523-6666

MARK M. WHITNEY*
*also admitted in CT, NH & NY

DIRECT DIAL (617) 788-5023
DIRECT FAX (720) 293-9696
mwhitney@morganbrown.com

December 9, 2011

Via Hand Delivery

11-4502

The Honorable Justice Presiding over Civil Session
Suffolk Superior Court
Suffolk Superior Courthouse
Three Pemberton Square
Boston, MA 02108

Re: *Global Rescue LLC v. Edward Muhlner, et al.*

Your Honor:

Pursuant to Superior Court Rule 9A(a)(5), Plaintiff Global Rescue LLC ("GR"), through its undersigned counsel, hereby requests leave to file a memorandum of law that is 29 pages in the above-referenced matter.

As grounds for this Request, GR states that it has filed a Complaint against Defendants Edward Mulhner, Thomas Bochnowski and Mark Cohon (collectively, the "Defendants") seeking damages and injunctive relief arising from the Defendants' violations of restrictive covenants contained in their respective employment and/or consulting agreements and other wrongful conduct. The claims include, among others, claims for breach of contract, misappropriation of trade secrets, and breach of fiduciary duties. Additionally, GR is moving for a preliminary injunction to, among other things, enjoin the Defendants from violating their contractual obligations, and order the Defendants to return and refrain from disclosing GR's confidential and propriety information. Despite its best efforts, GR has been unable to adequately address the complicated factual and legal issues underlying the Plaintiff's motion within the 20-page limit provided in Rule 9A(a)(5). Accordingly, GR requests leave for an additional 9 pages so that it can provide this Court with a memorandum of law that sufficiently explains the grounds for their motion.

Respectfully submitted,

**GLOBAL RESCUE LLC**

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
Phone (617) 523-6666
Fax (720) 293-9696

cc: Clerk of Courts
Todd R. Wulffson, Esq.

MORGAN, BROWN & JOY LLP
ATTORNEYS AT LAW
200 STATE STREET
BOSTON, MASSACHUSETTS 02109-2605
TELEPHONE (617) 523-6666
FACSIMILE (617) 367-3125

CHRISTOPHER S. FEUDO

DIRECT DIAL (617) 788-5058
E-FAX (617) 977-9230
cfeudo@morganbrown.com

December 9, 2011

**VIA HAND DELIVERY**

Civil Clerk's Office
Suffolk Superior Court
Suffolk County Courthouse, 12th Floor
Three Pemberton Square
Boston, MA 02108

**Re:** ***Global Rescue LLC v. Muhlner, et al.***

Dear Sir/Madam:

Enclosed pleased find the following documents for filing and docketing in the above-referenced matter:

1. Plaintiff's Complaint;
2. Business Litigation Session Cover Sheet;
3. check in the amount of $275.00, which represents the filing fee;
4. check in the amount of $15.00 for three summonses;
5. Plaintiff's Motion for Appointment of Special Process Server;
6. Plaintiff's Motion for a Temporary Restraining Order (with attached Proposed Temporary Restraining Order);
7. Plaintiff's Memorandum of Law in Support of Its Motion for Temporary Restraining Order;
8. Plaintiff's Motion for a Preliminary Injunction (with attached Proposed Order);
9. Plaintiff's Memorandum of Law in Support of Its Motion for Preliminary Injunction;
10. Affidavit of Daniel L. Richards (with attached exhibits);
11. Affidavit of Mark G. Spencer (with attached exhibits); and

12. Plaintiff's Motion for Short Order of Notice

Please date-stamp the attached copies and return to them to me.

Thank you for your attention to this matter. Do not hesitate to contact me with any questions you may have.

Very truly yours,

Christopher S. Feudo

Enclosures

Copies to: Mark M. Whitney, Esq. (without enclosures)
Melissa L. Roth, Esq. (via-email, w/ enclosures)
Todd R. Wulffson, Esq. (via-email, w/ enclosures)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIORCOURTDEPARTMENT

| | |
|---|---|
| GLOBAL RESCUE LLC,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,<br><br>Defendants. | 11 1502<br><br>CIVIL ACTION NO. ______________ |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

Plaintiff Global Rescue LLC ("GR"), brings this action seeking injunctive relief and damages against two former senior executives, Edward Muhlner ("Muhlner") and Thomas Bochnowski ("Bochnowski"), and a former consultant, Mark Cohon ("Cohon") (collectively, the "Defendants"). As set forth below, this action arises from the Defendants' simultaneous and concerted breach of their contractual and other legal obligations owed to GR stemming from their improper scheme to form a competing company using GR's confidential information, developments, and goodwill. Finally, this action seeks damages associated with the Defendants' apparent taking of data from GR's computer system on or very near to their termination dates and the resulting investigative and forensic analysis costs.

## PARTIES, JURISDICTION AND VENUE

1. GR is a Delaware limited liability company with its principal place of business at 177 Milk Street, Boston, Massachusetts.

2. Upon information and belief, Muhlner is an individual who currently resides at 416-B Washington Boulevard, San Francisco, California.

3. Upon information and belief, Bochnowski is an individual who currently resides at 2091 Bent Creek Drive, San Ramon, California.

4. Upon information and belief, Cohon is an individual who resides at 61 River Road, Weston, Connecticut 06883.

5. The Superior Court has original subject matter jurisdiction over this action pursuant to M.G.L. c. 212, §§ 3-4 and M.G.L. c. 214, § 1. This Court also has jurisdiction over the Defendants pursuant to M.G.L. c. 223A, § 3.

6. This Court also has jurisdiction over this action based on the Defendants' express contractual agreement to submit to the jurisdiction of this Court, and their express waiver to object to the same.

7. Pursuant to M.G.L. c. 223, § 1, venue is proper because GR has a usual place of business in Suffolk County.

8. Venue in this Court is proper under Mass. Gen. Laws ch. 93 § 42 and 42A.

9. Venue in this Court is also proper based on the Defendants' express contractual agreement to submit any disputes arising out of their employment contracts in the state or federal courts of Massachusetts.

# FACTS

## Global Rescue

10. Founded in 2004, Boston-based GR provides advisory and response services for medical emergencies, security crises, and other urgent and emergency situations, as well as timely advice, stand-by services and travel risk management consultation before situations escalate to emergencies. GR, through its Global Rescue Risk Services ("GRRS") department helps manage client insurance, benefits and risk services and provides consultative services for captive and risk pooling services, including group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling.

## Tom Bochnowski and Ted Muhlner

11. In 2008, GR's CEO (Daniel Richards ("Richards")) approached Bochnowski and Muhlner regarding hiring them to work at GR. Bochnowski and Richards were classmates at graduate business school. Bochnowski and Muhlner are brothers-in-law. In 2008 they were working in San Francisco, California, for a company called Tacitum Solutions ("Tacitum"). Tacitum was an investigative and security operations services company, which GR eventually acquired.

12. On the explicit condition precedent that Bochnowski first agree to relocate to Boston, GR offered him the position of Director of Corporate Accounts. Bochnowski accepted the offer and moved to Boston. After agreeing to relocate, Bochnowski executed an Employee Obligations Agreement ("EOA") on April 16, 2008. On May 3, 2008, Bochnowski executed a second EOA that expressly replaced and superseded the April agreement (the "Bochnowski Agreement"). Bochnowski executed this agreement after he had relocated to Boston,

Massachusetts. A true and accurate copy of the May 3, 2008 Bochnowski Agreement is attached as **Exhibit**.

13. On the explicit condition precedent that Muhlner relocate to Boston, GR offered him the position of Director of Operations. Muhlner accepted the offer and moved to Charlestown, MA. After agreeing to relocate, Muhlner executed an EOA on April 21, 2008 (the "Muhlner Agreement"). A true and accurate copy of the Muhlner Agreement is attached as **Exhibit B.**

14. The agreement by Bochnowski and Muhlner to relocate to Boston was a condition precedent to GR extending an offer of employment, and therefore a condition precedent to the execution of their two agreements. This condition was of such importance to GR that it is emphasized in the offer letters as follows: "You will be based in Boston ... to perform the functions stated above. .... *Your employment with the Company* ***is contingent on*** *your moving permanently to Boston.*" (Emphasis added.) This contingency was communicated to both Bochnowski and Muhlner in their offer letters which was the transmittal mechanism for their unsigned agreements, so there is no dispute that they were aware of this contingency ***before*** they signed their agreements.

**Mark Cohon**

15. Richards met Cohon in December 2008, when a personal contact of Richards' from One Beacon Insurance introduced Cohon to him. At the time, Cohon was an employee at American Benefits Consulting ("ABC"), a benefits and insurance consulting firm. Cohon presented himself as someone with experience in employee insurance, benefits and risk services. Cohon and Richards continued to see each other in 2009 at various industry events and shows, and the two became friends.

16. In late 2009, Cohon confided in Richards that he intended to leave ABC and that he wanted to explore whether there was a way in which he could assist GR. Richards and Cohon discussed the possibility of GR developing a new department that would be based around the insurance, benefits and risk-sharing industries and that would successfully integrate into GR's existing services so that GR could offer a more comprehensive package of services to its clients.

17. Further to these discussions, on March 18, 2010, Cohon executed a Consultant Agreement (the "Cohon Agreement"). A true and accurate copy of the Cohon Agreement is attached as **Exhibit C.**

18. At the time Cohon signed his Agreement, GR paid him his expenses while working on behalf of GR and the parties agreed that any other compensation terms would be discussed and formalized at a later date. GR and Cohon agreed to this manner of payment for Cohon's services at Cohon's request, for reasons that are personal to Cohon.

**Agreements At Issue**

19. The Bochnowski Agreement, the Muhlner Agreement, and the Cohon Agreement all attached as Exhibits A, B and C respectively, are identical in all relevant respects.

20. The Bochnowski Agreement and the Muhlner Agreement include the following provision that prohibits disclosure or use of confidential information. The Cohon Agreement includes an identical provision, however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*":

> 3. Confidentiality. I understand and agree that my employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties

> to the Company. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

21. The Bochnowski Agreement and the Muhlner Agreement include the following provision that prohibits post-employment competition. The Cohon Agreement includes an identical provision, however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*":

> 8. Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

22. The Bochnowski Agreement and the Muhlner Agreement include the following provision that prohibits solicitation of customers. The Cohon Agreement includes an identical provision however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*":

> 9. Nonsolicitation of Customers. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:
>
> (a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

> (b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,
>
> (c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,
>
> (d) provide or assist with the provision of Services to a Customer (except in his capacity as an employee of the Company), or
>
> (e) refer a Customer or supplier to another provider of Services.

23. The Bochnowski Agreement and the Muhlner Agreement include the following provision that prohibits solicitation of employees. The Cohon Agreement includes an identical provision however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*":

> 10. Nonsolicitation of Employees. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:
>
> (a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or
>
> (b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee, prospective employee, consultant or prospective consultant of the Company to terminate his or her employment or other relationship with the Company or provide services to any entity other than the Company.

24. All three agreements provide that any inventions or developments, as defined by the agreements, are the sole property of GR.

25. All three agreements contain very specific provisions by which the three Defendants unequivocally submit themselves to the jurisdiction of this Court. These provisions also expressly prohibit any of the Defendants from engaging in litigation over issues that arise from or relate to their respective agreements anywhere other than Massachusetts:

> 21. Governing Law; Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process for any action, suit or proceeding brought against it in any such court.

**Creating Global Rescue Risk Services**

26. In connection with their creation of GRRS, Cohon and Richards identified and developed this GR growth opportunity together, relying on both of their existing industry knowledge to navigate and succeed in an area which, while built upon both of their experience and knowledge, was a novel approach to the industry for both of them. This new department made business sense because GR's core services are often integrated in a client's insurance, benefits and risk sharing agreements. Cohon contributed his experience and knowledge of the insurance, benefits and risk-sharing industries while Richards contributed his knowledge of how those services could be integrated to meet client needs. Prior to working with GR, Cohon knew nothing of the crisis response, travel assistance and evacuation industry. Richards showed him how the industry functions, how capital flows are processed and how these services can have

significant impacts on a variety of insurance and risk bearing/pooling entities. This department became known as "Global Rescue Risk Services" (referred to herein as "GRRS").

27. Throughout 2009, 2010, and 2011, up until his resignation on November 2, 2011, Cohon and Richards worked closely together to develop the GRRS department. They often spoke several times per week, met with dozens of potential clients and partners and attended tradeshows, including: RIMS (the Risk and Insurance Managers Society annual conference), VCIA (the Vermont Captive Insurance Association annual conference) and IBIS Advisors' International Benefits and Human Resources symposium.

28. As part of their efforts to develop GRRS, Richards and Cohon met with numerous existing and potential GR clients including but not limited to Alcoa, Fidelity Investments, Liberty Mutual, VSE, etc.

29. Cohon regularly represented himself to the market and potential clients as the head of GRRS. The signature block on Cohon's email identified him as working for GRRS.

30. GR devoted substantial resources to creating and printing marketing materials to promote GRRS to clients and potential clients at insurance and risk-services tradeshows and at direct client meetings. Cohon, Bochnowski and other GR employees participated in creating these materials.

31. As their development of GRRS progressed, Cohon became more integrated with GR's sales team, which was led by Bochnowski and included multiple lower-level sales employees.

32. In 2010, as part of the overall strategy to sell services through GRRS, GR devoted substantial resources to create Crisis Services Company ("CSC"), a captive insurance company that provides risk pooling and a vehicle by which clients can share (i.e., "pool") their risk.

33. Over time, GRRS became an established and entrenched branch of GR and was consistently pitched by Cohon and others to GR's clients as a way to provide them with additional cost savings.

34. By the fall of 2011, GRRS provided the following services: manage and consult on client insurance, benefits, and risk services, and provide consultative services for captive and risk pooling services, including group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling.

**GR's Confidential Information**

35. GR devoted substantial time and resources in developing GRRS. Neither Bochnowski nor Muhlner had any knowledge of travel assistance, crisis response, evacuation, insurance, benefits, or risk industries prior to joining GR. While possessing insurance and benefits background, Cohon did not have background in travel assistance, crisis response, evacuation and the new and unique service offerings that GRRS ultimately provided.GR diverted substantial energy and sales efforts from its core services to those services offered by GRRS. GR spent significant amounts of money on GRRS marketing materials, training, and expenses for Cohon, Bochnowski and other GR employees to attend client meetings and tradeshows.

36. Moreover, Cohon, Bochnowski, and Muhlner possess a significant amount of GR proprietary and confidential information and knowledge as a result of having worked for GR in high-level positions of trust and confidence. They have inside knowledge of the substantial resources, strategy, and decision-making that went into the unique services offered through GRRS. They have detailed knowledge of GR's proprietary databases, documents, client, and vendor relationships. They have been privy to many of GR's current and anticipated client and

vendor agreements. Other specific examples of confidential and proprietary knowledge that they have gained while employed or during their relationship with GR:

a. Intimate working knowledge of vendor or partner relationships and contacts;

b. Sales and marketing strategy for GR's entire organization;

c. Operations strategy for GR's entire organization;

d. Knowledge of overall business planning for the company;

e. Knowledge of all of GR's data sources and contract status for those sources;

f. Knowledge of GR's new data infrastructure;

g. Knowledge of GR's costs and pricing structure;

h. Knowledge of company financial information;

37. Simply put, as Vice President of Sales, Vice President of Operations and the head of the GRRS department, Bochnowski, Muhlner and Cohon had access to much of GR's most sensitive, valuable, confidential, and proprietary information. Should their knowledge of GR's proprietary information, GR's current and prospective client lists, and trade secrets be used by Cohon, Muhlner and Bochnowski to compete against GR in the marketplace GR could be significantly harmed, the value of which could be difficult to ascertain.

**Chronology of Events Leading to Resignations**

38. Beginning sometime in 2010, Richards became aware that Bochnowski's wife was pressuring him to move to California to be closer to their family. Bochnowski's wife was spending significant amounts of time in California, and as a result GR allowed Bochnowski to make regular business trips to California so that he could see her, even though Richards did not always think that these trips made good business sense.

39. On or around the beginning of 2011, Richards made clear to Bochnowski and Muhlner that it did not make business sense for GR to open an office in California for many reasons, including dramatically higher operating costs, the adverse tax structure of the State of California and the management structure of the company. However, Richards did tell Bochnowski and Muhlner about a plan to open an office in New Hampshire because of New Hampshire's dramatically lower operating costs, favorable tax structure, and its proximity to Boston and the management of the company. When Richards initially hired them, they had discussed whether there was potential for GR to ever open a California office. Richards had indicated to them at that time that, if it made business sense in the future, it was a possibility. However, Richards made no promises on the issue of a California office as he could not predict when or even if the need for a California office would ever arise.

40. Throughout the spring and early summer of 2011, Richards had numerous separate conversations with Bochnowski and Muhlner regarding the future of GR and their individual commitments to the company as the company continued to grow. They repeatedly pressed to be promoted and given Vice President titles. However, Richards had concerns about their ability to lead and manage effectively because certain parts of GR had experienced employee turnover and morale issues under their leadership. Additionally, given Richards's knowledge of the desire of Bochnowski's wife to move to California, he was concerned about their long-term commitment to GR. Nevertheless, Richards wanted to reward them for their efforts over the past three years. For example, Richards hired a Sales Director with a significantly greater track record than Bochnowski, Tiger Shaw, to work under Bochnowski even though Shaw had successfully started and sold his own company and had many more years of

relevant sales and management experience than Bochnowski. Richards put Shaw under, and not above, Bochnowski as a sign of his loyalty to and appreciation for Bochnowski.

41. In conversations during this time, Richards asked Bochnowski and Muhlner directly if they were committed to GR and would commit to living in Boston. Because Richards knew that Bochnowski's wife was unhappy in Boston, Richards offered him the opportunity to work out of the future New Hampshire office if that would make his personal life better, even though that would not be the best outcome for the company because GR's sales staff is located in Boston. Richards made clear to them that if they were committed to GR and to living on the east coast for a significant period of time (Richards's expectation based on these conversations was at least five years) then he would promote them each to Vice President.

42. Upon information and belief, it was around this same time – late spring/early summer of 2011 – that the Defendants began active and secret planning to leave as a group and form a competing business based on the unique GRRS model developed by Richards and Cohon.

43. At some time in June 2011, Bochnowski and Muhlner gave Richards separate commitments that they were committed to GR and living in the Boston area. Bochnowski told Richards that he and his wife were looking into buying a house in Winchester, Massachusetts. Muhlner had always told Richards, and reconfirmed, that he and his wife enjoyed Boston and that, because his wife had recently received a job offer in Boston, they would remain in the Boston area and that he was committed to working for GR.

44. As it is now abundantly clear, both Bochnowski and Muhlner were lying to Richards when they expressed a desire to commit to GR and staying in the Boston area. They lied in order to extort additional money and a loftier title out of GR in furtherance of launching their competing business.

45. In reliance on those false expressions of commitment to GR, Richards agreed to promote them to a Vice President position, agreed to pay them each a $20,000 mid-year bonus, and agreed to raise their base salary from $110,000 to $130,000 per year. On more than one occasion, Richards and Bochnowski/Muhlner shook hands in congratulations, as did Stuart Richards, GR's Senior Vice President, and Melissa Roth, GR's Vice President and General Counsel.

46. On Sunday, July 24, 2011, Richards sent a company-wide email announcing the promotions of Bochnowski and Muhlner.

47. On Friday, July 29, 2011, the $20,000 bonuses were transferred into Bochnowski's and Muhlner's individual bank accounts.

48. On Monday, August 1, 2011, after the money hit their accounts, Bochnowski and Muhlner came into Richards's office together and both resigned. They told Richards that over the weekend their wives forced them to move to California. Bochnowski said that he wanted to be fair and to help the company, so he thought a two-week notice period was reasonable. Richards was shocked by their resignation, which was a complete reversal of what they had committed to only a few weeks before. While they paid lip service during their resignation to being committed to helping GR transition in the wake of the coordinated departure, they were insistent upon their need to meet the two-week departure deadline, despite their previous oral representations that they were going to stay at GR for the long term.

49. Stuart Richards, Melissa Roth and Richards spent the next few evenings negotiating with Bochnowski and Muhlner to create a transition plan through the end of 2011 and possibly for them to act in consultant roles through 2012. Bochnowski and Muhlner made clear that they did not want to be considered employees of GR but that they wanted to have their

titles to be "consultant" immediately. They did not tell GR why they wanted that title, but GR now realizes that it was because they are acting as consultants in their new competing business.

50. On August 9, 2011, Richards gave Bochnowski and Muhlner separate Separation Agreements that he believed were a good faith effort to memorialize the terms that everyone agreed to in the negotiations. On August 11, 2011, at 9:41pm and 9:57pm respectively, Muhlner and Bochnowski sent Richards separate but identical emails including their resignation letters and each stating that the agreement "does not reflect the good faith discussions and negotiations…and I have concluded based on your proposed draft agreement that we will be unable to reach any agreement with you on the terms that would be acceptable." At no point before this did they bring up any issues with the agreement or try to further negotiate the terms. Richards emailed them back and stated "Your accusation that we have negotiated with you in bad faith is perplexing since it appears the agreement we sent you represents all of the things we discussed. If there were issues you had with the document, good faith on your part would have resulted in a discussion regarding those issues. I'm disappointed that this didn't happen and frankly don't understand. However, your motives are your own and it isn't for me to know them. I am open to further discussion if that is what you would like…."

51. The last day that Bochnowski and Muhlner worked at GR was August 15, 2011. However, Bochnowski and Muhlner asked Richards if they could come into the office on August 16, 2011 to pick up some final items and to drop off their laptop computers and Blackberry mobile devices. Richards consented and asked them to come in near the close of business hours.

52. A few days after their last day at GR Richards spoke with Cohon about the resignations. At no point did Cohon inform Richards that he, Bochnowski and Muhlner had been planning on starting a business that would offer the same services as GR. Moreover, in the

days following Bochnowski's and Muhlner's last day at GR, Cohon told Richards that he connected Muhlner with a company in California that was looking to hire a Chief Security Officer. Richards also asked Cohon to inform him of any contact he had with Bochnowski and Muhlner and he told Richards that he would.

53. As far as Richards knew at this point, Cohen was still acting in GR's interest as its agent. He was very wrong.

54. Cohon continued to lead GRRS after Bochnowski's and Muhlner's resignation.

55. On October 21, 2011,Richards sent Cohon a Partner Agreement, a Stock Option Agreement and a Consultant Agreement (at the time Richards could not locate the Consultant Agreement that he had signed and that is attached as Exhibit C). Richards and Cohon were coming close to closing their first deals on behalf of GR, so they began negotiating his compensation agreement per their previous agreement.

56. Richards spoke with Cohon after Cohon reviewed the proposed agreements, which, among other things, required him to disclose his other business activities. Cohon specifically stated that he did not want to disclose his other activities and the flow of funds for potential deals. Richards told him that in order for them to continue to work together, they needed to be able to trust each other and understand how each deal was structured. The only way to do this was through disclosure of all parties to a deal.

57. On Sunday, October 30, 2011, Cohon mistakenly exposed his, Bochnowski's and Muhlner's secret conspiracy. Cohon (apparently by accident) forwarded an email from his AOL web mail account to Bochnowski's old GR email address, which was captured by the GR email server. The email was from mbcohon@aol.com to tmuhlner@univops.com and tbochnowski@globalrescue.com. The email's subject was "Fwd: What's new to Costco

Services!" Cohon wrote in the email "Looks like we're in competition with Costco. They perform payroll as well." Having had no previous indication that GR's two former employees and current consultant had gone into business together, Richards was extremely surprised by this email. The timing of this apparently accidental mis-sent email is important. Cohon sent it at 10:59 p.m. Sunday evening.

58. On Monday, October 31, 2011, the Defendants and their new company called Universal Operations and Risk Management, LLC ("UnivOps") filed suit against GR in the Superior Court of the state of California for the county of San Francisco. In their suit, the defendants seek a declaratory judgment against GR. To date, GR has not received a copy of this initial complaint.

59. Defendants and UnivOps apparently were so incredibly concerned about the inadvertent disclosure of their business relationship with each other that they ran into a California court ***within 16 hours*** of the email's sending time. It is important to note that GR did not even see the email until the morning of October 31, 2011, and GR did not contact any of the Defendants about it prior to their commencing the lawsuit.

60. On Wednesday, November 2, 2011, with no awareness that Cohon had just filed suit against GR, Richards spoke with Cohon on the phone. Richards told him that he knew that Cohon was working on something with Bochnowski and Muhlner and that he wanted to know what was going on. Richards asked him if they were partners. Richards asked him when they began to work together. Richards told him that he had a right to know this information and that, because he was still a consultant to GR, he had a duty of good faith and loyalty to him and GR, in addition to contractual obligations. Richards told him he wanted the truth. Cohon did not tell Richards that he, Bochnowski and Muhlner had formed a company. Cohon did not tell Richards

that he had already filed a lawsuit against GR on Monday. Cohon did tell Richards that he did not start to work with Bochnowski and Muhlner until after they left GR, which Richards learned later was not true. Richards asked Cohon to send him in writing, when he, Bochnowski and Muhlner started to work together and what they were doing together. Richards reminded Cohon that he, Bochnowski and Muhlner all signed agreements that gave GR rights and that GR intended to protect those rights. Cohon asked for a copy of his signed Consultant Agreement. At the end of the conversation, Richards emailed Cohon a copy of the agreement. Ex. C.

61. On Thursday, November 3, 2011, Cohon sent Richards an email terminating his consulting relationship with GR. It reads: "Dan, After consideration of our call yesterday afternoon, I will not be providing any more consulting services to Global Rescue now or in the future. I have appreciated our past relationship and have enjoyed working with you. With respect to your request for information regarding my business activities with Ted and Tom, please send a written request for the information you are seeking, and I will ensure a timely response (although I cannot commit that the specific information you may request can or will necessarily be provided). Thank you, Mark Cohon."

62. On Friday, November 4, 2011, a messenger showed up at GR's front door and delivered Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief filed in the superior court of the state of California for the county of San Francisco in the following case – *Universal Operations Risk Management, LLC, Edward Muhlner, Thomas Bochnowski and Mark Cohon's vs. Global Rescue LLC and DOES 1 through 10, inclusive.* On Tuesday, November 8, 2011, Richards was served with a certified copy of the same by certified mail.

**Cohon, Bochnowski and Muhlner's Violations of their Agreements with GR**

63. After being served with Plaintiffs' First Amended Complaint, Richards instructed GR's Information Technology Department ("IT") and outside computer forensic consultants to perform searches on emails sent or received by the Defendants and to conduct a search on both Bochnowski's and Muhlner's laptops. GR also discovered that removable drives capable of holding vast amounts of electronic data were attached to these computers and that there was significant document activity on the day of and in the days leading up to Bochnowski's and Muhlner's separation from GR. In addition, GR learned that both Blackberry devices were returned without the SD memory cards that had been installed in the devices and Bochnowski's device was returned without any data at all.

64. Although the Cohon Agreement requires that Cohon return his laptop immediately at termination or resignation (which was November 3, 2011) GR did not receive his laptop until December 2, 2011, after multiple requests. Cohon claims the delay in sending GR the laptop resulted from his having daughter spilled a soft drink on it. GR received notification of this spillage in a letter dated November 21, 2011. Strangely, when GR received the bubble wrapped laptop on December 2, 2011, more than two weeks after the reported spillage, the computer appeared to have been drenched in liquid and was still very wet. According to the UPS shipment slip, the computer had been shipped overnight on December 1, 2011. The liquid had a vinegary odor inconsistent with that of a soft drink and evaporated quickly after opening, indicating that the laptop had either been kept wet for a long period of time and/or had been doused after the November 21st notice letter date. Richards opened the computer in the presence of Melissa Roth, who can attest to the amount of liquid that dripped from the machine. GR also took pictures of the wet computer.

65. GR has learned that that Cohon, Bochnowski and Muhlner have been and are currently soliciting GR clients and potential clients on behalf of UnivOps, in violation of paragraph 9 of their respective Agreements.

66. Upon information and belief, Defendants have usurped corporate opportunities away from GR and directed them to their new entity UnivOps.

67. Plaintiffs' First Amended Complaint states that Cohon is the President of UnivOps and Bochnowski and Muhlner are Vice Presidents of UnivOps. In planning this new and competing enterprise while still affiliated with or employed by GR, the three Defendants necessarily solicited each other to leave GR. They have therefore violated the employee non-solicitation provision of their agreements. Upon information and belief, GR reasonably fears that the Defendants may be soliciting other current or former GR employees as well.

68. Defendants' abrupt departures and the current and ongoing investigation into the departures and related activities of the Defendants has caused GR to incur considerable expense and distraction from ongoing operations. GR has devoted substantial employee time to its investigation, as well as more than $5,000 spent on a forensic computer expert.

69. The loss of Bochnowski and Muhlner has caused GR to suffer, and will continue to cause GR to suffer, a loss of revenue.

70. The loss of Bochnowski and Muhlner has caused GR to incur other costs related to filling their vacated positions.

71. As this case has developed, GR has been required to commit additional resources (time, attention, and dollars) to address the substantial issues relating to its potentially stolen data. This process is still underway, and GR continues to incur additional expense in connection

with its investigation of the Defendants' conduct and misappropriation of its trade secrets, confidential and proprietary information.

**UnivOps Competes With GR**

72. Plaintiffs' First Amended Complaint alleges that "UnivOps is a limited liability company that manages client insurance, benefits and risk services, and provides expert consultative services for three main captive and risk pooling services: group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling."

73. The services that UnivOps offers are in direct competition with the services that GR, through GRRS, offers its clients, in violation of Paragraph 8 of the Defendants' agreements.

74. Upon information and belief, UnivOps offers services that are virtually identical to services offered by GR that were offered by Bochnowski, Muhlner and Cohon on behalf of GR. The allegations in the California action concerning UnivOps indicate that the company is competing with GR. Indeed, based on a review of the California declaratory judgment action, it does appear that UnivOps offers services that are virtually identical to services offered by GR.

## CLAIMS

### COUNT I
### Breach of Contract
### (Against All Defendants)

75. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 74 above.

76. All three Agreements attached to this Complaint contain restrictive covenants.

77. The restrictive covenants are intended and necessary to protect GR's legitimate business interests in its goodwill and confidential information.

78. The restrictive covenants are reasonably drawn in time and geographic scope to protect these interests.

79. The three Agreements are a valid and enforceable contract between GR and each Defendant.

80. The Defendants, by their conduct in conspiring to form a competing business while still employed by or affiliated with GR have breached their noncompete obligations.

81. The Defendants, by their conduct in conspiring to leave GR to form a competing business have breached their nonsolicitation obligations.

82. Upon information and belief, the Defendants continue to wrongfully retain GR's confidential data and other documents and company property, and they have copied some or all of the electronic data onto other computers or devices in violation of their nondisclosure obligations.

83. Upon information and belief, the Defendants have wrongfully utilized or disclosed, or at a minimum will inevitably utilize or disclose, GR's confidential information in the course of their employment by UnivOps.

84. As a result of the Defendants' breaches of the restrictive covenants, GR has sustained and stands to suffer irreparable injury. GR has no adequate remedy at law since the damages it suffered, and will continue to suffer, in connection with the divulgence of confidential information, by the loss of competitive advantage, goodwill, customers, and revenue is incalculable and irreparable.

85. Accordingly, a permanent injunction compelling the Defendants' specific performance with the restrictive covenants contained in their respective agreements is the only remedy that will afford GR meaningful and immediate relief.

86. As a result of the Defendants' breach of their contractual obligations, GR has suffered, and will continue to suffer, substantial damages, to be determined by a jury.

**COUNT II**
**Breach Of The Implied Covenant Of Good Faith And Fair Dealing**
**(Against All Defendants)**

87. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 86 above.

88. Defendants, through their actions set forth above, including the data theft, wrongful retention of data, secretly forming a competing business while still affiliated with GR, and blatantly soliciting the joint extraction of each other, utilizing misrepresentation to extort a bonus and higher title out of GR, have breached the implied covenant of good faith and fair dealing that is implied into their agreements with GR, as a result of which GR has been and will continue to be significantly harmed.

89. Defendants are liable to GR for all damages GR sustained as a result of their breach of the implied covenant of good faith and fair dealing.

**COUNT III**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

90. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 89 above.

91. Bochnowski's and Muhlner's positions at GR created a confidential relationship between GR and them. Likewise, Cohon's consultancy relationship with GR created a confidential relationship between GR and him.

92. In their respective positions, the Defendants had the confidence of GR, were agents of GR, and were bound to act in good faith, and in the interests of GR.

93. Defendants, through their actions set forth above, including the data theft, wrongful retention of data, secretly forming a competing business while still affiliated with GR, and blatantly soliciting the joint extract of each other, utilizing misrepresentation to extort a

bonus and higher title out of GR, have breached the implied covenant of good faith and fair dealing that is implied into their agreements with GR, as a result of which GR has been and will continue to be significantly harmed.

94. As a result of the Defendants' breach of their fiduciary duty, GR has suffered, and will continue to suffer, substantial damages, to be determined by a jury.

**COUNT IV**
**Breach of Duty of Loyalty**
**(Against All Defendants)**

95. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 94 above.

96. By engaging in the conduct described above, the Defendants have breached the duty of loyalty owed by him to GR.

97. By engaging in the conduct described above, the Defendants have breached their duty to preserve confidential and other proprietary information that they learned while employed at GR.

98. As a result of the Defendants' breach of their duty to preserve confidential and other proprietary information of GR, GR has sustained and stands to suffer irreparable injury. GR has no adequate remedy at law since the damages it suffered, and will continue to suffer, in connection with the divulgence of confidential information, by the loss of competitive advantage, goodwill, customers, and revenue is incalculable and irreparable.

99. Accordingly, GR is entitled to a permanent injunction compelling the Defendants' compliance with their ongoing obligation to preserve confidential and other proprietary information of GR to afford GR meaningful and immediate relief.

100. Defendants' breach has caused and is continuing to cause GR irreparable harm, the continued risk of irreparable harm, and monetary damages.

**COUNT V**
**Misappropriation of Trade Secrets**
**in Violation of Mass. Gen. L. c. 93, §§ 42 and 42A**
**(Against All Defendants)**

101. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 100 above.

102. Defendants, upon information and belief, through the conduct described above and additional conduct which GR expects to uncover through the discovery process, misappropriated, with the intent to convert to their own use, GR's trade secrets and confidential information.

103. Upon information and belief, Defendants has used and/or disclosed GR confidential information.

104. Defendants have no rightful claim of interest in GR's trade secrets and confidential information.

105. GR takes reasonable precautions to preserve its trade secrets and confidential information.

106. The actions of Defendants are causing irreparable harm and/or threaten to cause irreparable harm to GR which is not compensable through money damages.

107. Defendants' actions have damaged GR. Defendants are liable to GR, including double damages.

**COUNT VI**
**Civil Conspiracy**
**(Against All Defendants)**

108. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 107 above.

109. By engaging in the foregoing conduct, including but not limited to the Defendants' secret plan to form a competing business while still employed by or affiliated with GR, and doing so with full knowledge of each other's actions, the Defendants entered into an agreement to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.

110. The Defendants' actions have resulted in actual damages to GR in an amount to be determined at trial.

**COUNT VII**
**Replevin, Mass. Gen. L. ch. 247, § 7**
**(Against All Defendants)**

111. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 110 above.

112. Upon information and belief, the Defendants, both during their employment at and/or their agency relationship with GR and in connection with their departure from GR, unlawfully copied trade secrets and other confidential data from GR's computers.

113. Upon information and belief, the Defendants currently possess numerous confidential documents owned by GR on other data storage devices.

114. GR has a right to immediate possession of such property, the value of which exceeds the statutory minimum ($20.00).

115. The Defendants' continued possession of GR's confidential property is wrongful, and they should be compelled to return it immediately.

**COUNT VIII**
**Computer Fraud and Abuse Act**
**(Against Bochnowski and Muhlner[1])**

116. GR realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 115 above.

117. 18 U.S.C. § 1030(a)(2)(C) of the Computer Fraud and Abuse Act prohibits the intentional accessing of a protected computer and obtaining information without authorization.

118. Bochnowski's and Muhlner's authorization to have access to GR's computers ended when they began acting for the benefit of, and/or as agent of, their new and/or future employer.

119. Bochnowski's and Muhlner's authorization to have access to GR's computers ended when, without the knowledge of GR, they acquired interests adverse to GR.

120. Bochnowski's and Muhlner's authorization to have access to GR's computers ended when, without the knowledge of GR, they breached their fiduciary duty and duty of loyalty to GR and breached their contracts (described above) with GR.

121. Bochnowski and Muhlner acted without authorization and/or exceeded their authorized access to GR's computers within the meaning of 18 U.S.C. § 1030(c) when, acting for the benefit of themselves and/or UnivOps, with interests adverse to GR and/or in breach of their duty of loyalty to GR and their contractual obligations, they obtained information in their computers and, upon information and belief, removed said information from GR's premises that they were not entitled to obtain and remove.

---

[1] *N.B.* – At the time of filing this complaint, GR's analysis of the liquid soaked laptop of Cohon had not been completed. Upon information and belief, GR expects to find that Cohon's laptop contains similar evidence found on the laptops of Bochnowski and Muhlner concerning the improper use of portable storage devices. GR will likely amend this count after its analysis of the Cohon laptop is complete.

122. As a result of Bochnowski's and Muhlner's misconduct, GR has been damaged by an amount in excess of $5,000 to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, GR respectfully requests that the Court grant the following relief:

1. injunctive relief;
2. judgment on Counts I through VIII;
3. damages in an amount to be determined at trial;
4. double damages;
5. costs, reasonable attorneys' fees, and interest; and
6. such other relief as the Court deems just and proper.

**JURY DEMAND**

GR hereby demands a trial by jury on all claims raised in its Complaint that are so triable.

Respectfully submitted,

**GLOBAL RESCUE LLC**

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA02109
Phone (617) 523-6666
Fax (720) 293-9696

Dated: December 9, 2011

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| PLAINTIFF(S)<br>Global Rescue LLC | | DEFENDANT(S)<br>Edward Muhlner, Thomas Bochnowski and Mark Cohon |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>Mark M. Whitney, Morgan, Brown & Joy, LLP, 200 State Street, 11th Fl. Boston, MA 02109 - 617-523-6666 | | ATTORNEY (if known)<br>Todd R. Wulffson, Greenberg Traurig,LLP, 3161 Michelson Dr., Ste. 1000, Irvine,CA 92612 949-732-6500 |

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * BD3
Restrictive Covenants (B) (X)Yes ( ) No

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this action against Defendants Muhlner and Bochnowski – two of its former senior executives – and Defendant Cohon – its former high-level consultant – for violating the post employment restrictive covenants owed under three agreements between Plaintiff and each of the Defendants and for wrongful conduct engaged in by the Defendants both before and after the termination of their relationship with Plaintiff. Plaintiff asserts claims of breach of contract, misappropriation of trade secrets and breach of fiduciary duties, among others.

This case belongs in the BLS because it involves claims concerning employment agreements, confidential, proprietary and trade secret information, restrictive covenants, fiduciary duties, business torts and other complex issues.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record [signature]
DATE: 12/5/11

# Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. 11-4502
(AFFIX FILING STAMP HERE)

Global Rescue LLC, Plaintiff(s)

v.

Edward Muhlner ET AL, Defendant(s)

## SUMMONS AND RESTRAINING ORDER

To the above-named Defendant: Edward Muhlner, Thomas Bochnowski & Mark Cohon

You are hereby summoned and required to serve upon Morgan Brown & Joy LLP, plaintiff's attorney, whose address is 200 State St Boston, MA. 02109, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You also are required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim that you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Boston in courtroom 1008 of said court on Tuesday the 20th day of December A.D. ~~200~~2011 at Two o'clock ~~A.M.~~ PM, at which you may appear and show cause why such application should not be granted.

In the meantime, until such hearing, WE COMMAND YOU, said Defendant and your agents, attorneys and counsellors, and each and every one of them, to desist and refrain from

*See Attached Order*

Witness, Barbara J. Rouse, Esquire, at Boston, the Ninth day of December, in the year of our Lord two thousand and Eleven.

Assistant Clerk.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ______________________, 200___, I served a copy of the within summons and restraining orders, together with a copy of the complaint in this action, upon the within named defendant, in the following manner (See Mass. R. Civ. P. 4(d)(1-5):

_______________________________________________

_______________________________________________

_______________________________________________

Dated: ________________, 200___.

N.B. **TO PROCESS SERVER:**
PLEASE PLACE **DATE** YOU MAKE SERVICE ON DEFENDANT IN
THIS BOX **ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

| |
|---|
| , 200 . |

In the meantime, until such hearing, WE COMMAND YOU, said Defendant and your agents, attorneys and counsellors, and each and every one of them, to desist and refrain from

*See Attached Order*

Witness, Barbara J. Rouse, Esquire, at Boston, the Ninth day of December, in the year of our Lord two thousand and Eleven.

Assistant Clerk.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT DEPARTMENT

GLOBAL RESCUE LLC,

Plaintiff,

v.

EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,

Defendants.

CIVIL ACTION NO. 11-4502 G

## TEMPORARY RESTRAINING ORDER

Upon consideration of the plaintiff's *ex parte* motion for a temporary restraining order, the Court enters the following Order:

1. Defendants Edward Muhlner ("Muhlner"), Thomas Bochnowski ("Bochnowski"), and Mark Cohon ("Cohon") (collectively, the "Defendants") are hereby enjoined from prosecuting a separate suit in any other court, including but not limited to the state and federal courts of California, that arises from or involves the same nucleus of facts, controversy and/or issues raised in the instant suit or that would otherwise interfere with this action.

2. Defendants are hereby enjoined from obtaining relief in any other court [except a federal court in Ma Court] that would stay, limit or restrain this Court or restrict plaintiff from prosecuting its claims in this action.

3. This Order shall remain in force until it is revisited at the hearing on Plaintiff's motion for a preliminary injunction, at which time it ~~may be entered as a permanent order.~~ will be reviewed. (EMF)

4. This Order shall apply in all respects to Defendants, as well as to their attorneys, agents or any other individual or entity within their control.

SO ORDERED this 9th day of December, 2011.

Hon.
Justice of the Superior Court

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.** **SUPERIOR COURT DEPARTMENT**

| | |
|---|---|
| GLOBAL RESCUE LLC,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,<br><br>Defendants. | CIVIL ACTION NO. ______________ |

**MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER**

In accordance with the provisions of Mass. R. Civ. P. 4(c), Plaintiff Global Rescue LLC ("GR") hereby moves that this Court appoint Beacon Hill Research, Inc. ("Beacon Hill Research"), located at 2 Park Plaza, Suite 409, Boston, Massachusetts, as special process server in the above-entitled action.

The undersigned swears that, to the best of their knowledge and belief, the persons employed by Beacon Hill Research are experienced in the service of process, are 18 years of age or older, and are not parties to the action.

Respectfully submitted,

**GLOBAL RESCUE LLC**

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
Phone (617) 523-6666
Fax (720) 293-9696

Dated: December 9, 2011

**CERTIFICATE OF SERVICE**

I, Christopher S. Feudo, hereby certify that a true and accurate copy of the above document was served by Federal Express with a courtesy copy sent via e-mail to wulffsont@gtlaw.com on this 9th day of December upon the following:

Todd R. Wulffson
GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612

Christopher S. Feudo

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT

GLOBAL RESCUE LLC,

Plaintiff,

v.

EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,

Defendants.

11 4502 G

CIVIL ACTION NO. ______

allowed, Fahey, J. 12/9/11
attest: Russell V Mercuro Jr
asst clk

# MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

In accordance with the provisions of Mass. R. Civ. P. 4(c), Plaintiff Global Rescue LLC ("GR") hereby moves that this Court appoint Beacon Hill Research, Inc. ("Beacon Hill Research"), located at 2 Park Plaza, Suite 409, Boston, Massachusetts, as special process server in the above-entitled action.

The undersigned swears that, to the best of their knowledge and belief, the persons employed by Beacon Hill Research are experienced in the service of process, are 18 years of age or older, and are not parties to the action.

Respectfully submitted,

GLOBAL RESCUE LLC

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
Phone (617) 523-6666
Fax (720) 293-9696

Dated: December 9, 2011

## CERTIFICATE OF SERVICE

I, Christopher S. Feudo, hereby certify that a true and accurate copy of the above document was served by Federal Express with a courtesy copy sent via e-mail to wulffsont@gtlaw.com on this 9th day of December upon the following:

Todd R. Wulffson
GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612

Christopher S. Feudo

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, ss. SUPERIOR COURT DEPARTMENT

GLOBAL RESCUE LLC,

Plaintiff,

v.

EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,

Defendants.

CIVIL ACTION NO. ______________

**EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiff, Global Rescue LLC ("GR"), hereby moves *ex parte* pursuant to Mass. R. Civ. P. 65 for a temporary restraining order ("TRO") enjoining defendants Edward Muhlner ("Muhlner") and Thomas Bochnowski ("Bochnowski"), former GR senior executives who recently resigned in a highly suspicious manner and began working for a competing company, and Mark Cohon ("Cohon"), a former consultant for GR who similarly resigned and is now providing services to the same competing company (collectively, the "Defendants"), from prosecuting a separate suit in any other court arising from or involving the same nucleus of facts, controversy and/or issues raised in the instant suit or that would otherwise interfere with this action.

As set forth more fully in the accompanying Memorandum of Law in Support of the instant motion, as well as in the Complaint and Affidavits of Daniel L. Richards and Mark G. Spencer, a TRO is necessary to avoid irreparable harm to GR and the unnecessary compounding

and complication of this matter and to prevent the Defendants from further profiting from their unscrupulous conduct and vexatious litigation.

Due to the nature of the relief requested, Global Rescue respectfully submits that no security is necessary.

Respectfully submitted,

**GLOBAL RESCUE LLC**

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
Phone (617) 523-6666
Fax (720) 293-9696

Dated: December 9, 2011

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, ss. SUPERIOR COURT DEPARTMENT

GLOBAL RESCUE LLC,

Plaintiff,

v.

EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,

Defendants.

CIVIL ACTION NO. ______________

**TEMPORARY RESTRAINING ORDER**

Upon consideration of the plaintiff's *ex parte* motion for a temporary restraining order, the Court enters the following Order:

1. Defendants Edward Muhlner ("Muhlner"), Thomas Bochnowski ("Bochnowski"), and Mark Cohon ("Cohon") (collectively, the "Defendants") are hereby enjoined from prosecuting a separate suit in any other court, including but not limited to the state and federal courts of California, that arises from or involves the same nucleus of facts, controversy and/or issues raised in the instant suit or that would otherwise interfere with this action.
2. Defendants are hereby enjoined from obtaining relief in any other court that would stay, limit or restrain this Court or restrict plaintiff from prosecuting its claims in this action.

3. This Order shall remain in force until it is revisited at the hearing on Plaintiff's motion for a preliminary injunction, at which time it may be entered as a permanent order.

4. This Order shall apply in all respects to Defendants, as well as to their attorneys, agents or any other individual or entity within their control.

SO ORDERED this _____ day of December, 2011.

______________________________

Hon.
Justice of the Superior Court

Order Per Consent to Jurisdiction clauses in Bochnowski's Employee Obligations Agreement, in Cohon's Consultant Agreement and in Muhlner's Employee Obligations Agreement, this motion is allowed. See TRO

12/9/11 3:45pm

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT DEPARTMENT

| | |
|---|---|
| GLOBAL RESCUE LLC,<br>Plaintiff,<br>v.<br>EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,<br>Defendants. | 11-4502 G<br>CIVIL ACTION NO. ____<br>2011 DEC -9 PM 3:05<br>MICHAEL J... CLERK/MAGISTRATE |

## EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff, Global Rescue LLC ("GR"), hereby moves *ex parte* pursuant to Mass. R. Civ. P. 65 for a temporary restraining order ("TRO") enjoining defendants Edward Muhlner ("Muhlner") and Thomas Bochnowski ("Bochnowski"), former GR senior executives who recently resigned in a highly suspicious manner and began working for a competing company, and Mark Cohon ("Cohon"), a former consultant for GR who similarly resigned and is now providing services to the same competing company (collectively, the "Defendants"), from prosecuting a separate suit in any other court arising from or involving the same nucleus of facts, controversy and/or issues raised in the instant suit or that would otherwise interfere with this action.

As set forth more fully in the accompanying Memorandum of Law in Support of the instant motion, as well as in the Complaint and Affidavits of Daniel L. Richards and Mark G. Spencer, a TRO is necessary to avoid irreparable harm to GR and the unnecessary compounding

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT DEPARTMENT

GLOBAL RESCUE LLC,

Plaintiff,

v.

EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,

Defendants.

CIVIL ACTION NO. ______________

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiff Global Rescue LLC ("GR") submits this memorandum in support of its ex parte motion for a temporary restraining order ("Motion"). By this motion, GR seeks to enjoin the three individual defendants, Edward Muhlner and Thomas Bochnowski ("Muhlner" and "Bochnowski"), former senior executives who recently resigned in a highly suspicious manner and began working for a competing company, and Mark Cohon ("Cohon"), a former consultant for GR who similarly resigned and is now providing services to the same competing company (collectively, the "Defendants"), from prosecuting a separate suit in any other court arising from or involving the same nucleus of facts, controversy and/or issues raised in the instant suit or that would otherwise interfere with this action. As detailed herein, a TRO is necessary to avoid: irreparably harming GR; unnecessarily compounding and complicating the resolution of this matter; and rewarding Defendants for their unscrupulous conduct and vexatious litigation.

## I. RELEVANT FACTS

Plaintiff respectfully submits that an exhaustive recitation of the facts at issue in the instant litigation is unnecessary for purposes of the Court's analysis of this Motion. However, should the Court wish to consider the factual allegations at issue in the underlying litigation, Plaintiff respectfully refers the Court to Plaintiff's Complaint, Motion for Preliminary Injunction and memorandum in support thereof, Affidavit of Daniel L. Richards ("Richards Aff.") and Affidavit of Mark G. Spencer ("Spencer Aff."), filed contemporaneously herewith.

Bochnowski and Muhlner are former GR employees. (*See* Richards Aff., ¶¶ 6-7, 27, 30). Cohon is a former GR consultant. (*See id.*, ¶¶ 8-9, 38). Each Defendant signed an agreement with GR containing restrictive covenants. (*Id.*, ¶¶ 6-7, 9, 41-42, 45, 49). Specifically, those agreements restrict the Defendants from commencing any action, suit or proceeding arising out of or related to the agreements in any other forum other than the state or federal courts of Massachusetts. (*See id.*, ¶¶ 6-7, 9 and Exs. B, D and E) (governing law; consent to jurisdiction)).

On July 24, 2011, after months of discussions with GR CEO Dan Richards ("Richards") regarding potential promotions to Vice President positions during which Bochnowski and Muhlner affirmed their commitments to working for GR and continuing to reside in the Boston area, Richards promoted them both to Vice President. (*Id.*, ¶¶ 22-25). The promotions came with substantial salary increases and $20,000 mid-year bonusus that were deposited in their individual bank accounts on July 29, 2011. (*Id.*, ¶¶ 24, 26). Bochnowski and Muhlner abruptly resigned the business day following the $20,000 bonuses hitting their bank accounts and 8 days after their promotions to Vice President. (*Id.*, ¶¶ 24-27). In an incredible reversal of their supposed long-term commitment to GR, Bochnowski and Muhlner gave only two weeks' notice and refused to negotiate in good faith over the terms of a transition agreement, which would have aided GR in

maintaining employee morale and client confidence in the wake of Bochnowski and Muhlner's departure. (*Id.*, ¶¶ 27-29). Notably, at no point did ether Bochnowski or Muhlner disclose their intentions to operate a business in competition with GR along with GR's then-consultant Cohon. (*See id.*, ¶¶ 27-30, 35).

Months later, on October 30, 2011, Cohon erroneously sent an email to Bochnowski's's former GR email address (which was captured by GR's server), disclosing that the Defendants had started a business together. (*See id.*, ¶ 35). On October 31, 2011, no doubt realizing the potential ramifications of Cohon's inadvertent disclosure, and less than 24 hours from the inadvertent email, Defendants filed a declaratory judgment action, unbeknownst to GR and Richards, in California state court attempting to invalidate their respective restrictive covenants with GR. (*See id.*, ¶¶ 36-37, 40).

On November 2, 2011, Cohon and Richards had a phone conversation during which Richards questioned Cohon, *who was still a GR consultant*, about his apparent new business venture with GR's two former employees. (*Id.*, ¶ 37). Cohon was less than candid to put it mildly. (*See id.*) The following day, Cohon terminated his consultancy. (*Id.*, ¶ 38). One day later, November 4, 2011, GR received a copy of the First Amended Complaint in the California action. (*Id.*, ¶ 39).

Since that time, GR has had the opportunity to engage in analysis of Defendants' communications in the months prior to Bochnowski and Muhlner's departure. (*See id.*, ¶ 46). Plaintiff submits that, upon information and belief, their new company called "UnivOps" competes directly with GR, Defendants are soliciting GR customers (and have been doing so since before leaving GR) and that Defendants are exploiting GR's confidential and proprietary

business information that they have wrongfully taken and withheld. (*See id.*, ¶ 43-44, 46-48, 50-53).

## II. ARGUMENT

Defendants' California action is a transparent effort to escape their contractual obligations. Each signed a contract with restrictive covenants that contains a Massachusetts choice-of-law and Massachusetts venue provision. This action belongs in Massachusetts – where the Defendants worked and lived, where they planned to compete with GR and where they acquired the GR knowledge and information that they are now using to run a competing business in flagrant violation of their contracts.

### A. Granting The TRO Will Prevent A Manifest Wrong And Ensure That The Proper Law Is Applied

"As an exercise of judicial discretion, a court may restrain a party from prosecuting a suit in another state where it is required to prevent a manifest wrong and injustice, or to ensure proper application of the laws that should govern the right of the parties." *Comverse Network Sys. v. Computel Computadores e Telecommunicacoes, S.A.*, 9 Mass. L. Rptr. 12, 1998 WL 448910, at *5 (Mass. Super. Ct. July 13, 1998) (citing *Carson v. Dunham*, 149 Mass. 52, 53 (1889) and *Lydia Pinkham Medicine Co. v. Gove*, 298 Mass. 53, 66 (1937)). In *Comverse Network Systems*, the court refused to allow a defendant to circumvent its Massachusetts contractual obligation to participate in arbitration by preventing the defendant from commencing a legal action in Brazil that related to the subject matter of the Massachusetts action. *Comverse Network Systems*, 1998 WL 448910, at *5. Accord *Medtronic, Inc. v. Advanced Bionics Corporation*, 630 N.W.2d 438 (Minn. App. 2001) (in a virtually identical situation, the Minnesota Appeals Court upheld the issuance of an injunction enjoining parties from seeking relief in a California action over the

enforcement of a non-compete agreement based on the same controversy that would interfere with the Minnesota action).

This Court has previously awarded precisely the relief sought in this ex parte motion. In *LocatePlus Holdings Corp. v. Steve Silva*, C.A. No. 04-3278 (BLS), *slip op.*, the court was presented with a very similar situation. In *LocatePlus*, the defendant former employee scurried out of Massachusetts, where he previously worked, to Georgia for a new job at a competitor. LocatePlus filed suit in Massachusetts and Silva filed a declaratory judgment action in Georgia state court, seeking refuge under the then-extremely hostile Georgia public policy against out-of-state noncompete agreements. LocatePlus filed the same type of motion that is before the Court today, seeking an order to enjoin Silva from prosecuting a separate suit outside of Massachusetts. The BLS judge at the time, Hon. John Crastley, relied upon the *Comverse Network Sys.* and *Medtronic* cases and issued a TRO *ex parte* to force Silva to litigate the case in the place that had the strongest connection to the facts – Massachusetts. (A copy of the TRO issued is attached as Exhibit A.)

Defendants' Agreements relate to their employment at or consultancy relationship with a *Massachusetts*-based company. At all relevant times Bochnowski and Muhlner lived and/or worked in *Massachusetts* and their employment, as explicitly stated in their signed offer letters, was contingent on them relocating to Massachusetts. At all relevant times, Cohon lived in Connecticut and worked in Massachusetts and elsewhere on behalf of GR. The Agreements each contain a choice-of-law provision and a forum-selection clause that explicitly state that any disputes arising under the Agreement must be resolved in *Massachusetts*, under *Massachusetts* law. California is irrelevant to this matter, but for Defendants' knowledge that California prohibits most noncompete agreements – and Defendants no-doubt are hoping that California

offers them a safe harbor for their illicit competition with GR. Plaintiff's Motion seeks only to require Defendants to abide by the explicit terms of their contracts until this matter can be revisited at a hearing on GR's preliminary injunction motion. This would prevent the injustice that Defendants are seeking to inflict upon GR and ensure that Massachusetts law is applied to this Massachusetts dispute.

The Agreements signed by Bochnowski, Cohon, and Muhlner specifically state that the parties agree not to commence any action, suit, or proceeding arising out of or relating to the Agreement except in the state or federal courts of Massachusetts. And yet Defendants ignore these explicit provisions and filed in California. In essence, much like the Von Trapp family's escape to Switzerland, Defendants have absconded to California in a highly dubious manner and are now attempting to hide behind Cal. Bus. & Prof. §16,600, which prohibits most noncompetes in California. This course of action would enable the Defendants to circumvent their contractual obligations to abide by reasonable and enforceable restrictive covenants entered into under Massachusetts law.

**B. <u>Defendants' Winning The Race To The Courthouse Is Inapposite</u>**

As an initial matter, Defendants' filing first in California by no means legitimizes their choice of forum. Bochnowski, Cohon, and Muhlner tried to avoid their contractual obligations to litigate in Massachusetts, which clearly is the most appropriate forum to hear this action, by filing a declaratory judgment in California mere hours after the errant email which inadvertently disclosed their transgressions to GR. Under these circumstances, winning the "race to the courthouse" is neither controlling nor dispositive. In similar situations, Massachusetts courts have been "unwilling to reward a party 'merely for winning a race to the courthouse' and frown upon 'procedural gamesmanship' aimed at subjecting an unwitting opponent to an unfavorable

forum." *Storagenetworks, Inc. v. Metromedia Fiber Network Service, Inc.*, 13 Mass. L. Rptr. 640, 2001 WL 1334881, at *2 (Mass. Super. Ct. Aug. 13, 2001).

The situation surrounding the Defendants' filing of the declaratory judgment is extremely suspect, coming as it did on the heels of a misaddressed email. Although the Defendants were the first to file, it is only because GR had no knowledge of any violation of the Agreement until being provided with a copy of the case commencement papers just five days after the declaratory judgment was filed. Massachusetts does not condone the type of game playing in which Defendants have engaged. For example, in *Ethicon Endo-Surgery v. Pemberton*, 27 Mass. L. Rptr. 541, 2010 WL 5071848 (Mass. Super. Ct. Oct. 27, 2010), the defendant employee did not inform his employer that he had accepted a position at another company in violation of his noncompete agreement, until his last day of work. *Ethicon Endo-Surgery*, 2010 WL 5071848, at *3. On the very same day, the defendant and his new employer served their California complaint for declaratory judgment on his former employer. *Id.* The court ruled that "the first-filed rule is a presumption, and it is 'not unrebuttable.'" *Id.* Further explaining that while it was true the Defendants' complaint was filed before plaintiff's, they "were able to file first, however, because [defendant] did not inform [plaintiff] of his employment with [defendant company] until after [they] filed suit…[and] it cannot condone [defendant's] behavior by dismissing [plaintiff's] action under the first-filed rule." *Id.* at *4. Moreover, the Court noted that "[t]he Defendants' actions cannot even be compared to a race to the courthouse, since they failed to even notify [plaintiff] that there was a race until they had already crossed the finish line and hoisted the trophy." *Id.* at *4 n.3.

In the present action, Cohon mistakenly sent an email to Bochnowski's old GR account on Sunday, October 30, 2011. The following day, less than 24-hours after the email, Defendants

sought a declaratory judgment in California. Defendants did not serve Plaintiff or in any way alert Plaintiff to the lawsuit until they filed an amended complaint five days later. Based on *Ethicon Endo-Surgery*, it is clear that Defendants should not be rewarded for their actions in deceiving Plaintiff and then failing to inform Plaintiff of the lawsuit.

### C. <u>Defendants Contractually Agreed To Litigate In Massachusetts</u>

Each of the Agreements signed by Defendants contains a "Governing Law" provision, which specifically states that the parties agree that "[t]he validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts." Massachusetts courts have long allowed these agreements to be upheld. *See Morris v. Watsco, Inc.*, 385 Mass. 672, 674-75 (1982) (giving effect to parties' selection of governing law); *Inner-Tite Corp. v. Brozowski*, 27 Mass. L. Rptr. 204, 2010 WL 3038330, *13 (Mass. Super. Ct. Apr. 14, 2010) (citing *Hodas v. Morin*, 422 Mass. 544, 549-50 (2004)) ("As a general rule, Massachusetts courts will uphold the parties' choice of law as long as the result does not violate public policy.") Here, the Defendants signed the Agreements and worked in Massachusetts and/or worked on behalf of a Massachusetts company for over three years before they resigned and joined UnivOps. Based on these facts, nothing in the agreement relating to the parties' decision to choose Massachusetts law to govern any disputes arising out of a violation of the Agreement, could be considered a violation of public policy.

Further, the Agreements also contain "Consent to Jurisdiction" clauses, also known as "forum selection" clauses. The Massachusetts Supreme Judicial Court has consistently enforced forum selection clauses as long as they are "fair and reasonable." *Cambridge Biotech Corp. v. Pasteur Sanofi Diag.*, 433 Mass. 122 (2000) (citing *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 574-75 (1995)). A forum selection clause will be enforced unless one of the

following factors is present: fraud, undue influence, overweening bargaining power, "or such serious inconvenience in litigating in the selected forum that the defendant is effectively deprived of his day in court." *Renaissance Worldwide Strategy, Inc. v. Bridge Strategy Group, LLC.*, No. 991150, 2000 WL 1298131, *2 (Mass. Super. Ct. March 1, 2000).

In the present action, both Bochnowski and Muhlner signed the Agreement after first promising to move "permanently" to Massachusetts (which they both did). Moreover, Bochnowski signed a second agreement in Boston which superseded the first agreement. They then subsequently lived and worked in Massachusetts for over three years. Cohon spent a significant amount of time in Massachusetts while performing consulting work with GR, and continues to live in Connecticut, a state much closer to Massachusetts than California. Considering all of these factors, the Defendants cannot meet the heavy burden of showing that litigating this case in Massachusetts would be unfair or overly burdensome.

Thus, the Defendants chose to voluntarily, contractually bind themselves to Massachusetts for purposes of litigating issues arising under the Agreements. Because the choice-of-law and forum-selection provisions are consistent with Massachusetts' public policy of enforcing reasonable noncompete agreements, the Court should order the Defendants to cease breaching their Agreements by litigating in California and require Defendants to litigate in Massachusetts.

**D. Defendants Should Not Be Rewarded For Engaging In Blatant Forum Shopping To Avoid Their Massachusetts Legal Obligations**

The Defendants' filing of the California declaratory judgment action constitutes blatant forum shopping, which is a discouraged practice in most jurisdictions, including Massachusetts. *Neiman Marcus Group, Inc. v. D/E Hawaii Joint Venture*, 1 Mass. L. Rptr. 512, 1994 WL 879714, *3 (Mass. Super. Ct. Feb. 15, 1994) (citing *W.R. Grace & Co. v. Hartford Accident &*

*Indemnity Co.*, 407 Mass. 572, 577 (1990)) ("Moreover, courts should try and prevent forum shopping, duplication of effort and inconsistent judgments."). By filing in a forum that bans most noncompete agreements, which is consequently more favorable to their position, the Defendants are overtly, and in a calculated manner, attempting to sidestep their Massachusetts contractual obligations. Defendants, are, in effect, not only ignoring their explicit contractual agreements but are also seeking to deprive GR - the natural plaintiff under the circumstances - from its agreed-upon choice of forum, which as discussed below, is not an accepted practice in Massachusetts.

### E. Judicial Economy And Equity Favor Issuing The TRO

Judicial economy weighs heavily in favor of granting the TRO. Allowing the Defendants to continue prosecuting their California action will certainly inflate the costs to the parties and consume judicial resources. There is no need for either party to expend the resources to have a California court decide a dispute that involves Massachusetts employees, a Massachusetts company, and a contract that is governed by Massachusetts law.

Lastly, it is important for the Court to appreciate that GR is requesting the TRO be issued and made effective from now until GR's motion for a preliminary injunction is heard. At that time, GR will request that the TRO be made permanent (which may or may not be granted). GR has requested a hearing for the preliminary injunction at the Court's earliest convenience, ensuring that no delays in this matter will harm either side.

## III. CONCLUSION

For the reasons set forth above, GR respectfully requests that the Court:

1. Issue a Temporary Restraining Order in the form attached hereto Plaintiff's Ex Parte Motion for Temporary Restraining Order; and

2. Enter any other relief that the Court deems appropriate.

Respectfully submitted,

**GLOBAL RESCUE LLC**

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
Phone (617) 523-6666
Fax (720) 293-9696

Dated: December 9, 2011

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPT. OF THE TRIAL COURT

LOCATEPLUS HOLDINGS CORPORATION,
Plaintiff,

v.

STEVE SILVA,
Defendant.

CIVIL ACTION NO. 04-3278 BLS

## TEMPORARY RESTRAINING ORDER

Upon consideration of the plaintiff's *ex parte* motion for a temporary restraining order, the Court enters the following Order:

1. Defendant Silva is hereby enjoined from prosecuting a separate suit in any other court, including but not limited to the state and federal courts of Georgia, that arises from or involves the same nucleus of facts, controversy and/or issues raised in the instant suit or that would otherwise interfere with this action.
2. Defendant Silva is hereby enjoined from obtaining relief in any other court that would stay, limit or restrain this Court or restrict plaintiff from prosecuting its claims in this action.
3. This Order shall remain in force until it is revisited at the hearing on plaintiff's motion for a preliminary injunction on 8/4/04, 10AM, at which time ~~it may be entered as~~ a ~~permanent order~~. it will be reviewed.

4. This Order shall apply in all respects to defendant Silva, as well as to his attorneys, agents or any other individual or entity within his control.

SO ORDERED this 29th day of July, 2004.

Hon. John C. Cratsley
Justice of the Superior Court

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, ss. SUPERIOR COURT DEPARTMENT

GLOBAL RESCUE LLC,

Plaintiff,

v.

EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,

Defendants.

CIVIL ACTION NO. _______________

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Mass. R. Civ. P. 65, Plaintiff Global Rescue LLC ("GR"), by its attorneys, hereby moves for a preliminary injunction enjoining Defendants Thomas Bochnowski ("Bochnowski"), Mark Cohon ("Cohon") and Edward Muhlner ("Muhlner") (collectively, the "Defendants") from engaging in activities that violate the post-employment restrictive covenants owed under three agreements: (1) an Employee Obligations Agreement between GR and Muhlner; (2) an Employee Obligations Agreement between GR and Bochnowski; and (3) a Consultant Agreement between GR and Cohon (collectively, the "Agreements"). The pertinent portions of each of the Agreements contain a 2-year noncompete provision, 2-year nonsolicitation of customers and employees provisions, a nondisclosure of confidential information provision, and a provision that expressly compels them to litigate any disputes arising from the Agreements in Massachusetts.

Bochnowski and Muhlner worked for GR from 2008 until August 2011. Bochnowski

was in charge of GR's sales, while Muhlner oversaw GR's operations. Cohon worked as a consultant for GR from March 2010 until November 2011. During their respective tenures at GR, each of the Defendants had virtually unfettered access to GR's confidential information and had substantial involvement in and exposure to key client relationships that GR spent years developing. In particular, the Defendants had exposure to and were involved in the development of new business ventures and risk management-related product lines in which GR invested significant time and resources. Cohon, in particular, was retained specifically by GR's CEO to work on the development of unique risk management products and services.

As explained in GR's Memorandum of Law, supporting documents, as well as the Complaint, the Defendants engaged in a coordinated effort to leave GR together to form Universal Operations Risk Management, LLC ("UnivOps"), an entity that directly competes with GR, in violation of at least the noncompete, nonsolicitation, and nondisclosure provisions of the Agreements. GR's preliminary investigation, which is ongoing, revealed that the Defendants have arranged for at least one of GR's customers to place some of its risk management business to UnivOps. As part of their plan to use GR's proprietary risk management services business model and other proprietary information for their own advantage, the Defendants filed an anticipatory lawsuit in California state court attempting to invalidate their Agreements within hours after GR first learned that the Defendants had apparently formed a business together– in a blatant effort to shop for a potentially more advantageous forum and in direct violation of their agreement to litigate only in Massachusetts.

In addition, GR's investigation into the Defendants' computer usage prior to their exit indicates that they attached several portable data storage devices to their computers during the days and weeks prior to their exit and they returned their Blackberry devices without any data on

them and without the SD memory cards that had been installed in the devices. Moreover, one of the individual Defendant's laptop computer was returned to GR, soaking wet with an unknown liquid, 30 days after his resignation. GR is extremely concerned about the data that may reside on the various portable devices that the Defendants used as well as the SD cards that are missing.

If the Defendants are not prohibited from engaging in deliberately destructive conduct, GR's goodwill will be greatly impaired and its confidential information so compromised, that it will suffer substantial and irreparable harm. Accordingly, GR respectfully requests that this Court order the Defendants to honor their nonsolicitation and nondisclosure obligations, their obligation to return all of GR's data from any computer or device to which they attached their data storage devices, and their obligation not to be employed by any company, organization or entity that sells competing services for a period of two years. GR also requests that the Court order the Defendants to present all computers or data storage devices indentified in the Affidavit of Mark G. Spencer, including the SD memory cards missing from their returned Blackberry devices, so that GR may verify the Defendant's compliance with their obligation to return all of GR's confidential information. GR further requests that this Court order the Defendants to honor the provision in their Agreements which compels them to litigate any disputes arising from the Agreements in Massachusetts (and not in California).

The grounds for this motion are more fully described in the accompanying Memorandum of Law in support of the instant motion, as well as in the Complaint and its exhibits, and the affidavits of Daniel Richards and Mark Spencer.

Respectfully submitted,

**GLOBAL RESCUE LLC**

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
Phone (617) 523-6666
Fax (720) 293-9696

Dated: December 9, 2011

**CERTIFICATE OF SERVICE**

I, Christopher S. Feudo, hereby certify that a true and accurate copy of the above document was served by Federal Express with a courtesy copy sent via e-mail to wulffsont@gtlaw.com on this 9th day of December upon the following:

Todd R. Wulffson
GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612

Christopher S. Feudo

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.** **SUPERIOR COURT DEPARTMENT**

GLOBAL RESCUE LLC,

Plaintiff,

v.

UNIVERSAL OPERATIONS RISK MANAGEMENT, LLC, THOMAS BOCHNOWSKI, MARK COHON and EDWARD MUHLNER,

Defendants.

CIVIL ACTION NO. _______________

**ORDER**

This matter came before the Court upon Plaintiff Global Rescue LLC's ("GR") Motion for a Preliminary Injunction. Upon consideration of the Motion and its supporting papers, as well as the Complaint, this Court hereby ORDERS:

(1) That Defendants Mark Cohon ("Cohon"), Thomas Bochnowski ("Bochnowski") and Edward Muhlner ("Muhlner") be restrained and enjoined from being employed by or affiliated with Universal Operations Risk Management, LLC ("UnivOps") for at least the period of two years from the termination of their employment and/or consulting relationship with GR;

(2) That Defendants Cohon, Bochnowski and Muhlner be restrained and enjoined from being employed by or affiliated with any entity that competes with GR for at least the period of two years from the termination of their employment and/or consulting relationship with GR;

(3) That Defendants Bochnowski and Muhlner be restrained and enjoined from (a) soliciting the business or patronage of any of GR's Customers, (b) diverting, enticing or otherwise taking away the business or patronage of any Customer or prospective customer from GR or attempting to do so, (c) soliciting or inducing any of GR's Customers, prospective customers, suppliers, prospective suppliers,

prospective vendors or vendors to terminate or reduce their relationship with GR, (d) providing or assisting with the provision of Services to a Customer of GR, or (e) referring a Customer or supplier to another provider of Services, as the terms "Services" and "Customer" are defined in their respective Employee Obligations Agreements with GR, for a period of two years from the termination of their employment relationship with GR;

(4) That Defendant Cohon be restrained and enjoined from (a) soliciting the business or patronage of any of GR's Customers, (b) diverting, enticing or otherwise taking away the business or patronage of any Customer or prospective customer from GR or attempting to do so, (c) soliciting or inducing any of GR's Customers, prospective customers, suppliers, prospective suppliers, prospective vendors or vendors to terminate or reduce their relationship with GR, (d) providing or assisting with the provision of Services to a Customer of GR, or (e) referring a Customer or supplier to another provider of Services, as the terms "Services" and "Customer" are defined in his Consulting Agreement with GR, for a period of two years from the termination of his consulting relationship with GR;

(5) That Defendants Cohon be restrained and enjoined from (a) hiring or employing, directly or indirectly through any enterprise with which they are associated, any current employee or consultant of GR or any individual who had been employed by or served as a consultant to GR within one year of the termination of his consulting agreement with GR and (b) recruiting, soliciting or inducing, or assisting another person or enterprise in recruiting, soliciting, or inducing, any employee, prospective employee, consultant or prospective consultant of GR to terminate his or her employment or other relationship with GR or provide services to any entity other than GR;

(6) That, Defendants Bochnowski and Muhlner be restrained and enjoined from (a) hiring or employing, directly or indirectly through any enterprise with which they are associated, any current employee or consultant of GR or any individual who had been employed by or served as a consultant to GR within one year of the termination of their employment relationship with GR and (b) recruiting, soliciting or inducing, or assisting another person or enterprise in recruiting, soliciting, or inducing, any employee, prospective employee, consultant or prospective consultant of GR to terminate his or her employment or other relationship with GR or provide services to any entity other than GR;

(7) That Defendants Bochnowski and Muhlner be restrained and enjoined from violating the nondisclosure provisions of their respective Employee Obligations Agreements with GR;

(8) That Defendants Cohon be restrained and enjoined from violating the nondisclosure provisions of his Consulting Agreement with GR;

(9) That Defendants Bochnowski and Muhlner be restrained and enjoined from utilizing or disclosing any Confidential Information, as that term is defined in

their respective Employee Obligations Agreements with GR;

(10) That Defendant Cohon be restrained and enjoined from utilizing or disclosing any Confidential Information, as that term is defined in his Consulting Agreement with GR;

(11) That Defendants Cohon, Bochnowski and Muhlner be restrained and enjoined from destroying, deleting, altering, and/or permitting to be destroyed, deleted, or altered, all GR data, property, and information currently in their possession, custody or control, in hard copy or electronic form. Each Defendant must maintain and preserve all GR data, property, and information, in hard copy or electronic form. For purposes of this Order, documents, data, or information maintained in electronic form includes, but is not limited to, emails (include business or webmail accounts, such as Gmail, Hotmail or Yahoo, etc.), databases, electronic files, data generated by or stored on each Defendant's computer system(s) and/or storage media (e.g.., hard drives, memory sticks and cards, flash and zip drives, floppy disks, CDs and DVDs tapes), word processing documents, spreadsheets, calendars, telephone logs, contact manager information, internet usage files;

(12) That Defendants Cohon, Bochnowski and Muhlner shall be compelled to return all GR data, property, and information currently in their possession, custody or control. In order to provide verification of compliance with this requirement, Defendants Cohon, Bochnowski and Muhlner shall present to GR's computer forensic expert within two (2) days of their receipt of this Order all computers or data storage devices identified in the Affidavit of Mark G. Spencer;

(13) That Defendants Cohon, Bochnowski, and Muhlner be restrained and enjoined from prosecuting a separate suit in any other court, including but not limited to the state and federal courts of California, that arises from or involves the same nucleus of facts, controversy and/or issues raised in the instant suit or that would otherwise interfere with this action;

(14) That Defendants Cohon, Bochnowski, and Muhlner be restrained and enjoined from obtaining relief in any other court that would stay, limit or restrain this Court or restrict plaintiff from prosecuting its claims in this action; and

(15) That Defendants Cohon, Bochnowski, and Muhlner be restrained and enjoined from using to any Company-Related Inventions and Developments, as that term is defined in their respective Employee Obligations Agreements and Consulting Agreement, that Defendants Cohon, Bochnowski and Muhlner conceived or developed, in whole or in part, either alone or jointly with others, during the term of their employment and/or consulting relationship with GR, including without limitation the Global Rescue Risk Services business model.

The above measures shall remain in effect until otherwise ordered by this Court.

IT IS SO ORDERED.

______________________________

DATED: December ____, 2011

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT DEPARTMENT

GLOBAL RESCUE LLC,

Plaintiff,

v.

EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,

Defendants.

11 4502

CIVIL ACTION NO. ______________

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Global Rescue LLC ("GR") submits this memorandum of law in support of its motion, pursuant to Mass. R. Civ. P. 65, for a preliminary injunction. GR has brought this action against its former consultant, Defendant Mark Cohon ("Cohon"), and its two former employees, Defendants Thomas Bochnowski ("Bochnowski") and Edward Muhlner ("Muhlner") (collectively, the "Defendants"), who each left GR to form together a business that competes with GR, Universal Operations Risk Management, LLC ("UnivOps"), seeking injunctive relief and damages to redress breaches by Cohon of his consulting agreement, breaches by Bochnowski and Muhlner of their respective employment agreements, and the apparent and/or potential theft of GR's trade secrets and other confidential business information. By this motion, GR seeks to enforce the unambiguous terms of the agreements signed by Cohon, Bochnowski and Muhlner, and prevent the Defendants' further misappropriation of GR's trade secrets and confidential information.

## FACTS

**The Parties**

GR is a limited liability company formed under the laws of Delaware with a principal place of business in Boston, Massachusetts. (Affidavit of Daniel L. Richards ("Richards Aff."), ¶ 2). GR's members are Daniel L. Richards ("Richards") and Global Rescue Corporation, which is incorporated in Delaware and has a principal place of business in Boston, Massachusetts. (*Id.*) Founded in 2004, GR provides advisory and response services for medical emergencies, security crises, and other urgent and emergency situations, as well as timely advice, stand-by services and travel risk management consultation before situations escalate to emergencies. (*Id.*, ¶ 4). GR, through its Global Rescue Risk Services ("GRRS") department helps manage client insurance, benefits and risk services and provides expert consultative services for captive and risk pooling services, including group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling. (*Id.*)

In 2008, Richards approached Bochnowski and Muhlner regarding hiring them to work at GR. (*Id.*, ¶ 5). Bochnowski and Richards were classmates at the Tuck School of Business at Dartmouth College. (*Id.*) Bochnowski and Muhlner are brothers-in-law. (*Id.*) In 2008 they were working in San Francisco, California, for Tacitum Solutions, an investigative and security operations services company, which GR acquired. (*Id.*) On the explicit condition that they relocate to Boston, MA, Richards gave Bochnowski and Muhlner offers to join GR – Bochnowski as its Director of Corporate Accounts and Muhlner as its Director of Operations. Both accepted the respective offers. (*Id.*, ¶¶ 6-7). Bochnowski executed an Employee Obligations Agreement ("EOA") on April 16, 2008. (*Id.*, ¶ 6). Muhlner executed an EOA on April 21, 2008 (the "Muhlner Agreement"). (*Id.*, ¶ 6). Bochnowski moved to 7 Emerson Place #708, Boston, Massachusetts and Muhlner moved to Charlestown, Massachusetts. (*Id.*, ¶¶ 6-7).

On May 3, 2008, Bochnowski executed an EOA that replaced and superseded the April agreement (the "Bochnowski Agreement"). (*Id.*, ¶ 6). Bochnowski executed the Bochnowski Agreement in Boston, Massachusetts. (*Id.*) Importantly, neither Bochnowski nor Muhlner had any knowledge of insurance, benefits, and risk industries prior to joining GR. (*Id.*, ¶ 51).

In December 2008, Steve Mueller at One Beacon Insurance, with whom Richards was previously acquainted, introduced Richards to Cohon. (*Id.*, ¶ 8). At the time, Cohon was an employee at American Benefits Consulting, a benefits and insurance consulting firm ("ABC"). Cohon presented himself as an experienced in employee insurance, benefits and risk services. (*Id.*) Richards and Cohon continued to see each other in business meetings and tradeshow events and became friends. (*Id.*) In late 2009, Cohon confided in Richards that he intended to leave ABC and that he wanted to explore with Richards if there was a way in which he could assist GR. (*Id.*) They discussed the possibility of GR developing a new department that would be based around the insurance, benefits and risk-sharing industries – Cohon's area of expertise – and that would successfully integrate into GR's existing services so that GR could offer a more complete package of services to its clients. (*Id.*) Cohon and Richards identified and developed this GR growth opportunity together, relying on both of their existing industry knowledge to navigate and succeed in an area which, while built upon both of their experience and knowledge, was a novel approach to the industry for both Richards and Cohon. (*Id.*) This new department made business sense because GR's core services are often integrated in a client's insurance, benefits and risk sharing agreements. (*Id.*) Cohon contributed his experience and knowledge of the insurance, benefits and risk-sharing industries while Richards contributed his knowledge of how those services could be interwoven into GR's existing services to meet client needs. (*Id.*) This department became known as GRRS. (*Id.*)

On March 18, 2010, Cohon executed a Consultant Agreement (the "Cohon Agreement"). (*Id.*, ¶ 9). At the time Cohon signed his Agreement, he agreed that his compensation would consist of paying for his expenses while working on behalf of GR and that any other compensation terms would be discussed and formalized later. GR and Cohon agreed to this manner of payment for business reasons and for reasons that are personal to Cohon. (*Id.*, ¶ 10).

**The Defendants' Respective Agreements**

The Bochnowski Agreement, the Muhlner Agreement and the Cohon Agreement are identical in all relevant respects. (*Id.*, ¶ 41). The Bochnowski Agreement and the Muhlner Agreement include a noncompetetition provision that states:

> 8. Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

(*Id.*, ¶ 42). The Cohon Agreement includes an identical provision however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*." (*Id.*). Furthermore, the Bochnowski Agreement and the Muhlner Agreement includes the provision addressing the nonsolicitation of both customers and employees, which provide:

> 9. <u>Nonsolicitation of Customers</u>. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

> (a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,
>
> (b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,
>
> (c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,
>
> (d) provide or assist with the provision of Services to a Customer (except in his capacity as an employee of the Company), or
>
> (e) refer a Customer or supplier to another provider of Services.
>
> 10. Nonsolicitation of Employees. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:
>
> (a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or
>
> (b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee, prospective employee, consultant or prospective consultant of the Company to terminate his or her employment or other relationship with the Company or provide services to any entity other than the Company.

(*Id.*, ¶¶ 45, 49). Again, the Cohon Agreement includes an identical provision however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*." (*Id.*). Additionally, the Bochnowski Agreement, Muhlner Agreement and Cohon Agreement all contain a nondisclosure provision. (*See id.*, Exs. B, D, E). Finally, the Bochnowski Agreement, Muhlner Agreement and Cohon Agreement each contain identical language providing that the Defendants agree not to commence any action, suit or proceeding

arising out of or relating to their respective agreements except in the courts of Massachusetts or the United State District Court located in Massachusetts:

> 21. Governing Law: Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process for any action, suit or proceeding brought against it in any such court.

(*See id.*)

**The Defendants Gain Access to GR's Trade Secrets and Other Confidential Information**

In the course of their relationship with GR the Defendants were exposed to a great deal of GR's proprietary and confidential information. (*Id.*, ¶ 52). In their work with GR, they gained detailed knowledge of GR's proprietary databases, documents, client, and vendor relationships. (*Id.*) Additionally, they have been privy to most of GR's current and anticipated client and vendor agreements. (*Id.*) Other specific examples of confidential and proprietary knowledge that they have gained while employed or during their relationship with GR include an intimate working knowledge of vendor or partner relationships and contacts, sales and marketing strategies for GR's entire organization, operations strategy for GR's entire organization; knowledge of overall business planning for the company; knowledge of all of GR's data sources and contract status for those sources; knowledge of GR's new data infrastructure; knowledge of

GR's costs and pricing structure, and knowledge of company financial information. (*Id.*)

Creating Global Rescue Risk Services

Throughout 2009, 2010, and 2011, up until his resignation on November 2, 2011, Cohon and Richards worked closely together to develop the GRRS department. (*Id.*, ¶ 11). They often spoke several times per week, met with dozens of potential clients and partners and attended tradeshows, including the Risk and Insurance Managers Society ("RIMS") annual conference, the Vermont Captive Insurance Association ("VCIA") annual conference, and IBIS Advisors' International Benefits and Human Resources symposium. (*Id.*) As the development of GRRS progressed, Cohon became integrated within GR's sales team, which was led by Bochnowski and included multiple lower level sales employees. (*Id.*) These activities were exemplified by several meetings Cohon and Richards had with important clients and prospective clients, including: (1) multiple meetings with Tom Oksanen of the Fidelity Investments' benefits group discussing how GR could reduce Fidelity's insurance spending and enhancing the group personal lines benefits for Fidelity employees; and (2) meetings with Liberty Mutual to discuss how Liberty Mutual could benefit both from GR's core services as well as those services provided by GR through GRRS. (*Id.*, ¶ 12). GR employees and Cohon introduced Cohon to clients and potential clients as the head of GRRS and Cohon's signature block on his email read "Mark B. Cohon, Global Rescue Risk Services." (*Id.*, ¶¶ 13-14).

GR has devoted substantial time and resources in developing GRRS and diverted substantial energy and sales efforts from its core services to those services offered by GRRS. (*Id.*, ¶ 51). GR has spent significant amounts of resources on GRRS marketing materials, training, and expenses for Cohon, Bochnowski and other GR employees to attend client meetings and tradeshows. (*Id.*, ¶¶ 15, 51). Additionally, in 2010, GR devoted substantial resources to

create Crisis Services Company ("CSC"), a captive insurance company that provides risk pooling and reinsurance recommendations and a vehicle by which clients can share (i.e. "pool") their risk. (*Id.*, ¶ 16).

Over time, GRRS became an established and entrenched branch of GR and was consistently pitched by Cohon and others to GR's clients as a way to provide them with additional cost savings. (*Id.*, ¶ 17). By the time of Cohon's resignation, GRRS provided the following services: manage and consult on client insurance, benefits and risk services and provide expert consultative services for captive and risk pooling services, including group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling. (*Id.*, ¶ 18). These are services that appear to be virtually identical to those now offered by UnivOps. (*Id.*, ¶ 19).

__**Bochnowski and Richards Commit to Staying in the Boston Area and Are Promoted**__

When GR initially hired them, Richards, Bochnowski and Muhlner discussed whether there was potential for GR to ever open a California office. (*Id.*, ¶ 21). At the time, Richards indicated to them that, if it made business sense in the future, it was a possibility. (*Id.*) However, he made no promises about opening a California office because he could not predict when or even if the need for a California office of GR would ever arise. (*Id.*) Beginning sometime in 2010, however, Richards became aware that Bochnowski was having marital problems and that his wife was pressuring him to move to California to be closer to their family. (*Id.*, ¶ 20). Richards learned that Bochnowski's wife was spending significant amounts of time in California. (*Id.*) As a result, Richards allowed Bochnowski to make regular business trips to California so that he could see her, even though he did not always think that these trips made good business sense. (*Id.*) In or around the beginning of 2011, however, Richards made clear to

Bochnowski and Muhlner that it did not make business sense for GR to open an office in California for many reasons, including dramatically higher operating costs, the adverse tax structure of the State of California and the management structure of the company. (*Id.*, ¶ 21).

Throughout the spring and early summer of 2011, Richards had numerous separate conversations with Bochnowski and Muhlner regarding the future of GR and their individual commitments to the company as the company continued to grow. (*Id.*, ¶ 22). During these conversations, they repeatedly asked to be given Vice President titles. (*Id.*) Richards, however, had concerns about promoting Bochnowski and Muhlner because certain parts of GR had experienced employee turnover and morale issues under their leadership and because he was concerned about their long-term commitment to GR. (*Id.*) Nevertheless, Richards attempted reward them for their efforts over the past three years. (*Id.*) For example, GR hired a Sales Director with a significantly greater track record than Bochnowski, Tiger Shaw, to work under Bochnowski even though Shaw had successfully started and sold his own company and had many more years of relevant sales and management experience than Bochnowski. (*Id.*) Richards put Shaw under, and not above, Bochnowski as a sign of his loyalty to and appreciation for Bochnowski. (*Id.*) Furthermore, during conversations Richards, Bochnowski and Muhlner discussed whether Bochnowski and Muhlner were committed to GR and would commit to living in Boston over the next few years. (*Id.*, ¶ 23). Because Richards knew that Bochnowski's wife was unhappy in Boston, Richards offered Bochnowski the opportunity to work out of GR's New Hampshire office to improve his personal life, even though such a move would not be ideal for GR given that GR's sales staff is based in Boston. (*Id.*) Moreover, Richard made clear to them that if they were committed to GR and to living on the east coast for a significant period of time (i.e. at least five years) then Richards would promote them each to Vice President. (*Id.*)

At some time in June 2011, Bochnowski and Muhlner gave Richards separate commitments that they were committed to GR and living in the Boston area. (*Id.*, ¶ 24). Bochnowski told Richards that he and his wife were looking into buying a house in Winchester, Massachusetts, while Muhlner confirmed that he and his wife enjoyed Boston, that they would be staying in Boston because his wife had received a job offer in the city, and that he was committed to working for GR. (*Id.*) As a direct result of those expressions of commitment to GR, Richards informed Bochnowski and Muhlner that they would be promoted to Vice President positions and that they would receive a $20,000 mid-year bonus and a salary raise from $110,000 to $130,000 per year. (*Id.*) At the news, Bochnowski and Muhlner shook hands in congratulations with Richards, GR's Senior Vice President Stuart Richards and GR's Vice President and General Counsel Melissa Roth. (*Id.*) On Sunday, July 24, 2011, Richards sent a company-wide email announcing the promotions of Bochnowski and Muhlner. (*Id.*, ¶ 25). On Friday, July 29, 2011, GR transferred the $20,000 bonuses into Bochnowski's and Muhlner's individual bank accounts. (*Id.*, ¶ 26).

**Bochnowski and Muhlner Abruptly Resign from GR**

On Monday, August 1, 2011, Bochnowski and Muhlner, eight days after they had been promoted and one business day after collecting their $20,000 bonuses from GR, both entered Richards' office and resigned, claiming that over the weekend their wives forced them to move to California. (*Id.*, ¶ 27). Bochnowski stated that he wanted to be fair and to help the company, so he thought a two-week notice period was reasonable. (*Id.*) The announcement of their resignation was a complete reversal of what they had committed to only a few weeks before. (*Id.*) While they paid lip service during their resignation to being committed to helping GR transition in the wake of the dual departure, they were insistent upon their need to meet the two-

week departure deadline, despite their previous oral representations that they were going to stay at GR for the long term. (*Id.*)

In the days following their resignation announcement, GR negotiated with Bochnowski and Muhlner to create a transition plan through the end of 2011 and possibly for them to act in consultant roles through 2012. (*Id.*, ¶ 28). Bochnowski and Muhlner made clear that they did not want to be considered employees of GR but that they wanted to have their titles to be "consultant." (*Id.*) They did not explain why wanted that title, but it later became clear because they are acting as consultants in their new competing business. (*Id.*) On August 9, 2011, Richards gave Bochnowski and Muhlner separate Separation Agreements that GR believed were a good faith effort to memorialize the terms that the parties had agreed to in their negotiations. (*Id.*, ¶ 29). However, on August 11, 2011, at 9:41pm and 9:57pm respectively, Muhlner and Bochnowski sent Richard separate but identical emails including their resignation letters. (*Id.*) Each stated that the agreement did not reflect the good faith discussions and negotiations" and concluded they would be unable to agree with GR "on the terms that would be acceptable." (*Id.*) At no point previous to the emails had they brought up any issues with the agreement or tried to further negotiate the terms. (*Id.*) Bochnowski's and Muhlner's last day at GR was August 15, 2011. (*Id.*, ¶ 30).

**<u>GR Learns That The Defendants Have Conspired to Create a Competing Business</u>**

A few days after their departure, Richards spoke with Cohon about the resignations. (*Id.*, ¶ 31). At no point did Cohon tell Richards what he would ultimately learn: that Cohon, Bochnowski and Muhlner had been planning on starting a business that would offer the same services as GR. (*Id.*) In fact, in the days following Bochnowski's and Muhlner's last day at GR, Cohon told Richards that he had connected Muhlner with a company in California that was

looking to hire a Chief Security Officer. (*Id.*). Richards also asked Cohon to inform him of any contact that he had with Bochnowski and Muhlner and Cohon told Richards that he would. (*Id.*).

Following the resignations of Bochnowski and Muhlner, Cohon continued to lead GRRS. (*Id.*, ¶ 32). GR was coming close to closing its first deals involving GRRS, so Richards and Cohon began negotiating Cohon's compensation agreements. (*Id.*, ¶ 33). On October 21, 2011 Richards sent Cohon a Partner Agreement, a Stock Option Agreement and another Consultant Agreement. (*Id.*). Upon reviewing the agreements, Cohon took issue with their requirement that Cohon disclose his other business activities, stating he did not want to disclose these activities. (*Id.*, ¶ 34). In response, Richards told him that in order for GR and Cohon to continue to work together, GR and Cohon needed to be able to trust each other and understand how each deal was structured, which could only be accomplished through disclosure of his activities. (*Id.*)

However, GR quickly learned why Cohon may have been reluctant to disclose his other business activities. On Sunday, October 30, 2011, Cohon forwarded an email to Bochnowski's old GR email address, which was captured by GR's email server and seen by Richards. (*Id.*, ¶ 35). The email was from mbcohon@aol.com to tmuhlner@univops.com and tbochnowski@globalrescue.com. The email's subject was "Fwd: What's new to Costco Services!" Cohon wrote in the email "Looks like we're in competition with Costco. They perform payroll as well." (*Id.*) Having had no previous indication that Bochnowski, Muhlner and Cohon had apparently gone into business together, Richards was extremely surprised by this email. (*Id.*)

On Monday, October 31, 2011, the day after Cohon sent the email to Bochnowski's GR address, UnivOps, Muhlner, Bochnowski and Cohon filed a Complaint for Declaratory and Injunctive Relief against GR and DOES 1 through 10, inclusive, in the Superior Court of the

State of California for the County of San Francisco (the "California Complaint"). (*Id.*, ¶ 36). GR has never been served with a copy of the California Complaint and GR was not immediately aware that the lawsuit had been initiated. (*Id.*, ¶¶ 36-37).

On Wednesday, November 2, 2011, with no awareness that Cohon had just filed suit against GR, Richards spoke with Cohon on the phone. (*Id.*, ¶ 37). Richards told him that he knew that Cohon was working with Bochnowski and Muhlner and that he wanted to know what was going on. (*Id.*) Richards asked if Bochnowski, Muhlner and Cohon were partners and when they began to work together. (*Id.*) Richards also asserted his right to know this information because Cohon was still a consultant to GR and had a duty of good faith and loyalty to GR as well as contractual obligations. (*Id.*) Cohon did not disclose that he, Bochnowski and Muhlner had formed a company, nor did he tell Richards that they had filed a lawsuit against GR earlier that week. (*Id.*) Cohon claimed that he did not start to work with Bochnowski and Muhlner until after Bochnowski and Muhlner left GR, which was not true. (*Id.*) Richards asked Cohon to send him in writing, when he, Bochnowski and Muhlner started to work together, what they were doing together and reminded Cohon that he, Bochnowski and Muhlner all signed agreements that gave GR certain rights and that GR intended to protect those rights. (*Id.*) At the end of the conversation, Richards emailed Cohon a copy of the Cohon Agreement. (*Id.*) On Thursday, November 3, 2011, Cohon sent Richards an email terminating his consulting relationship with GR. (*Id.*, ¶ 38). In the email, Cohon refused to commit to providing Richards with the requested information about his business relationship with Bochnowski and Muhlner. (*Id.*)

The next day, a messenger served GR with a First Amended Complaint for Declaratory and Injunctive Relief in the California action initiated by UnivOps, Bochnowski, Muhlner and Cohon against GR (the "Amended California Complaint"). (*Id.*, ¶ 39). The Amended California

Complaint asks for a declaration that Muhlner, Bochnowski and Cohon's employment with UnivOps does not violate any contractual or legal obligations to GR due to California law that finds other state's employment agreements as unenforceable in the state of California and that, even assuming that their respective agreements with GR are enforceable in California, their employment with UnivOps does not violate their agreements with GR. (*Id.*, ¶ 40). The California Amended Complaint reveals that Cohon is President of UnivOps and that Bochnowski and Muhlner are Vice Presidents of UnivOps and alleges that "UnivOps is a limited liability company that manages client insurance, benefits and risk services, and provides expert consultative services for three main captive and risk pooling services: group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling" – services that are in direct competition with the services that GR offers its clients through GRRS in violation of the Defendants' respective agreements. (*Id.*, ¶¶ 43-44, 49).

GR has learned that Cohon, Bochnowski and Muhlner have been and are currently soliciting GR clients and potential clients on behalf of UnivOps in violation of their respective Agreements. (*Id.*, ¶ 48). GR further believes that Cohon, Bochnowski and Muhlner may be soliciting other current or former GR employees as well. (*Id.*, ¶ 50).

## ARGUMENT

### I. THE COURT SHOULD GRANT GR'S MOTION FOR A PRELIMINARY INJUNCTION

Under Massachusetts law, a party seeking preliminary injunctive relief must establish: (1) it is likely to prevail on the merits of its claims; (2) it will suffer irreparable injury in the absence of injunctive relief; (3) the injury to plaintiff outweighs any harm which granting injunctive relief would inflict on defendant; and (4) the public interest will be served by the issuance of the injunction. *Boston Police Patrolmen's Ass'n, Inc.* v. *Police Dept. of Boston*, 446 Mass. 46, 50

(2006); *Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 405 N.E. 2d 106 (1980). Because GR can demonstrate the requisite elements for each of the claims under which it seeks injunctive relief, GR's Motion for a Preliminary Injunction should be granted.

## II. GR HAS DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS

To obtain a preliminary injunction, the plaintiff must establish likelihood of success on the merits. *T&D Video, Inc. v. City of Revere*, 423 Mass. 577, 580, 670 N.E. 2d 162, 165 (1996). Here, GR can demonstrate a strong likelihood of success on the merits on its contract claims because, by their actions, Cohon, Bochnowski and Muhlner have breached and threaten to continue to breach the restrictive covenants in their respective Agreements. Furthermore, GR can demonstrate a strong likelihood of success of the merits of its misappropriation of trade secrets claim against Cohon, Bochnowski and Muhlner.

### A. GR Has Demonstrated That It Will Likely Prevail On Its Breach Of Contract Claims

Under Massachusetts law, to prove a breach of contract claim, a plaintiff must show (1) the existence of a valid and binding contract, (2) that the defendant breached the terms of the contract, and (3) that the plaintiff suffered damage. *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995) (applying Massachusetts law). Here, Cohon, Bochnowski and Muhlner each entered to a valid and binding contract with GR containing enforceable noncompetition, nonsolicitation, nondisclosure provisions and forum selection clauses, that each engaged in conduct that breached these provisions, and that GR has suffered and will continue to suffer damages as a result of those breaches. Accordingly, GR has demonstrated that it is likely to prevail on its breach of contract claims.

### 1. The Agreements Signed by Cohon, Bochnowski and Muhlner Are Valid and Enforcable.

GR can plainly establish that it entered into valid and enforceable contracts with Cohon, Bochnowski and Muhlner. "A non-competition provision is enforceable if there is consideration." *Stone Legal Res. Group, Inc. v. Glebus*, No. CA025136, 2003 WL 914994, at *5 (Mass. Super. Ct. Dec. 16, 2002) (citing *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 287 (1974)). Further, a noncompete clause is enforceable if "it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." *Boulanger v. Dunkin' Donuts, Inc.*, 442 Mass. 635, 639 (2004). Massachusetts courts apply the same analysis in considering the enforceability of nondisclosure and nonsolicitation provisions as well. *See, e.g., Wordwave, Inc. v. Owens*, No. 044758F, 19 Mass. L. Rptr. 37, at *2-4 (Mass. Super. Ct. Dec. 7, 2004). Forum selection clauses will be enforced in Massachusetts if they are reasonable and fair. *See Jacobsen v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 575 (1995). The Agreements at issue in this case meet all of these prerequisites.

#### i. *The Agreements Are Supported by Valid Consideration.*

When a restrictive covenant is executed before or at the beginning of employment, it is supported by consideration under Massachusetts law. *See Stone Legal Res. Group, Inc.*, 2003 WL 914994, at *5 ("When a non-competition provision is signed at the beginning of the employment there is sufficient consideration."). Even if a noncompete agreement is entered into just after the employment relationship has begun, it is considered ancillary to the employment agreement and is enforceable. *Marine Contractors Co. v. Hurley*, 365 Mass. 280 (1974). Nevertheless, Massachusetts courts have recognized that continued employment alone may constitute adequate consideration for a restrictive covenant. *See, e.g., EMC Corp. v. Donatelli*,

No, 091727BLS2, 25 Mass. L. Rptr. 399, at * (Mass. Super. Ct. May 5, 2009) (citing "doctrine that continued employment alone may suffice to support" covenant to compete).

Here, Cohon, Bochnowski and Muhlner all executed their respective agreements containing the restrictive covenants at issue at the beginning of their relationships with GR. (See Richards Aff., ¶ 6, 7, 9. Accordingly, there was sufficient consideration for each of the Agreements at issue as a matter of law.

**ii. *The Noncompete, Nonsolicitation, and Nondisclosure Provisions at Issue Must Be Enforced to Protect GR's Important Business Interests***

Covenants not to compete may protect legitimate business interests such as trade secrets, other confidential information, or the good will the employer has acquired through its dealings with customers. *New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977); *All Stainless Inc., v. Colby*, 364 Mass. 773, 779 (1974); *Veridiem, Inc. v. Phelan*, No. 034418, 17 Mass. L. Rptr. 8, at *2 (Mass. Super. Sept. 26, 2003). With respect to good will, "[a] former employee with close association and relationships with an employer's customers is in a position to harm the employer's good will because the close relationship with the employer's customers may cause those customers to associate the former employee, and not the employer, with the product and services delivered to the customer through the efforts of the former employee." *See National Engineering Service Corporation* v. *Grogan*, No. 071583, 23 Mass. L. Rptr. 451, at *4 (Mass. Super. Jan. 29, 2008) (citing *All Stainless, Inc.*, 364 Mass. at 779-80). Accordingly, courts have been particularly willing to enforce covenants not to compete in order to preserve good will with regard to those who have close relationships with customers. *Id.* (citations omitted).

Here, GR's legitimate business interests of maintaining its confidential information and good will are at risk by the breach and threatened continued breach of their restrictive covenants

by Cohon, Bochnowski and Muhlner. The restrictive covenants are necessary to protect those important interests. While employed at GR, Cohon, Bochnowski and Muhlner were privy to GR's trade secrets and other confidential information, including customer contact, sales and marketing strategies, new product development and business planning. (*See* Richard Aff, ¶ 52). All three were entrusted with fostering relationships with key customers and business partners, as well as prospective customers and business partners. By forming and working for UnivOps, a competitor of GR, the conduct of Cohon, Bochnowski and Muhlner necessarily constitutes a substantial risk of harm to GR's legitimate business interests, especially its confidential information and goodwill. Because the injunctive relief requested is necessary to protect GR's legitimate business interests, this Court should require Cohon, Bochnowski and Muhlner to abide by their contractual obligations. *See Veridiem, Inc.*, 17 Mass. L. Rptr. 8, at *1-2. (granting preliminary injunction precluding defendant from working for a competitor for one year where defendant was a high-level executive in a small and competitive industry whose position allowed him to have considerable contact with customers and knowledge about employer's confidential information and was "sufficiently high" to justify enforcement of his non-compete agreement).

In Massachusetts, non-competition, non-solicitation, and non-disclosure agreements are regularly found to be valid and enforceable where they seek to protect an employer from a former employee's engagement in direct competition with the former employer's products or services, and Massachusetts courts have routinely allowed injunctive relief in these circumstances. *See Parexel Int'l Corp. v. Nanavati,* 26 Mass. L. Rptr. 426, 2010 WL 685688, * 1 (Mass. Super. 2010) (granting injunctive relief to enforce pharmaceutical company defendant's contract with former executive containing non-competition, non-solicitation and confidentiality obligations); *Emptoris, Inc.* v. *Opera Solutions, LLC,* No. 06-1239, 26 Mass. L. Rptr. 461, *1-4

(Mass. Super. 2009) (finding that covenants not to compete and not to solicit in employment agreement were valid and enforceable); *Grogan,* 23 Mass. 1. Rptr. 451, at *7-8 (granting injunctive relief to enforce defendant's contract with former account executive containing non-competition, non-solicitation and confidentiality obligations); *DePuy Spine, Inc.* v. *Stryker Biotech, LLC*, No. 071464BLS1, 2007 WL 1418507, at * 4-5 (Mass. Super. 2007) (granting injunctive relief to enforce defendant's contract containing non-competition, non-solicitation and confidentiality obligations). Indeed, non-solicitation and confidentiality obligations are typically subject to less scrutiny than noncompete provisions because those provisions do not prevent someone from working in a particular job. *See, e.g., Getman v. USI Holdings Corp.*, No. 05-3286-BLS2, 19 Mass. L. Rptr. 679, at *5 (Mass. Super. Ct. Sept. 1, 2005) (granting injunctive relief to enforce defendant's contract containing noncompetition, non-solicitation and confidentiality obligations); *Acordia Northeast, Inc v. Academic Risk Resources & Ins., LLC*, No. 045601BLS2, 19 Mass. L. Rptr. 75, at * 6 (granting injunctive relief to enforce defendant's contract containing non-competition, non-solicitation and confidentiality obligations); *Wordwave, Inc.*, 19 Mass. L. Rptr. 37, at *5 (granting injunctive relief to enforce defendant's contract containing non-competition, non-solicitation and confidentiality obligations); *Robert Half Int'l., Inc.* v. *Buoncontri,* No. CA030298BLS2, 15 Mass. L. Rptr. 742, at *6 (Mass. Super. Ct. Jan. 28, 2003) (granting injunctive relief to enforce defendant's contract containing non-competition, non-solicitation and confidentiality obligations); *Stone Legal Resources Group, Inc.*, 2003 WL 914994, at *6-7 (Mass. Super. Dec. 16, 2002) (granting injunctive relief to enforce defendant's contract containing non-competition, nonsolicitation and confidentiality obligations).

In particular, Massachusetts courts have routinely held that non-solicitation agreements validly protect an employer's legitimate business interest where they protect against customer <u>and</u> employee raiding by a former employee who was in a position to build relationships or gain knowledge of such customers and employees. *See Parexel Int'l Corp.*, 26 Mass. L. Rptr. 426, at * 1 (upholding validity of and enforcing non-solicitation agreement for employee who "[i]n his executive positions ... became intimately knowledgeable of Parexel's proprietary business processes, its research, its customers and clients, the strengths and weaknesses of the company with respect to its business model and to its selling and performing pharmacology."); *Grogan*, 23 Mass. L. Rptr. 451, at *6 (upholding validity of and enforcing non-solicitation agreement where such agreement did "not restrict [the individual] from using his own skills, knowledge or talent, but rather prevent[ed] him from trading on the goodwill of [his former employer] by restricting him from using the relationships he developed with [the former employer's] customers, clients and accounts and the confidential information of [his former employer], including knowledge of these customers and their needs."); *Wordwave*, 19 Mass. L. Rptr. 37, at * 2-3 ( upholding validity of and enforcing non-solicitation agreement where it protected the employer's legitimate business interest which "may derive from [a former employee's] knowledge of confidential information or contact with clients who may associate the former employee, rather than the employer, with the quality of goods sold or services rendered.").

Furthermore, injunctions are especially appropriate in situations where the former employee has stolen trade secrets and other confidential information from the former employer. *See Shipley v. Kozlowski*, 926 F. Supp. 28, 30 (D. Mass. 1996) (injunctive relief proper where employee accepted employment with competitor of plaintiff within one year of his termination and secretly accessed and copied confidential information from plaintiff); *Analogic Corporation*

*v. Data Translation, Inc.*, 371 Mass. 642 (1976) (injunctive relief proper to redress misappropriation of proprietary information and trade secrets).

Consistent with this precedent, injunctive relief should be entered to enforce noncompete, nonsolicitation, and nondisclosure provisions of the Agreements against Cohon, Bochnowski and Muhlner. Both Bochnowski and Muhlner were high level employees, working first as Senior Directors then as Vice Presidents, in a highly-competitive industry, who held responsibility for managing and developing relationships with GR's key customers and prospective customers and were involved in the development of GR's business planning. (*See* Richards Aff., ¶ 52). The same is true for Cohon, a high level consultant who worked directly with GR's president in developing to new lines of business for GR. (*See id.*). As such, they were privy to a considerable amount of GR's confidential information. (*See id.*). Because the Agreements were designed to reasonable protect GR's legitimate business interests by prohibiting Cohon, Bochnowski and Muhlner from competing with GR for a period of two years after the termination of their employment and/or consulting relationship, and from soliciting customers or employees of GR for a period of two years after termination of their employment and/or consulting relationship and protect GR's trade secrets and other confidential information, the Agreements must now be enforced against Cohon, Bochnowski and Muhlner.

### iii. *The Duration And Geographic Scope Of The Restrictive Covenants At Issue Are Reasonable*

The non-compete covenant at issue in this case seeks to impose a two-year restriction without geographic limitation with respect to any services or productions provided or intended to be provided by GR. The nonsolicitation covenant runs for two years. Under Massachusetts law, both types of restrictions are routinely enforced.

It is well-settled that a two-year noncompete restriction is eminently reasonable. See, e.g., *Blackwell v. E.M. Helides, Jr., Inc.*, 368 Mass. 225, 228 (1975) (three year restriction not unreasonable); *Marine Contractors Co.*, 365 Mass. 280 , 290 (1974) (upholding allowance of injunctive relief for the three years remaining on a five-year restrictive covenant); *All Stainless, Inc.*, 364 Mass. at 777 (noting that a "two year restriction is reasonable"); *Emptoris, Inc.*, 26 Mass. L. Rptr. at *2 (enforcing a two-year covenant not to compete against former principals of company) (citing *All Stainless, Inc.* v. *Colby*, 364 Mass. at 779). Likewise, "Massachusetts courts have consistently enforced [non-solicitation] covenants of up to two years, even as great as five years duration, if they are otherwise reasonable under the circumstances." *Bowne of Boston, Inc. v. Levine*, No. CIV.A 97-5789A, 1997 WL 781444, at *4 (Mass. Super. Nov. 25, 1997) (finding two-year nonsolicitation agreement reasonable under the circumstances); *see also*; *Acordia Northeast, Inc.*, 19 Mass. L. Rptr. 75, at *4 (upholding two-year non-solicitation agreement for former employees of insurance brokerage and risk management firm).

Furthermore, courts have upheld agreements with no geographic scope where appropriate. *See Emptoris, Inc.*, 26 Mass. L. Rptr. 461, at *2 (holding two-year, geographically unlimited noncompete and nonsolicitation covenants where former employer had customers all over the world such that scope of the covenants "must have commensurate breadth to fully protect [the employer's] business interests"); *Filmore & Stern, Inc. v. Frankel*, No. 020821, 2002 WL 31678307 (Mass. Super. Sept. 17, 2002) (given the nature of the business in which the parties are employed, no geographic limitation was required); *see also Parexel Int'l Corp.*, 26 Mass. L. Rptr. 426, at *1 (upholding noncompetition, nonsolicitation and nondisclosure provisions without geographic scope against former corporate vice president of a

pharmacological research business). As its name indicates, GR or Global Rescue, is a company that operates and has clients all over the world.

### iv. *The Restrictive Covenants Are Not Contrary To The Public Interest*

Restrictive covenants in employment agreements are enforceable unless they are in some way injurious to the public interest. *Boulanger* v. *Dunkin' Donuts, Inc.*, 442 Mass. 635, 639 (2004) (restrictive covenants in employment agreements are enforceable if "consonant with the public interest"); *see also Alexander & Alexander* v. *Danahy*, 21 Mass. App. Ct. 488, 498 (1986) ("[A]ny covenant restricting competition is to be enforced ... [to the extent] that it is necessary to protect legitimate interests, and not an obstruction of the public interest"). Here, the Agreements' restrictive covenants in no way harm the public interest. They merely place individual restrictions on Cohon, Bochnowski and Muhlner's ability to work for a competitor, use of GR's confidential business information, and ability to solicit GR's customers and employees. Such restrictions implicate only the interests of GR and Cohon, Bochnowski and Muhlner and in no way harm the public interest. Indeed, the public interest is actually served by enforcing the post-employment restrictive covenants in the Agreements because GR retains the right to protect its legitimate business interests in such a manner that does not improperly restrict Cohon, Bochnowski or Muhlner from being gainfully employed and earning a livelihood in their chosen profession.

### v. *The Forum Selection Clause is Reasonable and Fair*

Forum selection clauses will be enforced in Massachusetts if they are reasonable and fair. *See Jacobsen v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 575 (1995). A party seeking to evade application of a contractual forum selection clause must demonstrate that "trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical

purposes be deprived of his day in court." *See Cambridge Biotech Corp. v. Pasteur Sanofi Diag.*, 433 Mass. 122, 130 (2000) (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972)). Here, Cohon, Bochnowski and Muhlner cannot make this showing. Restricting Cohon, Bochnowski or Muhlner from bringing an action under the Agreements in any state other than Massachusetts is not so difficult and inconvenient that it would deprive them of their day in court. Clearly, Cohon, Bochnowski and Muhlner have a significant relationship to Massachusetts. Bochnowski and Muhlner worked from 2008 until August 2011 and resided in Massachusetts as recently as this past summer. Cohon consulted for GR from March 2010 until November 2011 and frequently traveled to Massachusetts. Furthermore, Greenberg Traurig, LLP, the law firm representing the Defendants in their litigation against GR in California, has a Boston office staffed with capable attorneys who could prosecute their claims in Massachusetts court. In fact, the Boston office has already been involved in this litigation.

**2. GR Has Demonstrated That Cohon, Bochnowski and Muhlner Have Breached The Restrictive Covenants in Their Respective Agreements**

GR has demonstrated clear breaches by Cohon, Bochnowski and Muhlner of the restrictive covenants owed under their respective agreements. By forming and working for UnivOps – a company designed to compete against GR that offers the same services – there is no question that Cohon, Bochnowski and Muhlner have breached their noncompete restrictions. Further, the abundant and compelling evidence of confidential data theft demonstrates conclusively that Cohon, Bochnowski and Muhlner each breached the nondisclosure provisions of their respective agreements. (*See id.*, ¶ __). Also, the timing of their departures from GR strongly suggests that Cohon, Bochnowski and Muhlner encouraged each other in their coordinated departure from GR in violation of their nonsolicitation obligations. (*See id.*, ¶ __). Finally, Cohon, Bochnowski and Muhlner, by instituting a declaratory judgment action in

California state court, have unequivocally breached the terms of their respective agreements which preclude them from commencing any action, suit or proceeding related to their respective agreements outside of Massachusetts. (*See id.*, ¶ __). Thus, GR can plainly establish a breach of the Agreements sufficient for success on a claim for breach of contract against Cohon, Bochnowski and Muhlner.

**3. GR Has Demonstrated That It Has Suffered And Will Continue To Suffer Damages As A Result of The Breaches By Cohon, Bochnowski and Muhlner**

As a result of the breaches of their restrictive covenants by Cohon, Bochnowski and Muhlner, GR has suffered and continues to suffer significant harm. These damages include, without limitation, its loss of established customer relationships, the conversion of its goodwill, loss of revenue and misuse of its confidential information. (*See* Richard Aff., ¶ __). By bringing a declaratory judgment action against GR in California, Cohon, Bochnowski and Muhlner have already breached their obligation not to initiate litigation against GR in a jurisdiction other than Massachusetts and has forced GR to expend significant time and resources unnecessarily defending an action that Cohon, Bochnowski and Muhlner should never have brought.

**III. <u>GR WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT GRANTED</u>**

Massachusetts courts have long recognized that misappropriation of trade secrets constitutes irreparable harm. *Transkaryotic Therapies, Inc. v. Bain & Co., Inc.*, No. 020747BLS, 14 Mass. L. Rptr. 397, at *3 (Mass. Super. March 5, 2002) (finding plaintiff would suffer irreparable harm if an injunction did not protect its trade secrets); *Storage Tech. Corp. v. Custom Hardware Engin. & Consulting, Inc.*, No. Civ.A. 02-12102RWZ, 2004 WL 1497688, at *5 (D. Mass. July 2, 2004) (finding "theft of trade secrets requires no further proof of harm because it is presumed"), rev'd on other grounds 421 F3d 1307 (Fed. Cir. 2005); *see also Touchpoint Solutions, Inc.* v. *Eastman Kodak Company*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004) (loss of a

trade secret is generally found to constitute irreparable harm in recognition of the fact that "once the trade secret is lost, it is gone forever"). Disclosure to a competitor of the type of proprietary information that Defendants have misappropriated from GR is exactly the type of irreparable harm which the courts have recognized should be enjoined. *See New England Overall Co. v. Woltmann*, 343 Mass. 69, 77-78 (1961) (enjoining former employee from using customer lists and other factual information compiled by former employer).

Likewise, "[c]ourts in Massachusetts have repeatedly held that the loss of a company's good will results in irreparable harm and is appropriately protected by an injunction." *Garber Bros., Inc. v. Evlek*, 122 F. Supp. 2d 375, 384 (E.D.N.Y. 2000) (applying Massachusetts substantive law; citing cases); *see also K-Mart Corp. v. Oriental Plaza*, 875 F.2d 907, 915 (1st Cir. 1989) ("[H]arm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages - and for that reason, more likely to be 'irreparable.'"); *Grogan*, 23 Mass. L. Rptr. 451, (Mass. Super. Ct. Jan. 29, 2008) ("Loss of good will is not easily measured and any harm therefore would be irreparable").

GR is likely to suffer irreparable harm from the threatened loss of established customer relationships, conversion of its goodwill, loss of revenue and misuse of its confidential information if Cohon, Bochnowski and Muhlner are not enjoined from breaching their restrictive covenants. Without the injunctive relief that GR seeks to obtain, the substantial risk remains that GR's confidential information and goodwill will be lost. This loss will erode the value of GR's confidential information and goodwill, which GR has spent incalculable time and money to develop, and give the Defendants an unfair competitive advantage in the marketplace that cannot be measured in dollars. Moreover, the harm caused by Cohon, Bochnowski and Muhlner is difficult to measure and could not be adequately remedied by money damages alone, as Cohon,

Bochnowski and Muhlner themselves acknowledge in their respective agreements. Because GR will suffer irreparable harm from the egregious misconduct of Cohon, Bochnowski and Muhlner, injunctive relief should be granted. *Emprix, Inc. v. Ivanov*, No. SUCV201101239, 28 Mass. L. Rptr. 511, at *4 (Mass. Super. Ct. May 17, 2011) (holding that employer would suffer irreparable harm sufficient to merit preliminary injunction where employee went to work for competitor possessing plan for development of new products, sales strategies, internal organizational information and customer information and such knowledge would inevitably surface during his employment with competitor).

## IV. THE BALANCE OF HARDSHIP TIPS DECIDEDLY IN FAVOR OF GR

Balancing the hardships is easy in this case. As GR has demonstrated, it will suffer irreparable harm if injunctive relief is not granted and Cohon, Bochnowski and Muhlner are not forced to comply with their contractual obligations. Thus, the damage to GR if a preliminary injunction is not granted far outweighs any damage that would be suffered by Cohon, Bochnowski and Muhlner if the order is granted. Importantly, compliance with their contractual obligations does not prevent Cohon, Bochnowski or Muhlner from working in their chosen field(s); rather, the Agreements simply require that they not work for a direct competitor of GR during the restrictive period. Because the harm to GR in the absence of an injunction would be greater than that to Cohon, Bochnowski and Muhlner if an injunction was granted, the balance of harms dictates that the Court should grant GR's Motion for a Preliminary Injunction. *See George Guertin Trophy, Inc. v. Guertin Graphics, Inc.*, No. 071610A, 2007 WL 4248084, at *2 (Mass. Super. Oct. 11, 2007) (granting a preliminary injunction after "balanc[ing] the potential harm faced by the moving party compared to the harm that the preliminary injunction would inflict on the nonmoving party") (*citing Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 616-17 (1980).

## V. <u>INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST</u>

As stated above, restrictive covenants are enforceable unless they are in some way injurious to the public interest. *Boulanger*, 442 Mass. at 639; *see also Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 498 (1986). Here, the public interest will be served by granting injunctive relief because "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged." *Philips Elec. North America Corp.* v. *Halperin*, No. 005251, 13 Mass. L. Rptr. 10, at *4 (Mass. Super. Ct. Dec. 12, 2000) (quoting *New England Circuit Sales, Inc.* v. *Randall*, No. 1:96CV10840, 1996 WL 1171929, at *3 (D. Mass. June 4, 1996)). "Granting a preliminary injunction would simply uphold the duty to honor one's word, and respect a contract that an individual entered knowingly, willingly and voluntarily, for financial gain." *Eastern Bag & Paper Co., Inc.* v. *Ross*, No. 07CV2089L, 22 Mass. L. Rptr. 742, at *3 (Mass. Super. Ct. June 23, 2007). Because granting injunctive relief would merely serve to require Cohon, Bochnowski and Muhlner to comply with contractual obligations that each freely entered into, the public interest would be served by this Court's issuance of the injunctive relief requested by GR.

## <u>CONCLUSION</u>

For the reasons set forth above, GR's Motions for a Temporary Restraining Order and Preliminary Injunction should be allowed.

Respectfully submitted,

**GLOBAL RESCUE LLC**

By its attorneys,

Mark M. Whitney (BBO #637054)
mwhitney@morganbrown.com
Christopher S. Feudo (BBO #670499)
cfeudo@morganbrown.com
Nicole S. Corvini (BBO #670587)
ncorvini@morganbrown.com
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
Phone (617) 523-6666
Fax (720) 293-9696

Dated: December 9, 2011

CERTIFICATE OF SERVICE

I, Christopher S. Feudo, hereby certify that a true and accurate copy of the above document was served by Federal Express with a courtesy copy sent via e-mail to wulffsont@gtlaw.com on this 9th day of December upon the following:

Todd R. Wulffson
GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612

Christopher S. Feudo