# EXHIBIT A

# PART 2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIORCOURTDEPARTMENT

| | |
|---|---|
| GLOBAL RESCUE LLC,<br>Plaintiff,<br><br>v.<br><br>EDWARD MUHLNER, THOMAS BOCHNOWSKI, and MARK COHON,<br>Defendants. | CIVIL ACTION NO. __________ |

**AFFIDAVIT OF DANIEL L. RICHARDS**

I, Daniel L. Richards, hereby depose and state:

1. I am the founder and Chief Executive Officer of Global Rescue LLC ("GR" or "Global Rescue").

2. GR is a limited liability company formed under the laws of Delaware with a principal place of business in Boston, Massachusetts. GR's members are myself and Global Rescue Corporation, which is incorporated in Delaware with a principal place of business in Boston, Massachusetts.

3. I submit this affidavit in support of Plaintiff's Motions for a Temporary Restraining Order and for a Preliminary Injunction.

**Description Of Global Rescue And Its Services**

4. Founded in 2004, GR provides advisory and response services for medical emergencies, security crises, and other urgent and emergency situations, as well as timely advice, stand-by services and travel risk management consultation before situations escalate to emergencies. GR,

through its Global Rescue Risk Services ("GRRS") department helps manage client insurance, benefits and risk services and provides consultative services for captive and risk pooling services, including group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling.

**The Former Employees**

5. In 2008, I approached Tom Bochnowski and Ted Muhlner regarding hiring them to work at Global Rescue. Bochnowski and I were classmates at the Tuck School of Business at Dartmouth College. Bochnowski and Muhlner are brothers-in-law. In 2008 they were working in San Francisco, California for Tacitum Solutions, an investigative and security operations services company, which GR acquired.

6. On the explicit condition that he relocate to Boston, MA, I gave Bochnowski the offer to join GR as its Director of Corporate Accounts. A true and accurate copy of my offer letter to Bochnowski (the "Bochnowski Offer") is attached as Exhibit A. Bochnowski accepted the offer and moved to 7 Emerson Place #708, Boston, Massachusetts. Bochnowski executed an Employee Obligations Agreement("EOA") on April 16, 2008. On May 3, 2008, Bochnowski executed an EOA that replaced and superseded the April agreement (the "Bochnowski Agreement"). Bochnowski executed the Bochnowski Agreement in Boston, Massachusetts. A true and accurate copy of the Bochnowski Agreement is attached as Exhibit B.

7. On the explicit condition that he relocate to Boston, Massachusetts, I gave Muhlner the offer to join GR as its Director of Operations. A true and accurate copy of my offer letter to Muhlner (the "Muhlner Offer") is attached as Exhibit C. Muhlner accepted the offer and moved to Charlestown, Massachusetts. Muhlner executed an EOA on April 21, 2008 (the "Muhlner Agreement"). A true and accurate copy of the Muhlner Agreement is attached as Exhibit D.

8. In December 2008, Steve Mueller at One Beacon Insurance, with whom I was previously acquainted, introduced me to Mark Cohon. At the time, Cohon was an employee at American Benefits Consulting, a benefits and insurance consulting firm ("ABC"). Cohon presented and continues to present himself as an expert in employee insurance, benefits and risk services. We continued to see each other in business meetings and tradeshow events and became friends. In late 2009, Cohon confided in me that he intended to leave ABC and that he wanted to explore with me if there was a way in which he could assist GR. We discussed the possibility of GR developing a new department that would be based around the insurance, benefits and risk-sharing industries – Cohon's area of expertise – and that would successfully integrate into GR's existing services so that GR could offer an enhanced package of services to its clients. Cohon and I identified and developed this GR growth opportunity together, relying on both of our existing industry knowledge to navigate and succeed in an area which, while built upon both of our experience and knowledge, was a novel approach to the industry for both of us. This new department made business sense because GR's core services are often integrated in a client's insurance, benefits and risk sharing agreements. Cohon contributed his experience and knowledge of the insurance, benefits and risk-sharing industries while I contributed my knowledge of how those services could be integrated to meet client needs. Prior to working with me, Cohon knew nothing of the crisis response, travel assistance and evacuation industry. I showed him how the industry functions, how capital flows are processed and how these services can have significant impacts on a variety of insurance and risk bearing/pooling entities. This department became known as "Global Rescue Risk Services."

9. On March 18, 2010, Cohon executed a Consultant Agreement (the "Cohon Agreement"). A true and accurate copy of the Cohon Agreement is attached as Exhibit E.

10. At the time Cohon signed his Agreement, GR and Cohon agreed that his compensation would consist of paying for his expenses while working on behalf of GR and that any other compensation terms would be discussed and formalized at a later date. GR and Cohon agreed to this manner of payment for reasons that are personal to Cohon.

**Creating Global Rescue Risk Services**

11. Throughout 2009, 2010, and 2011, up until his resignation on November 2, 2011, Cohon and I worked closely together to develop the Global Rescue Risk Services department. We often spoke several times per week, met with dozens of potential clients and partners and attended tradeshows, including: RIMS (the Risk and Insurance Managers Society annual conference), VCIA (the Vermont Captive Insurance Association annual conference) and IBIS Advisors' International Benefits and Human Resources symposium. As our development of Global Rescue Risk Services progressed, Cohon became integrated with GR's sales team, which was led by Bochnowski and included multiple lower level sales employees. True and accurate emails demonstrating attendance at these conferences and associated client meetings are attached as Exhibit F.

12. There are many examples of meetings that show Cohon and GR's concerted efforts to develop and establish Global Rescue Risk Services. For example, there were multiple meetings starting in June 2010 with Tom Oksanen, a Senior Vice President of the Fidelity Investments' benefits group, during which we discussed reducing Fidelity's insurance spending and enhancing the group personal lines benefits for Fidelity employees. A true and accurate copy of Bochnowski's notes entered contemporaneously into Salesforce are attached as Exhibit G. Another example is a meeting that Cohon and I had with Liberty Mutual in April 2010 to discuss how Liberty Mutual could benefit both from GR's core services as well as those services

provided by GR through Global Rescue Risk Services. The agenda included discussions regarding "Personal Lines Insurance, Life Accident and Disability, and Captive Potential and Application." True and accurate copies of the email and agenda for that meeting are attached as Exhibit H.

13. GR employees and Cohon introduced Cohon to clients and potential clients as the head of Global Rescue Risk Services. True and accurate copies of emails that introduce Cohon as the head of GRRS are attached as Exhibit I.

14. Cohon's signature block on his email read "Mark B. Cohon, Global Rescue Risk Services." True and accurate copies of emails that display Cohon's signature block are attached as Exhibit J.

15. GR devoted substantial resources to creating and printing marketing materials to promote Global Rescue Risk Services to clients and potential clients at insurance and risk-services tradeshows and at direct client meetings. Cohon, Bochnowski and other GR employees participated in creating these materials. True and accurate copies of emails between Cohon, Bochnowski and other GR employees creating the Global Rescue Risk Services marketing materials are attached as Exhibit K. A true and accurate copy of the GRRS marketing materials and the printed brochure that was handed out at the Risk Management Society ("RIMS") annual conference is attached as Exhibit L.

16. In 2010, GR devoted substantial resources to create Crisis Services Company ("CSC"), a captive insurance company that provides risk pooling and reinsurance recommendations and a vehicle by which clients can share (i.e. "pool") their risk. For example, CSC was utilized to help share the American Alpine Club's risk. A true and accurate email reflecting the AAC and CSC agreement is attached as Exhibit M.

17. Over time, Global Rescue Risk Services became an established and entrenched branch of GR and was consistently pitched by Cohon and others to GR's clients as a way to provide them with additional services. For example, on May 18, 2011, Cohon introduced himself through email to Tina Bailey, VP of Human Resources of VSE Corporation, an existing GR client. The email states "Tina, I am the head of Global Rescue's Risk Management and Services team. We have recently been able to leverage our services at existing clients to help them reduce various insurance and benefits costs. As you may be aware, last week, VSE and GR's CEOs discussed GR's Risk Services team preparing a proposal to be used as a basis for discussing how VSE may be able to reduce the cost of some of your current commercial insurance and benefits while possibly improving service levels to VSE and your employees..." A true and accurate copy of this email is attached as Exhibit N.

18. By early November 2011 (the time of Cohon's resignation), Global Rescue Risk Services provided the following services: manage and consult on client insurance, benefits and risk services and provide consultative services for captive and risk pooling services, including group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling.

19. I have reviewed in detail the filings and correspondence associated with Cohon's, Bochnowski's and Muhlner's California declaratory judgment action. Based on the representations contained in those documents, I believe that Universal Operations Risk Management, LLC ("UnivOps") offers services that are virtually identical to services offered by GR that were offered by Bochnowski, Muhlner and Cohon on behalf of GR because their complaint alleges that they perform the same services listed in Paragraph 18 above.

**Description of Resignations**

20. Beginning sometime in 2010, I became aware that Bochnowski was having marital problems and that his wife was pressuring him to move to California to be closer to their family. I was aware that Bochnowski's wife was spending significant amounts of time in California, and as a result I allowed Bochnowski to make regular business trips to California so that he could see her, even though I did not always think that these trips made good business sense.

21. On or around the beginning of 2011, I made clear to Bochnowski and Muhlner that it did not make business sense for GR to open an office in California for many reasons, including dramatically higher operating costs, the adverse tax structure of the State of California and the management structure of the company. However, I did tell Bochnowski and Muhlner about a plan to open an office in New Hampshire because of New Hampshire's dramatically lower operating costs, favorable tax structure and its proximity to Boston and the management of the company. When I initially hired them, we had discussed whether there was potential for GR to ever open a California office. I had indicated to them at that time that, if it made business sense in the future, it was a possibility. However, I made no promises on the issue of a California office as I could not predict when or even if the need for a California office would ever arise.

22. Throughout the spring and early summer of 2011, I had numerous separate conversations with Bochnowski and Muhlner regarding the future of GR and their individual commitments to the company as the company continued to grow. They repeatedly asked to be given Vice President titles. However, I had concerns about their ability to lead and manage effectively because certain parts of GR had experienced employee turnover and morale issues under their leadership. Additionally, given my knowledge of the desire of Bochnowski's wife to move to California, I was concerned about their long-term commitment to GR. Nevertheless, I wanted to

reward them for their efforts over the past three years. For example, I hired a Sales Director with a significantly greater track record than Bochnowski, Tiger Shaw, to work under Bochnowski even though Shaw had successfully started and sold his own company and had many more years of relevant sales and management experience than Bochnowski. I put Shaw under, and not above, Bochnowski as a sign of my loyalty to and appreciation for Bochnowski.

23. In conversations during this time, I asked Bochnowski and Muhlner directly if they were committed to GR and would commit to living in Boston over the next few years. Because I knew that Tom's wife was unhappy in Boston, I offered him the opportunity to work out of the future New Hampshire office if that would make his personal life better, even though that would not be the best outcome for the company because our sales staff is located in Boston. I made clear to them that if they were committed to GR and to living on the east coast for a significant period of time (my expectation based on these conversations was at least five years) then I would promote them each to Vice President.

24. At some time in June 2011, Bochnowski and Muhlner gave me separate commitments that they were committed to GR and living in the Boston area. Bochnowski told me that he and his wife were looking into buying a house in Winchester, Massachusetts. Muhlner had always told me, and reconfirmed, that he and his wife enjoyed Boston and that, because his wife had recently received a job offer in Boston, they would remain in the Boston area and that he was committed to working for GR. As a direct result of those expressions of commitment to GR, I told them that they would be promoted to Vice President and that they would receive a $20,000 mid-year bonus and a salary raise from $110,000 to $130,000 per year. On more than one occasion, we shook hands in congratulations as did Stuart Richards, GR's Senior Vice President and my father, and Melissa Roth, GR's Vice President and General Counsel and my wife.

25. On Sunday, July 24, 2011, I sent a company-wide email announcing the promotions of Bochnowski and Muhlner.

26. On Friday, July 29, 2011, the $20,000 bonuses were transferred into Bochnowski's and Muhlner's individual bank accounts.

27. On Monday, August 1, 2011, Bochnowski and Muhlner came into my office together and both resigned. They told me that over the weekend their wives forced them to move to California. Bochnowski said that he wanted to be fair and to help the company, so he thought a two-week notice period was reasonable. I was surprised and unhappy with their decision, which was a complete reversal of what they had committed to only a few weeks before. While they paid lip service during their resignation to being committed to helping GR transition in the wake of the dual departure, they were insistent upon their need to meet the two-week departure deadline, despite their previous oral representations that they were going to stay at GR for the long term.

28. Stuart Richards, Melissa Roth and I spent the next few evenings negotiating with Bochnowski and Muhlner to create a transition plan through the end of 2011 and possibly for them to act in consultant roles through 2012. Bochnowski and Muhlner made clear that they did not want to be considered employees of GR but that they wanted to have their titles to be "consultant." They did not tell us why they wanted that title, but I now realize it is because they are acting as consultants in their new competing business.

29. On August 9, 2011, I gave Bochnowski and Muhlner separate Separation Agreements that I believe were a good faith effort to memorialize the terms that we agreed to in our negotiations. On August 11, 2011, at 9:41pm and 9:57pm respectively, Muhlner and Bochnowski sent me separate but identical emails including their resignation letters and each stating that the agreement "does not reflect the good faith discussions and negotiations…and I

have concluded based on your proposed draft agreement that we will be unable to reach any agreement with you on the terms that would be acceptable." At no point before this did they bring up any issues with the agreement or try to further negotiate the terms. True and accurate copies of these emails and the attached resignation letters are attached as Exhibit O. I emailed them back and stated "Your accusation that we have negotiated with you in bad faith is perplexing since it appears the agreement we sent you represents all of the things we discussed. If there were issues you had with the document, good faith on your part would have resulted in a discussion regarding those issues. I'm disappointed that this didn't happen and frankly don't understand. However, your motives are your own and it isn't for me to know them. I am open to further discussion if that is what you would like..." A true and accurate copy of this email is attached as Exhibit P.

30. The last day that Bochnowski and Muhlner worked at GR was August 15, 2011. However, Bochnowski and Muhlner asked me if they could come into the office on August 16, 2011 to pick up some final items and to drop off their laptop computers and Blackberry mobile devices. I consented and asked them to come in near the close of business hours.

31. A few days after their last day at GR, I spoke with Cohon about the resignations. At no point did Cohon tell me that he, Bochnowski and Muhlner had been planning on starting a business that would offer the same services as GR. Moreover, in the days following Bochnowski's and Muhlner's last day at GR, Cohon told me that he connected Muhlner with a company in California that was looking to hire a Chief Security Officer. I also asked Cohon to inform me of any contact he had with Bochnowski and Muhlner and he told me that he would.

32. Cohon continued to lead Global Rescue Risk Services after Bochnowski's and Muhlner's resignation.

33. On October 21, 2011 I sent Cohon a Partner Agreement, a Stock Option Agreement and a Consultant Agreement (at the time I could not locate the Consultant Agreement that he had signed). We were coming close to closing our first deals, so we began negotiating his compensation agreement. True and accurate copies of the email that I sent Cohon and the agreements are attached as Exhibit Q.

34. I spoke with Cohon after he reviewed the agreements, which, among other things, required him to disclose his other business activities. He specifically stated that he did not want to disclose his other activities and the flow of funds for potential deals. I told him that in order for us to continue to work together, we needed to be able to trust each other and understand how each deal was structured. The only way to do this was through disclosure of all parties to a deal.

35. On Sunday, October 30, 2011, Cohon forwarded an email to Bochnowski's old GR email address, which was captured by the GR email server. The email was from mbcohon@aol.com to tmuhlner@univops.com and tbochnowski@globalrescue.com. The email's subject was "Fwd: What's new to Costco Services!" Cohon wrote in the email "Looks like we're in competition with Costco. They perform payroll as well." A true and accurate copy of this email is attached as Exhibit R. Having had no previous indication that my two former employees and current consultant had gone into business together, I was extremely surprised by this email.

36. On Monday, October 31, 2011, UnivOps, Muhlner, Bochnowski and Cohon filed Plaintiffs' Complaint for Declaratory and Injunctive Relief against GR and DOES 1 through 10, inclusive in the Superior Court of the state of California for the county of San Francisco. I was not aware of this filing, nor have I ever been served with or seen a copy of this Complaint.

37. On Wednesday, November 2, 2011, again with no awareness that he had just filed suit against GR, I spoke with Cohon on the phone. I told him that I knew that he was working with

Bochnowski and Muhlner and that I wanted to know what was going on. I asked him if they were partners. I asked him when they began to work together. I told him that I had a right to know this information and that, because he was still a consultant to GR, he had a duty of good faith and loyalty to me and GR, in addition to contractual obligations. I told him I wanted the truth. Cohon did not tell me that he, Bochnowski and Muhlner had formed a company. Cohon did not tell me that he had already filed a lawsuit against me on Monday. Cohon did tell me that he did not start to work with Bochnowski and Muhlner until after they left GR, which I learned later was not true. I asked Cohon to send me in writing, when he, Bochnowski and Muhlner started to work together and what they were doing together. I reminded Cohon that he, Bochnowski and Muhlner all signed agreements that gave GR rights and that GR intends to protect those rights. Cohon asked for a copy of his signed Consultant Agreement. At the end of the conversation, I emailed Cohon a copy of the agreement. A true and accurate copy of this email is attached as Exhibit S.

38. On Thursday, November 3, 2011, Cohon sent me an email terminating his consulting relationship with GR. It reads "Dan, After consideration of our call yesterday afternoon, I will not be providing any more consulting services to Global Rescue now or in the future. I have appreciated our past relationship and have enjoyed working with you. With respect to your request for information regarding my business activities with Ted and Tom, please send a written request for the information you are seeking, and I will ensure a timely response (although I cannot commit that the specific information you may request can or will necessarily be provided). Thank you, Mark Cohon." A true and accurate copy of this email is attached as Exhibit T.

39. On Friday, November 4, 2011, a messenger showed up at GR's front door and delivered Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief filed in the superior court of the state of California for the county of San Francisco in the following case – *Universal Operations Risk Management, LLC, Edward Muhlner, Thomas Bochnowski and Mark Cohon's vs. Global Rescue LLC and DOES 1 through 10, inclusive*. On Tuesday, November 8, 2011, I was served with a certified copy of the same ("Plaintiffs' First Amended Complaint"). A true and accurate copy of Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief is attached as Exhibit U.

**Cohon, Bochnowski and Muhlner's Violations of their Agreements with GR**

40. Plaintiffs' First Amended Complaint asks for a declaration that Muhlner, Bochnowski and Cohon's employment with UnivOps does not violate any contractual or legal obligation to GR due to California law that finds other state's employment agreements as unenforceable in the state of California. Plaintiffs also seek a declaration that even assuming that their respective agreements with GR are enforceable in California, their employment with UnivOps does not violate their agreements with GR.

41. The Bochnowski Agreement, the Muhlner Agreement and the Cohon Agreement are identical in all relevant respects. *See* Exhibits B, D, E. Bochnowski and Muhlner were very familiar with these agreements and they reference them in their respective resignation letters. *See* Exhibit O.

42. The Bochnowski Agreement and the Muhlner Agreement include the following provision. The Cohon Agreement includes an identical provision however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*":

> 8. Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter,

> regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

43. Plaintiffs' First Amended Complaint alleges that "UnivOps" is a limited liability company that manages client insurance, benefits and risk services, and provides expert consultative services for three main captive and risk pooling services: group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling."

44. The services that UnivOps offers are in direct competition with the services that Global Rescue Risk Services offer its clients in violation of Paragraph 8.

45. The Bochnowski Agreement and the Muhlner Agreement include the following provision. The Cohon Agreement includes an identical provision however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*":

> 9. Nonsolicitation of Customers. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:
>
> (a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,
>
> (b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an employee of the Company), or

(e) refer a Customer or supplier to another provider of Services.

46. Since being served with Plaintiffs' First Amended Complaint I had GR's Information Technology Department ("IT") and outside computer forensic consultants perform searches on emails sent or received by them and to conduct a search on both Bochnowski's and Muhlner's laptops. We also discovered that removable drives capable of holding gigabytes of information were attached to these computers and that there was document activity on the day of and in the days leading up to Bochnowski's and Muhlner's separation from GR. In addition, we learned that both Blackberry devices were returned without the SD memory cards that had been installed in the devices and Bochnowski's device was returned without any data at all.

47. Although the Cohon Agreement requires that Cohon return his laptop immediately at termination or resignation (which was November 3, 2011) we did not receive his laptop until December 2, 2011. Cohon claims the delay in sending GR the laptop is that his daughter spilled a soft drink on it. GR received notification of this spillage in a letter dated November 21, 2011. Strangely, when GR received the bubble-wrapped laptop on December 2, 2011, more than two weeks after the reported spillage, the computer appeared to have been drenched in liquid and was still very wet. According to the UPS shipment slip, the computer had been over-nighted on December 1, 2011. A true and accurate copy of the UPS overnight shipment slip is attached as <u>Exhibit V</u>. The liquid had a vinegary odor inconsistent with that of a soft drink and evaporated quickly after opening. I opened the computer in the presence of Melissa Roth and my attorneys, all of whom can attest to the amount of liquid. We also took pictures of the wet computer.

48. It has come to my attention that Cohon, Bochnowski and Muhlner have been and are currently soliciting GR clients and potential clients on behalf of UnivOps in violation of paragraph 9 of their respective Agreements.

49. The Bochnowski Agreement and the Muhlner Agreement include the following provision. The Cohon Agreement includes an identical provision however the first sentence "During the term of my *employment*" is replaced with "During the term of my *relationship*":

> 10. Nonsolicitation of Employees. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:
>
> (a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or
>
> (b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee, prospective employee, consultant or prospective consultant of the Company to terminate his or her employment or other relationship with the Company or provide services to any entity other than the Company.

50. Plaintiffs' First Amended Complaint states that Cohon is the President of UnivOps and Bochnowski and Muhlner are Vice Presidents of UnivOps. Since Cohon, Bochnowski, and Muhlner are all recent employees and/or consultants of GR, they are in violation of Paragraph 10. We believe that they might be soliciting other current or former GR employees as well.

51. GR devoted substantial time and resources in developing Global Rescue Risk Services. Neither Bochnowski nor Muhlner had any knowledge of travel assistance, crisis response, evacuation, insurance, benefits, or risk industries prior to joining GR. GR diverted substantial energy and sales efforts from our core services to those services offered by Global Rescue Risk

Services. GR spent significant amounts of money on Global Rescue Risk Services marketing materials, training, and expenses for Cohon, Bochnowski and other GR employees to attend client meetings and tradeshows.

52. Moreover, Cohon, Bochnowski and Muhlner have a significant amount of GR proprietary and confidential information and knowledge. They have detailed knowledge of GR's proprietary databases, documents, client, and vendor relationships. They have been privy to many of GR's current and anticipated client and vendor agreements. Other specific examples of confidential and proprietary knowledge that they have gained while employed or during their relationship with GR:

(a) Intimate working knowledge of vendor or partner relationships and contacts;

(b) Sales and marketing strategy for GR's entire organization;

(c) Operations strategy for GR's entire organization;

(d) Knowledge of overall business planning for the company;

(e) Knowledge of all of GR's data sources and contract status for those sources;

(f) Knowledge of our new data infrastructure;

(g) Knowledge of our costs and pricing structure;

(h) Knowledge of company financial information;

53. Simply put, as Vice President of Sales, Vice President of Operations and the head of the Global Rescue Risk Services department, Bochnowski, Muhlner and Cohon had access to much of GR's sensitive, confidential and proprietary information. Should their knowledge of GR's proprietary information, GR's current and prospective client lists and trade secrets be used by Cohon, Muhlner and Bochnowski, GR could be significantly harmed, the value of which could be difficult to ascertain.

Signed under the pains and penalties of perjury this 9th day of December, 2011.

Daniel L. Richards

# EXHIBIT A

GLOBAL rescue

**Daniel L. Richards**
Chief Executive Officer

(617) 459-4198
(858) 712-1295 (fax)

**April 16, 2008**

Mr. Thomas Bochnowski
28 Camino Por Los Arboles
Atherton, CA 94027

Dear Tom,

I am pleased to offer you the opportunity to join Global Rescue LLC ("Global Rescue" or the "Company") as a Director of Corporate Sales for the Company. I believe you will be a good fit at Global Rescue and that your outstanding record of accomplishments will enable you to make a significant impact on the future success of the Company.

As we have discussed, Global Rescue will expect you to perform the following functions: (i) design and implement sales protocols and strategy, (ii) provide Boston Operations Center ("BOC") organizational and in-the-field leadership to Global Rescue sales and marketing teams, (iii) represent Global Rescue in sales, marketing and business development activities with existing and future clients and, (iv) coordinate the provision of Global Rescue's services with the Company's partners, affiliates and consultants worldwide and, (v) support and participate in the planning and execution of operations in support of Global Rescue clients.

You will be based in Boston and expected to travel both domestically and internationally, as required, to perform the functions stated above. You should expect to travel several times per week.

<u>Compensation and Benefits</u>

*Salary* – Global Rescue will pay you $75,000 per year (the "Salary") in semi-monthly installments, two weeks in arrears. Your pay shall be deposited directly into the domestic bank account of your choice; details of which shall be provided by you to the Company. Global Rescue will provide this information to an authorized payroll vendor of the Company so these automatic deposits can occur.

*Annual Bonus* – Global Rescue will provide you and the sales and marketing team with incentive pay based on the amount of new and recurring business you generate for Global Rescue. The incentive pay shall be based on a formula related to the profits generated by

you. The formula shall be based on your performance and shall be determined by members of a compensation committee designated by the board (the "Compensation Committee"), who may modify it from time to time. The amount paid shall be between 5% - 10% of the gross profit of new business (based on a formula related to the sales goals for the year) sourced by you and 5% of the gross profit of renewal business sourced by you.

*Expenses* – During your employment, you will be entitled to receive reimbursement for all reasonable expenses incurred by you (in accordance with the policies and procedures established from time to time by the Company) in performing services hereunder, provided that you properly account for such expenses in accordance with Company policy.

*Benefits* – You shall be entitled to select health insurance coverage through a health insurance plan provided to the employees of Global Rescue while you are employed at the Company. The maximum monthly cost of any such health insurance plan shall be $613.64. This amount will be reviewed annually by Global Rescue's Compensation Committee. Should Global Rescue not be able to offer you health insurance, you shall be directly reimbursed by the Company for a health insurance plan of your selection up to the previously stated maximum.

*Equity* – As part of your employment with Global Rescue, you shall be granted equity in the Company in the form of Restricted Stock under the Global Rescue Corp. 2007 Stock Option and Grant Plan (the "Plan"). You shall be entitled to 300,000 shares of Restricted Stock under the Plan (the "Grant"), the specifics of which shall be governed by the Restricted Stock Agreement (the "Grant Agreement") under the Plan.

Each day you spend in the employ of the Company and not on Leave (as defined below) shall count toward the vesting of the Restricted Units. In the event you take a temporary leave of absence ("Leave"), vesting shall be frozen as of the start date of your Leave and shall resume upon the first day that you return from Leave to resume working full-time at the Company. For details regarding the structure of the equity incentive pool, please refer to the Plan and the Grant Agreement.

*Retirement Plan* – Global Rescue will be establishing a 401(k) plan for employees at a suitable investment firm that you will qualify to contribute to, if you wish, following its formation and once you begin your employment with Global Rescue.

*Vacation* – You shall be entitled to two (2) weeks' paid vacation and paid holidays in accordance with policies adopted by the Company as in effect from time to time. You will also have two (2) personal days per calendar year.

You understand that by accepting this offer that you are an employee "at will" and agree that this "at will" status shall govern both your and Global Rescue's responsibilities regarding your employment. This letter and your relationship with Global Rescue both as an employee and subsequent to your work for Global Rescue is subject to your agreeing with the terms and conditions and signing the Employee Obligations Agreement that accompanies this letter. The start date of your employment with Global Rescue will be June 15, 2008. Your employment with the Company is contingent on your moving permanently to Boston.

This letter agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Massachusetts without giving effect to the conflicts of laws provisions thereof.

While significant challenges lie ahead, we are confident we have the resources, relationships and perseverance to make the continued success of Global Rescue a reality. Your contribution to the team will be instrumental in making this happen.

If you choose to accept this offer, please sign below.

Sincerely,

Daniel L. Richards

Agreed and Accepted:

Thomas Bochnowski

23 April 2008

Date

**GLOBAL RESCUE LLC**
**CONSULTANT AGREEMENT**

**Consultant's Legal Name:** Mark Cohon
**Address:** 88 Cutter Mill Road STE 320, Great Neck, NY 11021

In consideration of my independent consulting relationship with Global Rescue LLC (the "Company"), whose address is 177 Milk St., Suite 700, Boston, MA 02109, I, the above-named Consultant, hereby agree with the Company as follows:

1. Definitions.

(a) Proprietary Information. As used in this Agreement, "Proprietary Information" means information belonging to the Company which is of value to the Company in the course of conducting its business. Proprietary Information includes without limitation trade secrets, product ideas, inventions, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials and other intellectual property, marketing plans and strategies, marketing or sales information, sales opportunities and strategies, reports, forecasts and plans, customer lists, financial information, reports, plans and forecasts, and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or assets, or proposed business affiliations) which have been discussed or considered by the management of the Company. Proprietary Information also includes information developed by me in the course of my relationship with the Company relating to the Company or otherwise relating to Inventions which belong to the Company under Section 5 below, as well as other information to which I may have access in connection with the Company.

(b) Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all any inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulas, data, techniques, know-how, secret or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection). Inventions and Developments include, by way of example and without limitation, discoveries and improvements which consist of or relate to any form of Proprietary Information.

(c) Company-Related Inventions and Developments. For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either (i) relate at the time of conception or development to the actual or demonstrably anticipated business of the Company or to its actual or demonstrably anticipated

research and development, (ii) relate to any work performed for the Company, whether or not during normal business hours, (iii) are developed on Company time or (iv) are developed primarily through or in substantial reliance on the use of the Company's Proprietary Information, equipment and software, or other facilities or resources.

(d) Company. For purposes of this Agreement, all references to the "Company" will be deemed to include the Company, its direct or indirect subsidiaries, whether currently in existence or hereafter acquired or created, and its affiliates.

(e) Company-Related Equipment. All equipment, including but not limited to computers, Blackberries, telephonic instruments or any other instrument or device purchased or furnished by the Company for the use, direct or indirect, of the above-named Consultant.

(f) Company Assigned Work. Any assigned deployment, due diligence, analysis or other temporary Company related work or function assigned to the Contractor to be executed over a Company designated timeframe for a Company designated rate or wage.

(g) Services. Crisis response services as further described in the Company's marketing collateral.

2. Return of Company-Related Equipment. Company-Related Equipment shall remain the property of and be returned to the Company when the Consultant's relationship with the Company ceases. Consultants who fail to immediately return Company equipment shall reimburse the Company 1.5 times the replacement cost of any such equipment. Company keys, IDs and keycards shall be returned immediately. Consultants who fail to return company keys, IDs or keycards immediately upon separation from the Company shall reimburse the Company $250 per key, ID or keycard not returned to cover the replacement costs of locks and the reprogramming cost of card readers.

3. Confidentiality. I understand and agree that my relationship creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my relationship with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company. Confidential Information includes but is not limited to the following: Company client information, locations, names of Company employees and pictures taken while being paid by the Company to support Company clients, If at any time I disclose Confidential Information without first obtaining direct written consent from the Company, I understand the Company may withhold pay without providing prior notice. I further understand I will be directly liable for any financial damages

sustained by the Company as a result of my disclosures and I will provide direct financial remuneration to the Company in an amount determined by the Company for such unauthorized disclosures. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

4. Documents, Records, etc. All documents, records, apparatus, information, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company or are produced by me in connection with my relationship will be and remain the sole property of the Company. I will return to the Company all such materials and property as and when requested by the Company. In any event, I will return all such materials and property immediately upon termination of my relationship for any reason. I will certify in writing the destruction of all electronic records, documents and other material that cannot be returned to the Company. I will not take with me any such material or property or any copies thereof upon such termination.

5. Ownership of Inventions and Developments. I agree that all Company-Related Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during any or resulting from any term of consultancy performed for the Company will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Company any proprietary rights which I may have or acquire in any such Company-Related Inventions and Developments without further compensation, and I waive any moral rights or other special rights which I may have or accrue therein. At the request and cost of the Company, I agree to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. The provisions of this Section 5 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my relationship with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after termination of my relationship, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my relationship were conceived during the term of my relationship with the Company unless I am able to establish a later conception date by clear and convincing evidence. The provisions of this Section 5 will not apply, however, to any Inventions and Developments which may be disclosed in Schedule A hereto, prior to its acceptance by the Company, representing Inventions and Developments made by me prior to my relationship with the Company.

6. Disclosure of Inventions and Developments. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 5.

7. Obtaining and Enforcing Proprietary Rights. I agree to assist the Company, at the Company's request from time to time and at the Company's expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my relationship, provided that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, but only for the purpose of executing and filing any such document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by me.

8. Competitive Activities. During the term of my relationship or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, Consultant, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world that directly competes with the Company. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

9. Nonsolicitation of Customers. During the term of my relationship or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

(a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

(b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an Consultant of the Company), or

(e) refer a Customer or supplier to another provider of Services.

10. Nonsolicitation of Employees. During the term of my relationship or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:

(a) hire or employ, directly or indirectly through any enterprise that provides Services similar to those provided by the Company and that I am associated with, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or

(b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any Consultant, prospective Consultant, consultant or prospective consultant of the Company to terminate his or her relationship or other relationship with the Company or provide services to any entity other than the Company.

11. Non-Disparagement. During my relationship with the Company, whether or not under this Agreement, and at all times thereafter, I will not, directly or indirectly, make, solicit or confirm any disparaging statement or other negative remarks, written or oral, about the Company or any of its past, present or future affiliated companies or businesses, or the past, present or future affiliates, directors, officers, employees, managers, members, consultants, partners, agents, or representatives of any of them. I acknowledge and agree that this prohibition extends to statements, written or verbal, made to anyone, including but not limited to, the news media, investors, potential investors, any board of directors or advisory board or directors, industry analysts, competitors, strategic partners, vendors, employees (past and present), clients (past and present), and potential clients.

12. Acknowledgments and Agreements. I acknowledge and agree that the terms and restrictions set forth in this Agreement are intended to protect the Company's interest in Confidential Information and its commercial relationships and goodwill (with its Customers, prospective customers, vendors, consultants and Consultants), including, without limitation, Confidential Information, commercial relationships and are reasonable and appropriate for these purposes and that my failure to strictly adhere to the terms of this agreement will constitute a breach of this agreement and be harmful to the Company.

13. Disclosure of Agreement. I will disclose the existence and terms of this Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering

into an relationship, partnership or other business relationship with such person or entity.

14. Third-Party Agreements and Rights. I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business. I represent to the Company that my execution of this Agreement, my relationship with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous relationship or other party.

15. Other Consultant Income. During the period for which I am a paid Consultant for the Company, I shall not receive payment for relationship, services rendered, or other activities from sources that represent a potential conflict of interest to the Company unless such activities are approved in advance in writing by the Company. Consultant shall immediately disclose any and all other sources of such income to the Company.

16. Expenses Relating to Company Assigned Work. Consultant shall obtain written pre-approval for all expenses related to Company Assigned Work. Contractor acknowledges that unless pre-approval is obtained from the Company, Contractor will be solely responsible for all expenses incurred. Contractor further acknowledges that to obtain reimbursement of pre-approved expenses Contractor must submit all original bills of sale or receipts to the Company within fourteen (14) days of return or completion of Company Assigned Work. For expenses which a bill of sale is not available within the specified submission window, Contractor must obtain written approval for late submission from the Company prior to the expiration of the submission window. Contractor must submit expenses related to all Company Assigned Work a minimum of thirty (30) days from the date such expenses are incurred.

17. Remedies. Without limiting the remedies available to the Company, I acknowledge that a breach or a threatened breach of any of the covenants in this Agreement could result in irreparable injury to the Company for which there might be no adequate remedy at law, and I agree that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary injunction and a permanent injunction restraining me from engaging in any activities prohibited or such other equitable relief as may be required to enforce specifically any of the covenants contained in this Agreement.

18. Binding Effect. This Agreement will be binding upon me and my heirs, executors, administrators and legal representatives and will inure to the benefit of the Company, any subsidiary of the Company, and its and their respective successors and assigns.

19. Enforceability. If any portion or provision of this Agreement is to any extent

declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable.

20. Entire Agreement. This Agreement constitutes the entire agreement between the Company and myself with respect to the subject matter hereof, and supersedes all prior representations and agreements, with respect to such subject matter. This Agreement may not be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification or waiver is sought. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, in any particular case will not prevent any subsequent enforcement of such term or obligation or to be deemed a waiver of any separate or subsequent breach.

21. Notices. Any notices, requests, demands and other communications provided for by this Agreement will be sufficient if in writing and delivered in person or sent by registered or certified mail, postage prepaid, to me at the last address which I have filed in writing with the Company or, in the case of any notice to the Company, at its main offices, to the attention of the undersigned officer.

22. Hold Harmless. I understand that some of the activities I may be requested to perform for the Company may be dangerous and I agree to hold harmless the Company, its officers, employees, directors, consultants and subcontractors for any injury of loss I may experience as a result of the services I perform for the Company.

23. Governing Law; Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above

shall be effective service of process for any action, suit or proceeding brought against it in any such court.

24. In the event of any action to enforce this Agreement, Global Rescue shall be entitled to be awarded reasonable legal fees and other reasonable costs should a judgment be rendered in Global Rescue's favor.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

Accepted and Agreed to:

______________________________
Name:

Date:_________________________

Accepted and Agreed to:

Global Rescue LLC

By: ___________________________
Name:
Title:

Date:__________________________

SCHEDULE A

CONTRIBUTED INVENTIONS AND DEVELOPMENTS

Consultant Name: ______________

Date: ____________

GLOBAL rescue

____________________
Name:

# EXHIBIT B

**GLOBAL RESCUE LLC**

**EMPLOYEE OBLIGATIONS AGREEMENT**

Employee's Name: Thomas Bochnak Employee's Address: 7 Emerson Place #708 Boston, MA 02114

Date: 03 May 08

In consideration of my employment by or other relationship with Global Rescue LLC (the "Company"), whose address is 115 Broad St., Suite 350, Boston, MA 02110, I, the above-named Employee, hereby agree with the Company as follows:

1. Definitions.

(a) Proprietary Information. As used in this Agreement, "Proprietary Information" means information belonging to the Company which is of value to the Company in the course of conducting its business. Proprietary Information includes without limitation trade secrets, product ideas, inventions, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials and other intellectual property, marketing plans and strategies, marketing or sales information, sales opportunities and strategies, reports, forecasts and plans, customer lists, financial information, reports, plans and forecasts, and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or assets, or proposed business affiliations) which have been discussed or considered by the management of the Company. Proprietary Information also includes information developed by me in the course of my employment by the Company or otherwise relating to Inventions which belong to the Company under Section 5 below, as well as other information to which I may have access in connection with my employment.

(b) Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all any inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulas, data, techniques, know-how, secret or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection). Inventions and Developments include, by way of example and without limitation, discoveries and improvements which consist of or relate to any form of Proprietary Information.

(c) Company-Related Inventions and Developments. For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either (i) relate at the time of conception or development to the actual or demonstrably anticipated business of the Company or to its actual or demonstrably anticipated research and development, (ii) relate to any work performed for the Company, whether or not during normal business hours, (iii) are developed on Company time or (iv) are developed primarily through or in substantial reliance on the use of the Company's Proprietary Information,

equipment and software, or other facilities or resources.

(d) Company. For purposes of this Agreement, all references to the "Company" will be deemed to include the Company, its direct or indirect subsidiaries, whether currently in existence or hereafter acquired or created, and its affiliates.

(e) Company-Related Equipment. All equipment, including but not limited to computers, Blackberries, telephonic instruments or any other instrument or device purchased or furnished by the Company for the use, direct or indirect, of the above-named Employee.

2. Return of Company-Related Equipment. Company-Related Equipment shall remain the property of and be returned to the Company when the Employee's employment by the Company ceases. Employees who fail to immediately return Company equipment shall reimburse the Company 1.5 times the replacement cost of any such equipment. Company keys, IDs and keycards shall be returned immediately. Employees who fail to return company keys, IDs or keycards immediately upon separation from the Company shall reimburse the Company $250 per key, ID or keycard not returned to cover the replacement costs of locks and the reprogramming cost of card readers.

3. Confidentiality. I understand and agree that my employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

4. Documents, Records, etc. All documents, records, apparatus, information, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company or are produced by me in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such materials and property as and when requested by the Company. In any event, I will return all such materials and property immediately upon termination of my employment for any reason. I will certify in writing the destruction of all electronic records, documents and other material that cannot be returned to the Company. I will not take with me any such material or property or any copies thereof upon such termination.

5. Ownership of Inventions and Developments. I agree that all Company-Related

Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during the term of my employment with the Company will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Company any proprietary rights which I may have or acquire in any such Company-Related Inventions and Developments without further compensation, and I waive any moral rights or other special rights which I may have or accrue therein. At the request and cost of the Company, I agree to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. The provisions of this Section 5 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my employment with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after termination of my employment, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my employment were conceived during the term of my employment with the Company unless I am able to establish a later conception date by clear and convincing evidence. The provisions of this Section 5 will not apply, however, to any Inventions and Developments which may be disclosed in Schedule A hereto, prior to its acceptance by the Company, representing Inventions and Developments made by me prior to my employment by the Company.

6. Disclosure of Inventions and Developments. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 5.

7. Obtaining and Enforcing Proprietary Rights. I agree to assist the Company, at the Company's request from time to time and at the Company's expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my employment, provided that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, but only for the purpose of executing and filing any such document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by me.

8. Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services

or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

9. Nonsolicitation of Customers. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

(a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

(b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an employee of the Company), or

(e) refer a Customer or supplier to another provider of Services.

10. Nonsolicitation of Employees. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:

(a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or

(b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee, prospective employee, consultant or prospective consultant of the Company to terminate his or her employment or other relationship with the Company or provide services to any entity other than the Company.

11. Non-Disparagement. At all times, both during my employment with the Company and after its termination, I will not, directly or indirectly, make, solicit, or confirm any public or private statements or communications that are or that may reasonably be considered to be harmful to, disparaging of, or reflect negatively upon (a) the Company or any employee or affiliate thereof, (b) the Company's business and (b) the Company's past, present or future Members and employees.

12. Acknowledgments and Agreements. I acknowledge and agree that the terms and restrictions set forth in this Agreement are intended to protect the Company's interest in Confidential Information and its commercial relationships and goodwill (with its Customers, prospective customers, vendors, consultants and employees), including, without limitation, Confidential Information, commercial relationships and are reasonable and appropriate for these purposes and that my failure to strictly adhere to the terms of this agreement will constitute a breach of this agreement and be harmful to the Company.

13. Disclosure of Agreement. I will disclose the existence and terms of this Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an employment, partnership or other business relationship with such person or entity.

14. Third-Party Agreements and Rights. I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business. I represent to the Company that my execution of this Agreement, my employment with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party.

15. Other Employee Income. Employee shall not receive payment for employment, services rendered, or other activities from entities other than the Company unless such activities are approved in advance in writing by the Company. Employee shall immediately disclose any and all other sources of income to the Company.

16. Injunction. I agree that it would be difficult to measure any damages caused to the Company which might result from any breach by me of the promises set forth in this Agreement, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to the Company.

17. Binding Effect. This Agreement will be binding upon me and my heirs, executors, administrators and legal representatives and will inure to the benefit of the Company, any subsidiary of the Company, and its and their respective successors and assigns.

18. Enforceability. If any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable.

19. Entire Agreement. This Agreement constitutes the entire agreement between the Company and myself with respect to the subject matter hereof, and supersedes all prior representations and agreements, with respect to such subject matter. This Agreement may not be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification or waiver is sought. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, in any particular case will not prevent any subsequent enforcement of such term or obligation or to be deemed a waiver of any separate or subsequent breach.

20. Notices. Any notices, requests, demands and other communications provided for by this Agreement will be sufficient if in writing and delivered in person or sent by registered or certified mail, postage prepaid, to me at the last address which I have filed in writing with the Company or, in the case of any notice to the Company, at its main offices, to the attention of the undersigned officer.

21. Governing Law; Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process for any action, suit or proceeding brought against it in any such court.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

Accepted and Agreed to:

______________________________
Name: , Employee

Accepted and Agreed to:

Global Rescue LLC

By: ______________________________ 5/8/08
Name:
Title:

SCHEDULE A
CONTRIBUTED INVENTIONS AND DEVELOPMENTS

Employee Name: Thomas Bochnowski

Date: 03 May 08

Name:

# EXHIBIT C

GLOBAL rescue

**Daniel L. Richards**
Chief Executive Officer

(617) 459-4198
(858) 712-1295 (fax)

**April 21, 2008**

Mr. Edward Muhlner
2 61st Place
Long Beach, CA 90803

Dear Ted,

I am pleased to offer you the opportunity to join Global Rescue LLC ("Global Rescue" or the "Company") as a Director of Sales Operations for the Company. I believe you will be a good fit at Global Rescue and that your outstanding record of accomplishments will enable you to make a significant impact on the future success of the Company.

As we have discussed, Global Rescue will expect you to perform the following functions: (i) design and implement sales protocols and strategy, (ii) provide Boston Operations Center ("BOC") organizational and in-the-field leadership to Global Rescue sales, marketing and operations teams, (iii) represent Global Rescue in sales, marketing and business development activities with existing and future clients, (iv) developing operational protocols, SOPs, resources and strategies to support current and future GR clients, (v) coordinate the provision of Global Rescue's services with the Company's partners, affiliates and consultants worldwide and, (vi) support and participate in the planning and execution of operations in support of Global Rescue clients.

You will be based in Boston and expected to travel both domestically and internationally, as required, to perform the functions stated above. You should expect to travel several times per week.

<u>Compensation and Benefits</u>

*Salary* – Global Rescue will pay you $75,000 per year (the "Salary") in semi-monthly installments, two weeks in arrears. Your pay shall be deposited directly into the domestic bank account of your choice; details of which shall be provided by you to the Company. Global Rescue will provide this information to an authorized payroll vendor of the Company so these automatic deposits can occur.

*Annual Bonus* – Global Rescue will provide you and the sales, marketing and operations teams with incentive pay based on the amount of new and recurring business you

generate for Global Rescue. The incentive pay shall be based on a formula related to the profits generated by you. The formula shall be based on your performance and shall be determined by members of a compensation committee designated by the board (the "Compensation Committee"), who may modify it from time to time. The amount paid shall be between 5% - 10% of the gross profit of new business (based on a formula related to the sales goals for the year) sourced by you and 5% of the gross profit of renewal business sourced by you.

*Expenses* – During your employment, you will be entitled to receive reimbursement for all reasonable expenses incurred by you (in accordance with the policies and procedures established from time to time by the Company) in performing services hereunder, provided that you properly account for such expenses in accordance with Company policy.

*Benefits* – You shall be entitled to select health insurance coverage through a health insurance plan provided to the employees of Global Rescue while you are employed at the Company. The maximum monthly cost of any such health insurance plan shall be $306.82 per spouse or a total of $613.64 if you both elect to have coverage. This amount will be reviewed annually by Global Rescue's Compensation Committee. Should Global Rescue not be able to offer you health insurance, you shall be directly reimbursed by the Company for a health insurance plan of your selection up to the previously stated maximum.

*Equity* – As part of your employment with Global Rescue, you shall be granted equity in the Company in the form of Restricted Stock under the Global Rescue Corp. 2007 Stock Option and Grant Plan (the "Plan"). You shall be entitled to 300,000 shares of Restricted Stock under the Plan (the "Grant"), the specifics of which shall be governed by the Restricted Stock Agreement (the "Grant Agreement") under the Plan.

Each day you spend in the employ of the Company and not on Leave (as defined below) shall count toward the vesting of the Restricted Units. In the event you take a temporary leave of absence ("Leave"), vesting shall be frozen as of the start date of your Leave and shall resume upon the first day that you return from Leave to resume working full-time at the Company. For details regarding the structure of the equity incentive pool, please refer to the Plan and the Grant Agreement.

*Retirement Plan* – Global Rescue will be establishing a 401(k) plan for employees at a suitable investment firm that you will qualify to contribute to, if you wish, following its formation and once you begin your employment with Global Rescue.

*Vacation* – You shall be entitled to two (2) weeks' paid vacation and paid holidays in accordance with policies adopted by the Company as in effect from time to time. You will also have two (2) personal days per calendar year.

You understand that by accepting this offer that you are an employee "at will" and agree that this "at will" status shall govern both your and Global Rescue's responsibilities regarding your employment. This letter and your relationship with Global Rescue both as an employee and subsequent to your work for Global Rescue is subject to your agreeing with the terms and conditions and signing the Employee Obligations Agreement that accompanies this letter. The start date of your employment with Global Rescue will be

July 7, 2008. Your employment with the Company is contingent on your moving permanently to Boston.

This letter agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Massachusetts without giving effect to the conflicts of laws provisions thereof.

While significant challenges lie ahead, we are confident we have the resources, relationships and perseverance to make the continued success of Global Rescue a reality. Your contribution to the team will be instrumental in making this happen.

If you choose to accept this offer, please sign below.

Sincerely,

Daniel L. Richards

Agreed and Accepted:

Edward Muhlner

29 APR 2008

Date

# EXHIBIT D

**GLOBAL RESCUE LLC**

**EMPLOYEE OBLIGATIONS AGREEMENT**

Employee's Name: **Edward Muhlner** Employee's Address: **2 61st Place**
**Long Beach, CA 90803**

Date: April 21, 2008

In consideration of my employment by or other relationship with Global Rescue LLC (the "Company"), whose address is 115 Broad St., Suite 350, Boston, MA 02110, I, the above-named Employee, hereby agree with the Company as follows:

1. Definitions.

(a) Proprietary Information. As used in this Agreement, "Proprietary Information" means information belonging to the Company which is of value to the Company in the course of conducting its business. Proprietary Information includes without limitation trade secrets, product ideas, inventions, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials and other intellectual property, marketing plans and strategies, marketing or sales information, sales opportunities and strategies, reports, forecasts and plans, customer lists, financial information, reports, plans and forecasts, and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or assets, or proposed business affiliations) which have been discussed or considered by the management of the Company. Proprietary Information also includes information developed by me in the course of my employment by the Company or otherwise relating to Inventions which belong to the Company under Section 5 below, as well as other information to which I may have access in connection with my employment.

(b) Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all any inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulas, data, techniques, know-how, secret or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection). Inventions and Developments include, by way of example and without limitation, discoveries and improvements which consist of or relate to any form of Proprietary Information.

(c) Company-Related Inventions and Developments. For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either (i) relate at the time of conception or development to the actual or

demonstrably anticipated business of the Company or to its actual or demonstrably anticipated research and development, (ii) relate to any work performed for the Company, whether or not during normal business hours, (iii) are developed on Company time or (iv) are developed primarily through or in substantial reliance on the use of the Company's Proprietary Information, equipment and software, or other facilities or resources.

(d) Company. For purposes of this Agreement, all references to the "Company" will be deemed to include the Company, its direct or indirect subsidiaries, whether currently in existence or hereafter acquired or created, and its affiliates.

(e) Company-Related Equipment. All equipment, including but not limited to computers, Blackberries, telephonic instruments or any other instrument or device purchased or furnished by the Company for the use, direct or indirect, of the above-named Employee.

2. Return of Company-Related Equipment. Company-Related Equipment shall remain the property of and be returned to the Company when the Employee's employment by the Company ceases. Employees who fail to immediately return Company equipment shall reimburse the Company the replacement cost of any such equipment. Company keys, IDs and keycards shall be returned immediately. Employees who fail to return company keys, IDs or keycards immediately upon separation from the Company shall reimburse the Company $250 per key, ID or keycard not returned to cover the replacement costs of locks and the reprogramming cost of card readers.

3. Confidentiality. I understand and agree that my employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

4. Documents, Records, etc. All documents, records, apparatus, information, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company or are produced by me in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such materials and property as and when requested by the Company. In any event, I will

return all such materials and property immediately upon termination of my employment for any reason. I will certify in writing the destruction of all electronic records, documents and other material that cannot be returned to the Company. I will not take with me any such material or property or any copies thereof upon such termination.

5. Ownership of Inventions and Developments. I agree that all Company-Related Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during the term of my employment with the Company will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Company any proprietary rights which I may have or acquire in any such Company-Related Inventions and Developments without further compensation, and I waive any moral rights or other special rights which I may have or accrue therein. At the request and cost of the Company, I agree to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. The provisions of this Section 5 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my employment with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after termination of my employment, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my employment were conceived during the term of my employment with the Company unless I am able to establish a later conception date by clear and convincing evidence. The provisions of this Section 5 will not apply, however, to any Inventions and Developments which may be disclosed in Schedule A hereto, prior to its acceptance by the Company, representing Inventions and Developments made by me prior to my employment by the Company.

6. Disclosure of Inventions and Developments. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 5.

7. Obtaining and Enforcing Proprietary Rights. I agree to assist the Company, at the Company's request from time to time and at the Company's expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my employment, provided that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, but only for the purpose of executing and filing any such

document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by me.

8. Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

9. Nonsolicitation of Customers. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

(a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

(b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an employee of the Company), or

(e) refer a Customer or supplier to another provider of Services.

10. Nonsolicitation of Employees. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:

(a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any

individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or

(b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee, prospective employee, consultant or prospective consultant of the Company to terminate his or her employment or other relationship with the Company or provide services to any entity other than the Company.

11. Non-Disparagement. At all times, both during my employment with the Company and after its termination, I will not, directly or indirectly, make, solicit, or confirm any public or private statements or communications that are or that may reasonably be considered to be harmful to, disparaging of, or reflect negatively upon (a) the Company or any employee or affiliate thereof, (b) the Company's business and (b) the Company's past, present or future Members and employees.

12. Acknowledgments and Agreements. I acknowledge and agree that the terms and restrictions set forth in this Agreement are intended to protect the Company's interest in Confidential Information and its commercial relationships and goodwill (with its Customers, prospective customers, vendors, consultants and employees), including, without limitation, Confidential Information, commercial relationships and are reasonable and appropriate for these purposes and that my failure to strictly adhere to the terms of this agreement will constitute a breach of this agreement and be harmful to the Company.

13. Disclosure of Agreement. I will disclose the existence and terms of this Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an employment, partnership or other business relationship with such person or entity.

14. Third-Party Agreements and Rights. I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business. I represent to the Company that my execution of this Agreement, my employment with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party.

15. Other Employee Income. Employee shall not receive payment for employment, services rendered, or other activities from entities other than the Company unless such activities are approved in advance in writing by the Company. Employee shall immediately disclose any and all other sources of income to the Company.

16. Injunction. I agree that it would be difficult to measure any damages caused to the Company which might result from any breach by me of the promises set forth in this Agreement, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to the Company.

17. Binding Effect. This Agreement will be binding upon me and my heirs, executors, administrators and legal representatives and will inure to the benefit of the Company, any subsidiary of the Company, and its and their respective successors and assigns.

18. Enforceability. If any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable.

19. Entire Agreement. This Agreement constitutes the entire agreement between the Company and myself with respect to the subject matter hereof, and supersedes all prior representations and agreements, with respect to such subject matter. This Agreement may not be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification or waiver is sought. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, in any particular case will not prevent any subsequent enforcement of such term or obligation or to be deemed a waiver of any separate or subsequent breach.

20. Notices. Any notices, requests, demands and other communications provided for by this Agreement will be sufficient if in writing and delivered in person or sent by registered or certified mail, postage prepaid, to me at the last address which I have filed in writing with the Company or, in the case of any notice to the Company, at its main offices, to the attention of the undersigned officer.

21. Governing Law; Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related

thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process for any action, suit or proceeding brought against it in any such court.

22. Attorney's Fees. The prevailing party in any legal action shall be entitled to reasonable attorney's fees.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

Accepted and Agreed to:

Name: Edward Muhlner, Employee

Accepted and Agreed to:

Global Rescue LLC

By:

Name: Daniel L. Richards
Title: Chief Executive Officer

SCHEDULE A
CONTRIBUTED INVENTIONS AND DEVELOPMENTS

Employee Name: EDWARD HUHLNER

Date: 29 APR 2008

Name: EDWARD HUHLNER

# EXHIBIT E

**GLOBAL RESCUE LLC**

**CONSULTANT AGREEMENT**

**Consultant's Name:** Mark Cohon
**Address:** C/o Mellon Bean LLC 79 West Monroe St. Ste 1119, Chicago, IL 60603

In consideration of my independent consulting relationship with Global Rescue LLC (the "Company"), whose address is 115 Broad St., Suite 350, Boston, MA 02110, I, the above-named Consultant, hereby agree with the Company as follows:

1. Definitions.

(a) Proprietary Information. As used in this Agreement, "Proprietary Information" means information belonging to the Company which is of value to the Company in the course of conducting its business. Proprietary Information includes without limitation trade secrets, product ideas, inventions, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials and other intellectual property, marketing plans and strategies, marketing or sales information, sales opportunities and strategies, reports, forecasts and plans, customer lists, financial information, reports, plans and forecasts, and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or assets, or proposed business affiliations) which have been discussed or considered by the management of the Company. Proprietary Information also includes information developed by me in the course of my relationship with the Company relating to the Company or otherwise relating to Inventions which belong to the Company under Section 5 below, as well as other information to which I may have access in connection with the Company.

(b) Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all any inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulas, data, techniques, know-how, secret or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection). Inventions and Developments include, by way of example and without limitation, discoveries and improvements which consist of or relate to any form of Proprietary Information.

(c) Company-Related Inventions and Developments. For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either (i) relate at the time of conception or development to the actual or demonstrably anticipated business of the Company or to its actual or demonstrably anticipated research and development, (ii) relate to any work performed for the Company, whether or not

during normal business hours, (iii) are developed on Company time or (iv) are developed primarily through or in substantial reliance on the use of the Company's Proprietary Information, equipment and software, or other facilities or resources.

(d) Company. For purposes of this Agreement, all references to the "Company" will be deemed to include the Company, its direct or indirect subsidiaries, whether currently in existence or hereafter acquired or created, and its affiliates.

(e) Company-Related Equipment. All equipment, including but not limited to computers, Blackberries, telephonic instruments or any other instrument or device purchased or furnished by the Company for the use, direct or indirect, of the above-named Consultant.

2. Return of Company-Related Equipment. Company-Related Equipment shall remain the property of and be returned to the Company when the Consultant's relationship with the Company ceases. Consultants who fail to immediately return Company equipment shall reimburse the Company 1.5 times the replacement cost of any such equipment. Company keys, IDs and keycards shall be returned immediately. Consultants who fail to return company keys, IDs or keycards immediately upon separation from the Company shall reimburse the Company $250 per key, ID or keycard not returned to cover the replacement costs of locks and the reprogramming cost of card readers.

3. Confidentiality. I understand and agree that my relationship creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my relationship with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

4. Documents, Records, etc. All documents, records, apparatus, information, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company or are produced by me in connection with my relationship will be and remain the sole property of the Company. I will return to the Company all such materials and property as and when requested by the Company. In any event, I will return all such materials and property immediately upon termination of my relationship for any reason. I will certify in writing the destruction of all electronic records, documents and other material that cannot be returned to the Company. I will not take with me any such material or

property or any copies thereof upon such termination.

5. Ownership of Inventions and Developments. I agree that all Company-Related Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during the term of my relationship with the Company will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Company any proprietary rights which I may have or acquire in any such Company-Related Inventions and Developments without further compensation, and I waive any moral rights or other special rights which I may have or accrue therein. At the request and cost of the Company, I agree to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. The provisions of this Section 5 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my relationship with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after termination of my relationship, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my relationship were conceived during the term of my relationship with the Company unless I am able to establish a later conception date by clear and convincing evidence. The provisions of this Section 5 will not apply, however, to any Inventions and Developments which may be disclosed in Schedule A hereto, prior to its acceptance by the Company, representing Inventions and Developments made by me prior to my relationship with the Company.

6. Disclosure of Inventions and Developments. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 5.

7. Obtaining and Enforcing Proprietary Rights. I agree to assist the Company, at the Company's request from time to time and at the Company's expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my relationship, provided that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, but only for the purpose of executing and filing any such document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by me.

8. Competitive Activities. During the term of my relationship or other similar

relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, Consultant, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

9. Nonsolicitation of Customers. During the term of my relationship or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

(a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

(b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an Consultant of the Company), or

(e) refer a Customer or supplier to another provider of Services.

10. Nonsolicitation of Employees. During the term of my relationship or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:

(a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or

(b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any Consultant, prospective

Consultant, consultant or prospective consultant of the Company to terminate his or her relationship or other relationship with the Company or provide services to any entity other than the Company.

11. Non-Disparagement. At all times, both during my relationship with the Company and after its termination, I will not, directly or indirectly, make, solicit, or confirm any public or private statements or communications that are or that may reasonably be considered to be harmful to, disparaging of, or reflect negatively upon (a) the Company or any Consultant or affiliate thereof, (b) the Company's business and (b) the Company's past, present or future Members and Consultants.

12. Acknowledgments and Agreements. I acknowledge and agree that the terms and restrictions set forth in this Agreement are intended to protect the Company's interest in Confidential Information and its commercial relationships and goodwill (with its Customers, prospective customers, vendors, consultants and Consultants), including, without limitation, Confidential Information, commercial relationships and are reasonable and appropriate for these purposes and that my failure to strictly adhere to the terms of this agreement will constitute a breach of this agreement and be harmful to the Company.

13. Disclosure of Agreement. I will disclose the existence and terms of this Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an relationship, partnership or other business relationship with such person or entity.

14. Third-Party Agreements and Rights. I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business. I represent to the Company that my execution of this Agreement, my relationship with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous relationship or other party.

15. Other Consultant Income.Consultant shall not receive payment for relationship, services rendered, or other activities from sources that represent a potential conflict of interest tothe Company unless such activities are approved in advance in writing by the Company. Consultant shall immediately disclose any and all other sources of such income to the Company.

16. Injunction. I agree that it would be difficult to measure any damages caused to the Company which might result from any breach by me of the promises set forth in this Agreement, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or

proving any actual damage to the Company.

17. Binding Effect. This Agreement will be binding upon me and my heirs, executors, administrators and legal representatives and will inure to the benefit of the Company, any subsidiary of the Company, and its and their respective successors and assigns.

18. Enforceability. If any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable.

19. Entire Agreement. This Agreement constitutes the entire agreement between the Company and myself with respect to the subject matter hereof, and supersedes all prior representations and agreements, with respect to such subject matter. This Agreement may not be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification or waiver is sought. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, in any particular case will not prevent any subsequent enforcement of such term or obligation or to be deemed a waiver of any separate or subsequent breach.

20. Notices. Any notices, requests, demands and other communications provided for by this Agreement will be sufficient if in writing and delivered in person or sent by registered or certified mail, postage prepaid, to me at the last address which I have filed in writing with the Company or, in the case of any notice to the Company, at its main offices, to the attention of the undersigned officer.

21. Hold Harmless. I understand that some of the activities I may be requested to perform for the Company may be dangerous and I agree to hold harmless the Company, its officers, employees, directors, consultants and subcontractors for any injury of loss I may experience as a result of the services I perform for the Company.

22. Governing Law; Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to

this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process for any action, suit or proceeding brought against it in any such court.

23. In the event of any action to enforce this Agreement the prevailing party shall be entitled to be awarded reasonable legal fees and other reasonable costs.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

Accepted and Agreed to:

Name:

Date: 3/19/10

Accepted and Agreed to:

Global Rescue LLC

By: ______________________

Name: ~~Stuart L. Richards~~
Title: Vice President

Date: 3/18/10

# EXHIBIT F

**From:** William.Markwardt@minnesotalife.com
**Sent:** Wednesday, May 04, 2011 10:18 AM
**To:** Mark Cohon
**Subject:** Re: RIMS

How did the meetings with Von go. I will see him on Sunday I believe. Anything I sould be aware of. You had talked about a meeting in the Cayman's sometime late May or something. Is that still a possibility. I'm still working on a date for Zurich to meet.

Bill

----- Original Message -----
From: "Mark B. Cohon" [mcohon@globalrescue.com]
Sent: 04/29/2011 04:56 PM GMT
To: "Von Peterson" <von.peterson@minnesotalife.com>; William Markwardt
Cc: "Tom Bochnowski" <tbochnowski@globalrescue.com>; "James W. Walloga" <James.Walloga@acegroup.com>
Subject: RIMS

Von,
We have the following meetings and events scheduled so far:
Monday:
lunch with Valero Energy
3:30 with Lowe's
Dinner and reception with ACE and several clients
Tuesday:
AmerisourceBergen Breakfast
Verizon lunch
Travelers dinner and reception
Wednesday:
YUM Brands at 10
Boat Longyear at 3
Aon or Liberty mutual dinner

I also am attending several sessions with Deb Samuel from Alcoa and Sheila Small from Verizon. Steve Wilder from Disney is joining us at the ACE dinner.

Call me to set up logistics.

Mark
Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

**From:** Mark Cohon <mbcohon@aol.com>
**Sent:** Tuesday, August 09, 2011 3:11 PM
**To:** Daniel Richards
**Subject:** Re: VCIA

I'll go back to registration now.

Mark B. Cohon
917-584-3211
203-291-9073

Sent from my iPhone

On Aug 9, 2011, at 3:04 PM, Daniel Richards <drichards@globalrescue.com> wrote:

> Crisis Services Company. Are you in?
>
> ________________________
> Daniel L. Richards
> Chief Executive Officer
> Global Rescue LLC
> 177 Milk St. STE 700
> Boston, MA 02109
> P: 617-459-4198
> F: 858-712-1295
>
>
> -----Original Message-----
> From: Mark Cohon [mailto:mbcohon@aol.com]
> Sent: Tuesday, August 09, 2011 1:46 PM
> To: Daniel Richards
> Subject: Re: VCIA
>
> We need the Captive name or the member of VCiA's name to get the lower rate. GR is not on the membership roster.
> Mark Cohon
> 917-584-3211
>
> Sent from my Verizon Wireless BlackBerry
>
> -----Original Message-----
> From: "Mark Cohon" <mbcohon@aol.com>
> Date: Tue, 9 Aug 2011 17:37:43
> To: Daniel L. Richards<drichards@globalrescue.com>
> Reply-To: mbcohon@aol.com
> Subject: VCIA
>
> I'm not registered. Did GR register anyone.
> Is the Captive a member of VCIA?

> I'm at registration right now.
> Mark
> Mark Cohon
> 917-584-3211
>
> Sent from my Verizon Wireless BlackBerry

# EXHIBIT G

| | | | |
|---|---|---|---|
| **Assigned To** | Tom Bochnowski | **Status** | Completed |
| **Subject** | Meeting | **Name** | Tom Oksanen |
| **Due Date** | 6/28/2010 | **Related To** | Fidelity Investments- Risk Services 100504 |
| **Phone** | | **Email** | |
| **Priority** | Normal | **Assigned By 1** | |
| | | **Assigned By 2** | |

**System Information**

| | | | |
|---|---|---|---|
| **Created By** | Tom Bochnowski, 6/28/2010 4:51 PM | **Last Modified By** | Tom Bochnowski, 6/28/2010 4:51 PM |

**Description Information**

**Comments**

Mark, Dan and Tom met with Tom Oksanen at the Langham hotel for breakfast.

Friendly conversation.

Tom said he's interested in the GR program and understands that it won't cost him anything, but his team is overworked so they may not make it a priority.

Mark will be following up with Tom 1:1 to discuss how we get this done.

# EXHIBIT H

**From:** Tom Bochnowski <tbochnowski@globalrescue.com>
**Sent:** Thursday, April 08, 2010 2:43 PM
**To:** Mark B. Cohon; Daniel Richards
**Subject:** RE: Agenda
**Attachments:** Liberty Mutual Group Meeting with Global Rescue 100408.docx

Some thoughts

Tom Bochnowski
Senior Director Sales
Global Rescue LLC
115 Broad St. STE 350
Boston, MA 02110
W: (617) 459-4213
M: (415) 710-6990
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

---

**From:** Mark B. Cohon [mailto:mbcohon@aol.com]
**Sent:** Thursday, April 08, 2010 2:10 PM
**To:** Tom Bochnowski; Daniel Richards
**Subject:** Agenda

Tom,

Attached is the agenda. My additions to the presentation to follow. Can Kathleen get me on the Delta 1372 to Boston Monday and Delta 1393 return?
I am going to take the red eye and land at JFK at 8:30 am and go directly to Aon tomorrow morning.

I'll call you soon,

Mark Cohon
917 584 3211

Liberty Mutual Group Meeting with Global Rescue

Monday, April 12, 11:00 am – 1:00 pm

Attendees:

Liberty Mutual:

- Chris Capone
- Yvonne Garcia
- Nicole Dara
- Mark Parabicoli
- Alison MacLean
- Dan Lyons
- Chris Kroger

Global Rescue:

- Dan Richards
- Tom Bochnowski
- Mark Cohon

Agenda

- Liberty Mutual Introduction
- Global Rescue Introduction
- Global Rescue Crisis Response Services
  - Medical Evacuation
  - Security Extraction
- Application of Medical Evacuation and Crisis Response to Personal Lines Insurance
- Application of Medical Evacuation and Crisis Response to Life, Accident and Disability
- Captive Potential and Application
- Proposed Working Relationship
- Free Discussion
- Conclusion

# EXHIBIT I

**From:** Bailey, Tina <CBailey@vsecorp.com>
**Sent:** Wednesday, May 18, 2011 10:17 AM
**To:** Mark Cohon
**Subject:** FW: VSE and Global Rescue
**Attachments:** 20110517121118.pdf

Good Morning Mark: This is a follow up to my voice mail messages.

We are delighted to partner with you in regards to cost-savings associated with our various insurance coverage/policies. Per your request, I am in the process of gathering the various policy information. Meanwhile, I am interested in specific examples of how GR has successfully leveraged their services with existing clients. This information will permit us to focus on relevant policies, carriers, and coverage. The policy/information that I will share with you is proprietary and confidential. For this reason, I will need you to sign a Non-Disclosure Agreement (see attached) before releasing the information. As we continue our partnership, and request proprietary information from Global Rescue we will sign a Non-Disclosure Agreement and offer you the same protections.

Again, I am looking forward to working with you.

Please call if you have any questions.

Regards,

*Tina*

Tina (Bowers) Bailey
VP of Human Resources
VSE Corporation
2550 Huntington Avenue
Alexandria, VA 22303
703 329-3214




NOTICE: This communication may contain privileged or confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, recopy, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error and delete the copy you received. Thank you.

From: Mark B. Cohon [mailto:mcohon@globalrescue.com]
Sent: Monday, May 16, 2011 11:35 AM
To: Bailey, Tina
Cc: Tom Bochnowski; Rose, AJ; Gauthier, Maurice "Mo"; Daniel L. Richards
Subject:

Tina,
I am the head of Global Rescue's Risk Management and Services team. We have recently been able to leverage our services at existing clients to help them reduce various insurance and benefits costs.
As you may be aware, last week, VSE and GR's CEOs discussed GR's Risk Services team preparing a proposal to be used as a basis for discussing how VSE may be able to reduce the cost of some of your current commercial insurance and benefits while possibly improving service levels to VSE and your employees. Mr. Gauthier suggested we contact you to get the necessary information to prepare the proposal.
Would you please send me the following:
· Copies of the actual policies or agreements for the insurance of any corporate or group accident program, group life, VSE's various liability programs, workers compensation, expatriate medial and welfare as well as short term out of country medical and welfare programs and corporate or bodily hazard programs
· Covered population with employment definitions of the insureds for each policy and/or agreement
Please let me know if you'd like to discuss our request further by phone. We look forward to working with you.
Regards.
Mark
Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

**From:** Joshua Rose <jrose@globalrescue.com>
**Sent:** Monday, May 16, 2011 9:56 AM
**To:** Don Smith (donsmith@anco.com)
**Subject:** Texas visit

Hi Don,

I am trying to line up some schedules for a visit to College Station in early June. I'm hoping we may be able to speak with you and Henry about some options for providing services to the entire System. Would you be able to speak with Henry and let me know some good dates?

I would like to introduce you both to Mark Cohon, who heads up our risk services team. Mark is a genius at finding creative ways to spread the financial risk of medical and security evacuation services across multiple policies.

Please let me know what works, and I will try to get something firmed up.

Thanks

---

Joshua Rose, NREMT-P
Director, Strategic Accounts

Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
Ph: (617) 459-4209
Fx: (617) 507-1050
www.globalrescue.com
jrose@globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at +1 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

# EXHIBIT J

**From:** Mark Cohon <mcohon@globalrescue.com>
**Sent:** Wednesday, April 27, 2011 1:33 PM
**To:** Tom Bochnowski; Martha Williams; Joshua Rose
**Cc:** Daniel Richards
**Subject:** Fw: RIMS appointment

Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Walloga, James W" <James.Walloga@acegroup.com>
Date: Wed, 27 Apr 2011 13:17:37
To: Mark Cohon<mcohon@globalrescue.com>
Subject: RE: RIMS appointment

Mark -

Thank you for this. I'll call you to discuss schedules this afternoon.

Also, I need to discuss the marketing piece with you. It's going to be difficult to get it legally approved for RIMs. Notwithstanding our excitement about forming a marketing alliance with Global Rescue, there are a couple of issues. According to our corporate branding guidelines, we may only use the ACE Logo on promotional material when there is a formal ACE relationship, i.e. an agreement in place (i.e. insurance policy, Agency Agreement, Marketing Agreement, Service Agreement, etc.) that supports the context of the promotion.

The logo could be used (based on our Verizon relationship assuming there are no showstoppers to the agreement Karen is currently negotiating for the Verizon deal) in a slide showing other insurance companies, clients, etc. for whom you provide service.

Our corporate advertising rules do not allow us to use the term 'partnership' in our advertising materials unless we have a true legal partnership in place.

Let's discuss how to best position.

James Walloga
Vice President
Accident & Health Division, ACE USA
212-703-7197

-----Original Message-----
From: Mark B. Cohon [mailto:mcohon@globalrescue.com]
Sent: Tuesday, April 26, 2011 4:24 PM
To: Valerie.j.wilhite@lowes.com

Cc: Harry Levitt; Linda Martin; Rusty Heise; Tom Bochnowski
Subject: RIMS appointment

Valerie,
I was thrilled to get your message from Rusty Heise that you'll be available to meet with us at RIMS. We are available after noon on Monday before 5 on Tuesday and before 4 on Wednesday. Please let me know what time works best for you and we'll look forward to seeing you then. We have meeting rooms, a booth or we can meet in the convention itself. If you'd prefer to speak, please call me at 917-584-3211. Thanks for calling today.
Mark
Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

**From:** Bailey, Tina <CBailey@vsecorp.com>
**Sent:** Wednesday, May 18, 2011 10:17 AM
**To:** Mark Cohon
**Subject:** FW: VSE and Global Rescue
**Attachments:** 20110517121118.pdf

Good Morning Mark: This is a follow up to my voice mail messages.

We are delighted to partner with you in regards to cost-savings associated with our various insurance coverage/policies. Per your request, I am in the process of gathering the various policy information. Meanwhile, I am interested in specific examples of how GR has successfully leveraged their services with existing clients. This information will permit us to focus on relevant policies, carriers, and coverage. The policy/information that I will share with you is proprietary and confidential. For this reason, I will need you to sign a Non-Disclosure Agreement (see attached) before releasing the information. As we continue our partnership, and request proprietary information from Global Rescue we will sign a Non-Disclosure Agreement and offer you the same protections.

Again, I am looking forward to working with you.

Please call if you have any questions.

Regards,

*Tina*

Tina (Bowers) Bailey
VP of Human Resources
VSE Corporation
2550 Huntington Avenue
Alexandria, VA 22303
703 329-3214




NOTICE: This communication may contain privileged or confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, recopy, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error and delete the copy you received. Thank you.

From: Mark B. Cohon [mailto:mcohon@globalrescue.com]
Sent: Monday, May 16, 2011 11:35 AM
To: Bailey, Tina
Cc: Tom Bochnowski; Rose, AJ; Gauthier, Maurice "Mo"; Daniel L. Richards
Subject:

Tina,
I am the head of Global Rescue's Risk Management and Services team. We have recently been able to leverage our services at existing clients to help them reduce various insurance and benefits costs.
As you may be aware, last week, VSE and GR's CEOs discussed GR's Risk Services team preparing a proposal to be used as a basis for discussing how VSE may be able to reduce the cost of some of your current commercial insurance and benefits while possibly improving service levels to VSE and your employees. Mr. Gauthier suggested we contact you to get the necessary information to prepare the proposal.
Would you please send me the following:

- Copies of the actual policies or agreements for the insurance of any corporate or group accident program, group life, VSE's various liability programs, workers compensation, expatriate medial and welfare as well as short term out of country medical and welfare programs and corporate or bodily hazard programs
- Covered population with employment definitions of the insureds for each policy and/or agreement

Please let me know if you'd like to discuss our request further by phone. We look forward to working with you.
Regards.
Mark
Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

# EXHIBIT K

**From:** Joshua Rose <jrose@globalrescue.com>
**Sent:** Friday, April 15, 2011 8:56 AM
**To:** Martha Williams; Mark Cohon; mbcohon@aol.com
**Cc:** Tom Bochnowski
**Subject:** RE: RIMS brochure

Martha,

I spoke with Mark more about this last night. Tom's right – this language doesn't fit the original request. I will re-write some language on the plane ride this afternoon and send it to you tonight.

What I'd like to put together is a flyer that covers our entire range of risk services integration options and can be used as a conversation starter / take away. I know time is short for printing, so I'll get you something as soon as possible.

Thanks,

Josh

Joshua Rose, NREMT-P
Director, Strategic Accounts

Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
Ph: (617) 459-4209
Fx: (617) 507-1050
www.globalrescue.com
jrose@globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at +1 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

---

**From:** Joshua Rose
**Sent:** Thursday, April 14, 2011 7:23 PM
**To:** Martha Williams; Mark Cohon; mbcohon@aol.com
**Cc:** Tom Bochnowski
**Subject:** RE: RIMS brochure

A couple of comments:

- I understand Tom's concern; there is a disconnect between the interior content and the title. I wouldn't alter the interior, but actually redirect the title to something like "Captive-Based Enhanced Employee Benefits" – but I don't know what the original ask was

- The standard language I've used to discuss insurance integration follows below. This may be a helpful starting place if needed, but I thought that flyer already existed

- Also, what happened to using Frutiger as the text body font? I liked your idea of using a sans-serif font as text body, and a serif font for headings

I hope this helps. Let me know if you need anything else.

**Standard insurance-integration language:**

Global Rescue shapes the outcome of emergency events. The service differentiators – Johns Hopkins Medicine, deployable personnel, Field Rescue, paramedic and security call takers – all lead to substantially better outcomes and statistically higher survival rates when crises occur.

With Global Rescue, your employees will recover faster and better from medical or security events, resulting in quicker discharge and earlier return to function, avoidance of permanent disability, and even escaping death.

Beyond the obvious benefits for your company and your employees, Global Rescue's model has caused a paradigm shift. Insurance carriers can also see significant gains because Global Rescue significantly reduces the number and severity of claims.

Top-rated insurance underwriters have recognized that corporations who implement a Global Rescue crisis response solution will reduce the frequency and amount of claims relating to:

- Life / Accidental Death and Disability
- Business Travel Accident Policies
- Worker's Compensation
- Overseas Medical Expenses

As a direct result, Global Rescue clients can actually save money by reducing aggregate insurance premiums, even while adding superior services and promoting better outcomes for their employees.

---

Joshua Rose, NREMT-P
Director, Strategic Accounts

Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
Ph: (617) 459-4209
Fx: (617) 507-1050
www.globalrescue.com
jrose@globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at +1 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this

email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

---

**From:** Martha Williams
**Sent:** Wednesday, April 13, 2011 10:20 AM
**To:** Mark Cohon; mbcohon@aol.com; Joshua Rose
**Cc:** Tom Bochnowski
**Subject:** Re: RIMS brochure
**Importance:** High

Hi guys,

Tom is questioning the appropriateness of the Captive language in this piece for RIMS. Mark? Is this not the appropriate message for this audience?

If so, Josh, do you have any non-captive insurance language I can use in place?

Thanks boys,
Martha

—

Martha Williams
Marketing Manager
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
Ph: (617) 830-2804
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

---

**From:** Martha Williams <mwilliams@globalrescue.com>
**Date:** Tue, 12 Apr 2011 15:25:27 -0400
**To:** Tom Bochnowski <tbochnowski@globalrescue.com>, Mark Cohon <mcohon@globalrescue.com>, "mbcohon@aol.com" <mbcohon@aol.com>
**Subject:** RIMS brochure

Hi guys,

Attached for review.

Let me know what you think.

M

—

Martha Williams
Marketing Manager
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
Ph: (617) 830-2804
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

**From:** Mark Cohon <mcohon@globalrescue.com>
**Sent:** Wednesday, April 27, 2011 1:33 PM
**To:** Tom Bochnowski; Martha Williams; Joshua Rose
**Cc:** Daniel Richards
**Subject:** Fw: RIMS appointment

Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Walloga, James W" <James.Walloga@acegroup.com>
Date: Wed, 27 Apr 2011 13:17:37
To: Mark Cohon<mcohon@globalrescue.com>
Subject: RE: RIMS appointment

Mark -

Thank you for this. I'll call you to discuss schedules this afternoon.

Also, I need to discuss the marketing piece with you. It's going to be difficult to get it legally approved for RIMs. Notwithstanding our excitement about forming a marketing alliance with Global Rescue, there are a couple of issues. According to our corporate branding guidelines, we may only use the ACE Logo on promotional material when there is a formal ACE relationship, i.e. an agreement in place (i.e. insurance policy, Agency Agreement, Marketing Agreement, Service Agreement, etc.) that supports the context of the promotion.

The logo could be used (based on our Verizon relationship assuming there are no showstoppers to the agreement Karen is currently negotiating for the Verizon deal) in a slide showing other insurance companies, clients, etc. for whom you provide service.

Our corporate advertising rules do not allow us to use the term 'partnership' in our advertising materials unless we have a true legal partnership in place.

Let's discuss how to best position.

James Walloga
Vice President
Accident & Health Division, ACE USA
212-703-7197

-----Original Message-----
From: Mark B. Cohon [mailto:mcohon@globalrescue.com]
Sent: Tuesday, April 26, 2011 4:24 PM
To: Valerie.j.wilhite@lowes.com

Cc: Harry Levitt; Linda Martin; Rusty Heise; Tom Bochnowski
Subject: RIMS appointment

Valerie,
I was thrilled to get your message from Rusty Heise that you'll be available to meet with us at RIMS. We are available after noon on Monday before 5 on Tuesday and before 4 on Wednesday. Please let me know what time works best for you and we'll look forward to seeing you then. We have meeting rooms, a booth or we can meet in the convention itself. If you'd prefer to speak, please call me at 917-584-3211. Thanks for calling today.
Mark
Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

# EXHIBIT L

*"My former travel assistance provider left me out there to die. Global Rescue saved my life."*

*Blackstone Dilworth, Chief Executive Officer*
*Towers of Texas*

CONTACT US TODAY.

GLOBAL rescue

GLOBAL RESCUE · 1.800.381.9754 · INTL: +1.617.459.4200

WWW.GLOBALRESCUE.COM

# GLOBAL rescue



MEDICAL EVACUATION | SECURITY EXTRACTION | FIELD RESCUE | ADVISORY SERVICES



# GLOBAL RESCUE SAVES LIVES.

## OUR SERVICES ARE PROVEN TO SAVE LIVES, IMPROVE PATIENT OUTCOMES AND REDUCE ACCIDENT, LIFE, WORKERS COMPENSATION AND DISABILITY CLAIMS COSTS AND RELATED INSURANCE PREMIUMS.

Global Rescue reduces insurance exposure and controls the costs of claims compared to traditional assistance providers. As a result, Global Rescue clients save money on their insurance benefit premiums, usually far in excess of the cost of our services.

## HOW CAN INSURERS IMPROVE THEIR LOSS RATIOS AND EMPLOYERS REDUCE THEIR COSTS BY USING GLOBAL RESCUE?

Global Rescue and Johns Hopkins Medicine have reinvented how crisis response, emergency medical and security services are delivered. Our services dramatically increase the likelihood of positive outcomes.

## RESULTS.

Clients who live. Reduced liability and claims. Improved corporate resiliency. Significant savings.

GLOBAL RESCUE · 1.800.381.9754 · INTL: +1.617.459.4200
WWW.GLOBALRESCUE.COM

## GLOBAL RESCUE EXCEEDS TRAVEL ASSISTANCE COMPANIES IN CRITICAL CAPABILITIES AND SERVICES

| Critical Capabilities | Global Rescue | [illegible] |
|---|---|---|
| Operations Center Staffing | 24/7 staffing by critical care paramedics, physicians and special operations veterans | Staffed by telephone operators, call screeners and case managers reading from scripts |
| Operations Ratios | Highest operational personnel to client ratio in industry | Understaffed for high demand periods |
| Worldwide Field Rescue | Boots-on-ground extraction services for medical and security emergencies | Not available, clients must be admitted to a hospital or located at an airstrip |
| Kidnap and Detention Response | Negotiation, medical and armed response | Not available |
| Medical Advisory Services From Top Medical Institution | Medical advice provided in real-time by Johns Hopkins Medicine physicians and specialists; ranked #1 medical institution in U.S. for last 19 consecutive years | Not available |
| International Centers of Medical Excellence | 100 International Centers of Excellence medical facilities affiliated with Johns Hopkins Medicine or other preeminent U.S. medical institutions | Small clinics |
| Security Assessments | Security teams available to assess the internal and external security of client facilities in order to mitigate risk | Not available |
| Deployable Medical and Security Teams | Military special operations veterans, paramedics, physicians and search and rescue experts deployable worldwide for on-site support, field rescue, case management and security details | Medical support only, no deployable in-house teams |
| Reduced Claims Costs | Improved patient outcomes lowers insurance claims for clients and partners | Limited improvement in patient outcomes, no meaningful reduction in claims costs |

GLOBAL + rescue

Global Rescue is authorized as an indirect air carrier to provide aeromedical transport services.

**From:** Martha Williams <mwilliams@globalrescue.com>
**Sent:** Thursday, March 10, 2011 12:46 PM
**To:** Mark Cohon; Tom Bochnowski
**Subject:** Re: RIMS
**Attachments:** GR-Captive-RIMS.pdf

Hi Guys,

Here is the first draft of the RIMS print piece I worked up using content from Josh R. Please review and let me know what you think.

I'd like to schedule this to go to print by the middle of April, so please review and get me comments in as timely a manner as possible. (looking at you, Tom.)

I'm going to be sending out a series of invites for the events you want to attend at RIMS through Outlook so they are on your calendars. There will be a bunch coming in so heads up.

Best,
Martha

—

Martha Williams
Marketing Manager
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
Ph: (617) 830-2804
Fx: (617) 507-1050
www.globalrescue.com

In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200.

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

On 3/9/11 5:49 PM, "Mark Cohon" <mcohon@globalrescue.com> wrote:

>Martha,
>Enjoyed seeing you today. Here are the sessions I want to attend at RIMS:
>24x7 Comp, Monday 1:45
>Demystifying D&O, Tuesday 2:30
>ERM, Monday 3:30
>ERM Implementation, Tuesday 2:15
>ERM Tech, Monday 1:45
>Captive formation, Thursday 9:45
>Captive best practiced, Monday 1:45
>Senior exec forum, Tuesday 9
>Int exp unique, Monday 1:45
>Travel risk solutions, thursday 9:45
>
>I know that I have planned a lot of conflicts. I'd like Tom to attend
>some of the meetings as well. Please lay out the sessions above and
>we'll work through the the conflicts.
>
>Thanks a lot!
>
>Mark B. Cohon
>917-584-3211
>203-291-9073
>
>Sent from my iPhone

# Enhanced Employee Benefit Programs for Captives

*Global Rescue helps captive managers provide benefit enhancements to attract unrelated premium and meet regulatory requirements for maximum tax advantages*

Captive managers are challenged by recent Internal Revenue Service (IRS) changes which only provide the maximum tax advantages when 50% of the captive's premium is paid by parties unrelated to the parent. Captives can meet this requirement by reinsuring their corporation's group and voluntary ERISA benefit programs, leading to a **significant reduction in tax obligations**.

Traditionally, the Department of Labor (DOL) has made it difficult for captives to reinsure benefits, but recent precedent has eased the process:

- Captives can utilize an **expedited process** (78 days) to obtain a Prohibited Transaction Exemption, which will grant permission to reinsure benefits
- The captive must add a **benefit enhancement** to the reinsured product
- The captive must work with a highly rated insurance company to front the new product, and **reinsure the risk**
- The process is **invisible to employees**, with the exception of improved benefits; administration and claims processes remain unchanged

Captive managers who want to take advantage of this process need to partner with a benefits provider and insurer who will orchestrate and manage the process for relatively little investment.

## Global Rescue's Solution

Global Rescue is the premier provider of **travel-related medical and security assistance**, advisory, and evacuation services. Global Rescue's programs are embedded in life and disability benefits programs to provide life saving services when employees travel. The results:

- **Reduce costs and frequency** of life and disability claims
- **Improve the experience** of the group over time
- Help **keep premium constant**

By incorporating Global Rescue into existing life and disability benefits, captive managers can provide a **significant benefits enhancement**, satisfying IRS and DOL regulatory requirements:

- **Integrate and consolidate** benefits communications and emergency services programs under a **single source**
- Create a **true triage and benefits precertification service** provided by medical professionals for business travel events
- Provide **superior crisis response, travel intelligence, international security, and benefits services** for employees

Global Rescue will work with your consultants, as well as your current and third-party insurers, to review current programs and provide an estimation of the possible savings and superior services that are available.

Medical Evacuation | Security Extraction | Crisis Response

GLOBAL rescue

# About Global Rescue

Global Rescue provides complete advisory and response services for medical emergencies, security crises, and other urgent and emergency situations, as well as timely advice, stand-by services, and travel risk management consultation before situations escalate to emergencies.

Global Rescue's services include:

- **24/7 Operations Center** for direct access to critical-care paramedics and special operations veterans for immediate, life-saving advice and support
- **Business Travel Insurance and Benefits Precertification** provides a single call solution, where Global Rescue's Operations personnel will pre-certify medical cases for payment while initiating rescue services
- **Emergency Advisory Services** for medical and security guidance from experts at Global Rescue and Johns Hopkins Medicine
- **Medical Centers of Excellence Referrals** to guide travelers to the world's top hospitals, representing the best locally available treatment
- **Deployable Medical and Security Personnel** for direct, on-site case management and leadership during international medical or security operations
- **Medical Evacuation** from the site of illness or injury to the travelers' home country hospital of choice
- **Security Extraction** for individuals or large groups, in the event of war, civil unrest, natural disaster, terrorism, or other critical event
- **Travel Tracking and Intelligence Reports** provide automated 24/7 awareness of worldwide threats that could affect travelers, and pre-travel information to ensure compliance with company policies and disclosure requirements
- **Additional Security and Travel Support Services,** such as Kidnap and Detention response, personal security details, site surveys, traveler assistance, medical stand by services, and more

Global Rescue is a single source solution for all traveler support and crisis response needs, providing a single contact point for coordination of all services. Global Rescue's fee structure and offerings allow clients to save money by reducing liability and casualty insurance costs, as well as reducing total spend on travel security and crisis response programs.