# EXHIBIT A

# PART 3

# EXHIBIT M

**From:** Michael O'Malley <michael.omalley@srsmail.com>
**Sent:** Friday, March 25, 2011 2:10 PM
**To:** Daniel Richards
**Cc:** Melissa L. Roth
**Subject:** Emailing: AAC Reinsurance Agreement, Y-Bridge - CSC Policy Final Version
**Attachments:** AAC Reinsurance Agreement(RDW) (2).docx; AAC Reinsurance Agreement.pdf; Y-Bridge - CSC Policy Final Version.pdf

Dan,

Attached please find the reinsurance agreement and policy. I am comfortable with both documents. Please review reinsurance agreement as our internal counsel reviewed and edited. The last item we will need is a trust agreement which I will draft and forward for your review. I have attached the reinsurance agreement edits per our counsel. I will call to discuss. Thank you.

# EXHIBIT N

**From:** Bailey, Tina <CBailey@vsecorp.com>
**Sent:** Wednesday, May 18, 2011 10:17 AM
**To:** Mark Cohon
**Subject:** FW: VSE and Global Rescue
**Attachments:** 20110517121118.pdf

Good Morning Mark: This is a follow up to my voice mail messages.

We are delighted to partner with you in regards to cost-savings associated with our various insurance coverage/policies. Per your request, I am in the process of gathering the various policy information. Meanwhile, I am interested in specific examples of how GR has successfully leveraged their services with existing clients. This information will permit us to focus on relevant policies, carriers, and coverage. The policy/information that I will share with you is proprietary and confidential. For this reason, I will need you to sign a Non-Disclosure Agreement (see attached) before releasing the information. As we continue our partnership, and request proprietary information from Global Rescue we will sign a Non-Disclosure Agreement and offer you the same protections.

Again, I am looking forward to working with you.

Please call if you have any questions.

Regards,

*Tina*

Tina (Bowers) Bailey
VP of Human Resources
VSE Corporation
2550 Huntington Avenue
Alexandria, VA 22303
703 329-3214

VSE Human Resources
Delivering results that matter!

NOTICE: This communication may contain privileged or confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, recopy, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error and delete the copy you received. Thank you.

From: Mark B. Cohon [mailto:mcohon@globalrescue.com]
Sent: Monday, May 16, 2011 11:35 AM
To: Bailey, Tina
Cc: Tom Bochnowski; Rose, AJ; Gauthier, Maurice "Mo"; Daniel L. Richards
Subject:

Tina,
I am the head of Global Rescue's Risk Management and Services team. We have recently been able to leverage our services at existing clients to help them reduce various insurance and benefits costs.
As you may be aware, last week, VSE and GR's CEOs discussed GR's Risk Services team preparing a proposal to be used as a basis for discussing how VSE may be able to reduce the cost of some of your current commercial insurance and benefits while possibly improving service levels to VSE and your employees. Mr. Gauthier suggested we contact you to get the necessary information to prepare the proposal.
Would you please send me the following:
· Copies of the actual policies or agreements for the insurance of any corporate or group accident program, group life, VSE's various liability programs, workers compensation, expatriate medial and welfare as well as short term out of country medical and welfare programs and corporate or bodily hazard programs
· Covered population with employment definitions of the insureds for each policy and/or agreement
Please let me know if you'd like to discuss our request further by phone. We look forward to working with you.
Regards.
Mark
Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

# EXHIBIT O

**From:** Ted Muhlner <tmuhlner@globalrescue.com>
**Sent:** Thursday, August 11, 2011 9:41 PM
**To:** Daniel Richards
**Subject:** Agreement
**Attachments:** Ted Muhlner - Resignation Letter 110811.pdf

Dan,

After a review of the "Separation Agreement and Release" dated 10 August 2011, my attorney advised me not to sign the agreement. The agreement does not reflect the good faith discussions and negotiations that Tom and I entered into at your request in order to assist Global Rescue in finding our replacements and in transitioning our responsibilities.

As Tom and I discussed with you on 1 August 2011, as an "at will employee" and in accordance with my Employee Obligation Agreement, I am terminating my employment with Global Rescue effective 15 August 2011 due to personal reasons and the need to relocate my family to California. I have enclosed my resignation letter for your records.

I am willing to entertain cash payment offers for my vested Global Rescue restrictive stock and options.

I wish Global Rescue and its employees well and look forward to maintaining as positive a relationship outside of Global Rescue as while I was employed at Global Rescue.

Best regards,

Ted

Ted Muhlner
Vice President, Operations
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: (617) 459-4208
M: (858) 204-6363
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

August 11, 2011

Please accept this letter as my official resignation from Global Rescue. As we discussed on August 1, I am resigning for personal reasons and the last day of my employment at Global Rescue will be August 15, 2011.

I have enjoyed my time at Global Rescue and am thankful to have had the opportunity to work with such a talented team.

Sincerely,

Ted Muhlner

**From:** Tom Bochnowski <tbochnowski@globalrescue.com>
**Sent:** Thursday, August 11, 2011 9:57 PM
**To:** Daniel Richards
**Subject:** Agreement / Resignation Letter
**Attachments:** GR Resignation Letter 110811.pdf

Dan,

After a review of your draft "Separation Agreement and Release" dated 10 August 2011, and discussion with my attorney, please be advised that your proposed agreement is not acceptable. Indeed, your proposal does not reflect the good faith discussions and negotiations that Ted and I entered into at your request in order to assist Global Rescue find our replacements and transition our responsibilities. I have concluded based on your proposed draft agreement that we will be unable to reach any agreement with you on terms that would be acceptable.

As I discussed with you on 1 August 2011, I, as an "at will employee" and in accordance with my Employee Obligation Agreement, am terminating my employment with Global Rescue effective 15 August 2011 due to personal reasons and the need to relocate my family to California. I have enclosed my resignation letter for your records.

I am willing to entertain cash payment offers for my vested Global Rescue restrictive stock and options.

I wish Global Rescue and its employees well going forward and look forward to maintaining as positive a relationship outside of Global Rescue as while employed at Global Rescue.

Regards,

Tom

---

Tom Bochnowski
Vice President, Response Services
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
W: (617) 459-4213
M: (415) 710-6990
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

August 11, 2011

Please accept this letter as my official resignation from Global Rescue. As we discussed on August 1, I am resigning for personal reasons and the last day of my employment at Global Rescue will be August 15, 2011.

I have enjoyed my time at Global Rescue and am thankful to have had the opportunity to work with such a talented team.

Sincerely,

Thomas Bochnowski

# EXHIBIT P

**From:** Daniel Richards <drichards@globalrescue.com>
**Sent:** Thursday, August 11, 2011 10:52 PM
**To:** Ted Muhlner; Tom Bochnowski
**Cc:** Stuart Richards; Melissa L. Roth
**Subject:** Re: Agreement

YTed + Tom,

Your accusation that we have negotiated with you in bad faith is perplexing since it appears the agreement we sent you represents all of the things we discussed. If there were issues you had with the document, good faith on your part would have resulted in a discussion regarding your issues. I'm disappointed that this didn't happen and frankly don't understand.

However, your motives are your own and it isn't for me to know them. I am open to further discussions if that is what you would like. Neither of you should come to work tomorrow while you consider your course.

Dan

---

**From:** Ted Muhlner
**To:** Daniel Richards
**Sent:** Thu Aug 11 21:40:53 2011
**Subject:** Agreement
Dan,

After a review of the "Separation Agreement and Release" dated 10 August 2011, my attorney advised me not to sign the agreement. The agreement does not reflect the good faith discussions and negotiations that Tom and I entered into at your request in order to assist Global Rescue in finding our replacements and in transitioning our responsibilities.

As Tom and I discussed with you on 1 August 2011, as an "at will employee" and in accordance with my Employee Obligation Agreement, I am terminating my employment with Global Rescue effective 15 August 2011 due to personal reasons and the need to relocate my family to California. I have enclosed my resignation letter for your records.

I am willing to entertain cash payment offers for my vested Global Rescue restrictive stock and options.

I wish Global Rescue and its employees well and look forward to maintaining as positive a relationship outside of Global Rescue as while I was employed at Global Rescue.

Best regards,

Ted

---

Ted Muhlner
Vice President, Operations
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: (617) 459-4208
M: (858) 204-6363
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

# EXHIBIT Q

REDACTED

---

**From:** Daniel Richards
**Sent:** Friday, October 21, 2011 8:15 PM
**To:** Mark Cohon
**Subject:** Docs - v2

Mark,

Apologies for the slow response on this. Busy week. Attached are:

1) Revised partner agreement – pls review marked version and let me know of this works.
2) GR NQSO stock option agreement
3) GR consultants agreement

Let's discuss any q's you have next week.

Thanks

Dan

---

Daniel L. Richards
Chief Executive Officer
Global Rescue LLC

177 Milk St. STE 700
Boston, MA 02109
P: 617-459-4198
F: 858-712-1295

**Stock Option Agreement**
**under the Global Rescue Corp.**
**2007 Stock Option and Grant Plan**

| | |
|---|---|
| **Name of Optionee:** | Mark Cohon (the "Optionee") |
| **No. of Option Shares:** | 10,000 Shares of Common Stock |
| **Grant Date:** | September 30, 2011 (the "Grant Date") |
| **Expiration Date:** | September 30, 2021 (the "Expiration Date") |
| **Option Exercise Price/Share:** | $0.25 (the "Option Exercise Price") |

Pursuant to the Global Rescue Corp. 2007 Stock Option and Grant Plan (the "Plan"), Global Rescue Corp., a Delaware corporation (together with all successors thereto, the "Company"), hereby grants to the Optionee, who is an officer, director, employee, consultant or other key person of the Company or any of its Subsidiaries, an option (the "Stock Option") to purchase on or prior to the Expiration Date, or such earlier date as is specified herein, all or any part of the number of shares of Common Stock, par value $0.001 per share ("Common Stock"), of the Company indicated above (the "Option Shares," and such shares once issued shall be referred to as the "Issued Shares"), at the Option Exercise Price per share, subject to the terms and conditions set forth in this Non-Qualified Stock Option Agreement (this "Agreement") and in the Plan. This Stock Option is intended to qualify as an "incentive stock option" as defined in Section 422(b) of the Internal Revenue Code of 1986, as amended from time to time (the "Code").

1. **Definitions**. For the purposes of this Agreement, the following terms shall have the following respective meanings. All capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Plan.

An "Affiliate" of any Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the first mentioned Person. A Person shall be deemed to control another Person if such first Person possesses directly or indirectly the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

"Bankruptcy" shall mean (i) the filing of a voluntary petition under any bankruptcy or insolvency law, or a petition for the appointment of a receiver or the making of an assignment for the benefit of creditors, with respect to the Optionee or any Permitted Transferee, or (ii) the Optionee or any Permitted Transferee being subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to the Optionee's or such Permitted Transferee's assets, which involuntary petition or assignment or attachment is not discharged within 60 days after its date, and (iii) the Optionee or any Permitted

Transferee being subject to a transfer of the Stock Option or the Issued Shares by operation of law (including by divorce, even if not insolvent), except by reason of death.

"Cause" shall mean a vote of the Board resolving that the Optionee should be dismissed as a result of (i) the commission of any act by the Optionee constituting financial dishonesty against the Company (which act would be chargeable as a crime under applicable law); (ii) the Optionee's engaging in any other act of dishonesty, fraud, intentional misrepresentation, moral turpitude, illegality or harassment which, as determined in good faith by the Board, would: (A) materially adversely affect the business or the reputation of the Company with its current or prospective customers, suppliers, lenders and/or other third parties with whom it does or might do business; or (B) expose the Company to a risk of civil or criminal legal damages, liabilities or penalties; (iii) the repeated failure by the Optionee to follow the directives of the Company's chief executive officer or Board or (iv) any material misconduct, violation of the Company's policies, or willful and deliberate non-performance of duty by the Optionee in connection with the business affairs of the Company.

"Permitted Transferees" shall mean any of the following to whom the Optionee may transfer Issued Shares hereunder (as set forth in Section 8): the Optionee's spouse, children (natural or adopted), stepchildren or a trust for their sole benefit of which the Optionee is the settlor; provided, however, that any such trust does not require or permit distribution of any Issued Shares during the term of this Agreement unless subject to its terms. Upon the death of the Optionee (or a Permitted Transferee to whom shares have been transferred hereunder), the term Permitted Transferees shall also include such deceased Optionee's (or such deceased Permitted Transferee's) estate, executions, administrations, personal representations, heirs, legatees and distributees, as the case may be.

"Person" shall mean any individual, corporation, partnership (limited or general), limited liability company, limited liability partnership, association, trust, joint venture, unincorporated organization or any similar entity.

"Sale Event" shall mean, regardless of form thereof, consummation of (i) the dissolution or liquidation of the Company, (ii) the sale of all or substantially all of the assets of the Company on a consolidated basis to an unrelated person or entity, (iii) a merger, reorganization or consolidation in which the outstanding shares of Stock are converted into or exchanged for securities of the successor entity and the holders of the Company's outstanding voting power immediately prior to such transaction do not own a majority of the outstanding voting power of the successor entity immediately upon completion of such transaction, (iv) the sale of all or a majority of the outstanding capital stock of the Company to an unrelated person or entity or (v) any other transaction in which the owners of the Company's outstanding voting power immediately prior to such transaction do not own at least a majority of the outstanding voting power of the successor entity immediately upon completion of the transaction.

"Subsidiary" shall mean any corporation (other than the Company) in any unbroken chain of corporations or other entities beginning with the Company if each of the corporations (other than the last corporation in the unbroken chain) owns stock or other interests possessing 50 percent or more of the total combined voting power of all classes of stock or in one of the other corporations in the chain.

2. **<u>Vesting, Exercisability and Termination</u>.**

(a) No portion of this Stock Option may be exercised until such portion shall have vested.

(b) Except as set forth below and in Section 6, and subject to the determination of the Committee in its sole discretion to accelerate the vesting schedule hereunder, this Stock Option shall be vested and exercisable with respect to the Option Shares on the respective dates indicated below:

| Incremental (Aggregate Number) of Option Shares Exercisable | Vesting Date |
|---|---|
| 1,000 (20.00%) | 1 Year Anniversary of Grant Date |
| 250 (5.00%) | Per Quarter Thereafter |

Subject to Section 6 hereof, all of the Option Shares shall be deemed fully vested and exercisable on the five year anniversary of the Grant Date if Optionee is employed on such date.

(c) <u>Termination</u>. Except as may otherwise be provided by the Committee, if the Optionee's employment with the Company or a Subsidiary is terminated, the period within which to exercise this Stock Option may be subject to earlier termination as set forth below:

(i) <u>Termination Due to Death or Disability</u>. If the Optionee's employment terminates by reason of such Optionee's death or disability (as defined in Section 422(c)(6) of the Code), this Stock Option may be exercised, to the extent exercisable on the date of such termination, by the Optionee, the Optionee's legal representative or legatee for a period of 12 months from the date of death or disability (as defined in Section 422(c)(6) of the Code) or until the Expiration Date, if earlier, subject in any event to Section 6.

(ii) <u>Other Termination</u>. If the Optionee's employment terminates for any reason other than death or disability (as defined in Section 422(c)(6) of the Code), and unless otherwise determined by the Committee, this Stock Option may be exercised, to the extent exercisable on the date of termination, for a period of 90 days from the date of termination or until the Expiration Date, if earlier; <u>provided</u> <u>however</u>, if the Optionee's employment is terminated for Cause, this Stock Option shall terminate immediately upon the date of such termination.

For purposes hereof, the Committee's determination of the reason for termination of the Optionee's employment shall be conclusive and binding on the Optionee and his or her representatives or legatees or Permitted Transferees. Any portion of this Stock Option that is not exercisable on the date of termination of the employment shall terminate immediately and be null and void.

3. <u>**Exercise of Stock Option**</u>.

(a) The Optionee may exercise this Stock Option only in the following manner: Prior to the Expiration Date (subject to Section 6), the Optionee may deliver a Stock Option exercise notice (an "Exercise Notice") in the form of <u>Appendix A</u> hereto indicating his or her election to purchase some or all of the Option Shares with respect to which this Stock Option is exercisable at the time of such notice. Such notice shall specify the number of Option Shares to be purchased. Payment of the purchase price may be made by any one of the methods described below, and subject to Committee approval, more than one method of payment may be used.

(i) In cash, by certified or bank check, or other instrument acceptable to the Committee in U.S. funds payable to the order of the Company in an amount equal to the Option Exercise Price multiplied by the number of shares subject to the Exercise Notice (the "Option Purchase Price");

(ii) By the Optionee delivering to the Company a promissory note if the Board has expressly authorized the loan of funds to the Optionee for the purpose of enabling or assisting the Optionee to effect the exercise of his or her Stock Option; <u>provided</u> <u>that</u> at least so much of the exercise price as represents the par value of the Stock shall be paid other than with a promissory note if otherwise required by the Committee or applicable law; or

(iii) If the Initial Public Offering has occurred, then (A) through the delivery (or attestation to ownership) of shares of Common Stock that have been purchased by the Optionee on the open market or that have been held by the Optionee for at least six months and are not subject to restrictions under any plan of the Company and in any event with an aggregate Fair Market Value (as of the date of such exercise) equal to the Option Purchase Price, (B) by the Optionee delivering to the Company a properly executed Exercise Notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the Option Purchase Price, <u>provided</u> <u>that</u> in the event the Optionee chooses to pay the Option Purchase Price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Committee shall prescribe as a condition of such payment procedure, or (C) a combination of (i), (ii), (iii)(A) and (iii)(B) above.

(b) Certificates for the Option Shares so purchased will not be issued until: (i) the Company is satisfied that all legal matters in connection with the issuance and delivery of such shares have been addressed and resolved; (ii) if the outstanding Stock is at the time of delivery listed on any stock exchange or national market system, the shares to be delivered have been listed or authorized to be listed on such exchange or system upon official notice of issuance; and (iii) all requirements of the Plan have been satisfied or waived. The determination of the Committee as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to this Stock Option unless and until this Stock Option shall have been exercised pursuant to the terms hereof, the Company shall have issued

and delivered the Issued Shares to the Optionee, and the Optionee's name shall have been entered as a stockholder of record on the books of the Company. Thereupon, the Optionee shall have full dividend and other ownership rights with respect to such Issued Shares, subject to the terms of this Agreement.

(c) Notwithstanding any other provision hereof or of the Plan, neither this Stock Option, nor any portion of this Stock Option, shall be exercisable after the Expiration Date.

**4. Incorporation of Plan**. Notwithstanding anything herein to the contrary, this Stock Option shall be subject to and governed by all the terms and conditions of the Plan.

**5. Transferability of Stock Option**. This Agreement is personal to the Optionee and is not transferable by the Optionee in any manner other than by will or by the laws of descent and distribution. The Stock Option may be exercised during the Optionee's lifetime only by the Optionee (or by the Optionee's guardian or personal representative in the event of the Optionee's incapacity). The Optionee may elect to designate a beneficiary by providing written notice of the name of such beneficiary to the Company, and may revoke or change such designation at any time by filing written notice of revocation or change with the Company; such beneficiary may exercise the Optionee's Stock Option in the event of the Optionee's death to the extent provided herein. If the Optionee does not designate a beneficiary, or if the designated beneficiary predeceases the Optionee, the legal representative of the Optionee may exercise this Stock Option to the extent provided herein in the event of the Optionee's death.

**6. Effect of Certain Transactions**.

(a) Assumption or Substitution. If the Company engages in a Sale Event and such Sale Event is one in which there is an acquiring or surviving entity, the Committee may provide for the assumption of some or all outstanding Awards or for the grant of new awards in substitution therefor by the acquiror or survivor or an affiliate of the acquiror or survivor.

(b) Termination of Awards Upon Consummation of Covered Transaction. Each Award (unless assumed pursuant to Section 6(a) above), will terminate upon consummation of the Sale Event unless the Company, with the approval of the Committee, elects to treat such awards as continuing under as provided in the Sale Event. If the Sale Event (whether or not there is an acquiring or surviving entity) is one in which there is no assumption, substitution or cash-out, each Stock Option will become fully exercisable, and the delivery of shares of Stock deliverable under each outstanding Award of Stock Options will be accelerated and such shares will be delivered, prior to the Sale Event, in each case on a basis that gives the grantee of the Award a reasonable opportunity, as determined by the Committee, following exercise of the Award or the delivery of the shares, as the case may be, to participate as a stockholder in the Sale Event.

**7. Withholding Taxes**. The Optionee shall, not later than the date as of which the exercise of this Stock Option becomes a taxable event for federal income tax purposes, pay to the Company or make arrangements satisfactory to the Committee for payment of any federal, state and local taxes required by law to be withheld on account of such taxable event. Subject to

approval by the Committee, the Optionee may elect to have the minimum tax withholding obligation satisfied, in whole or in part, by authorizing the Company to withhold from shares of Common Stock to be issued or transferring to the Company, a number of shares of Common Stock with an aggregate Fair Market Value that would satisfy the minimum withholding amount due. The Optionee acknowledges and agrees that the Company or any Subsidiary of the Company has the right to deduct from payments of any kind otherwise due to the Optionee, or from the Option Shares to be issued in respect of an exercise of this Stock Option, any federal, state or local taxes of any kind required by law to be withheld with respect to the issuance of Option Shares to the Optionee.

8. **Restrictions on Transfer of Issued Shares.** None of the Issued Shares acquired upon exercise of the Stock Option shall be sold, assigned, transferred, pledged, hypothecated, given away or in any other manner disposed of or encumbered, whether voluntarily or by operation of law, unless such transfer is in compliance with all applicable securities laws (including, without limitation, the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "Act")), and such disposition is in accordance with the terms and conditions of Sections 8 and 9 and such disposition does not cause the Company to become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended. In connection with any transfer of Issued Shares, the Company may require the transferor to provide at the Optionee's own expense an opinion of counsel to the transferor, satisfactory to the Company, that such transfer is in compliance with all foreign, federal and state securities laws (including, without limitation, the Act). Any attempted disposition of Issued Shares not in accordance with the terms and conditions of Sections 8 and 9 shall be null and void, and the Company shall not reflect on its records any change in record ownership of any Issued Shares as a result of any such disposition, shall otherwise refuse to recognize any such disposition and shall not in any way give effect to any such disposition of any Issued Shares. Subject to the foregoing general provisions, Issued Shares may be transferred pursuant to the following specific terms and conditions:

(a) Transfers to Permitted Transferees. The Optionee may sell, assign, transfer or give away any or all of the Issued Shares to Permitted Transferees; provided, however, that such Permitted Transferee(s) shall, as a condition to any such transfer, agree to be subject to the provisions of this Agreement to the same extent as the Optionee (including, without limitation, the provisions of Sections 8, 9, 11 and 12) and shall have delivered a written acknowledgment to that effect to the Company. Further, the Optionee or any Permitted Transferee pursuant to this Section 8, may be required to enter into certain agreements as are reasonably requested by the Company, including but not limited to a stockholders agreement or similar agreement, prior to receipt of the Issued Shares.

(b) Transfers Upon Death. Upon the death of the Optionee, any Issued Shares then held by the Optionee at the time of such death and any Issued Shares acquired thereafter by the Optionee's legal representative pursuant to this Agreement shall be subject to the provisions of Sections 8, 9, 11 and 12, if applicable, and the Optionee's estate, executors, administrators, personal representatives, heirs, legatees and distributees shall be obligated to convey such Issued Shares to the Company or its assigns under the terms contemplated hereby.

(c) Company's Right of First Refusal. In the event that the Optionee (or any Permitted Transferee holding Issued Shares subject to this Section 8(c)) desires to sell or otherwise transfer all or any part of the Issued Shares, the Optionee (or Permitted Transferee) first shall give written notice to the Company of the Optionee's (or Permitted Transferee's) intention to make such transfer. Such notice shall state the number of Issued Shares which the Optionee (or Permitted Transferee) proposes to sell (the "Offered Shares"), the price and the terms at which the proposed sale is to be made and the name and address of the proposed transferee. At any time within 30 days after the receipt of such notice by the Company, the Company or its assigns may elect to purchase all or any portion of the Offered Shares at the price and on the terms offered by the proposed transferee and specified in the notice. The Company or its assigns shall exercise this right by mailing or delivering written notice to the Optionee (or Permitted Transferee) within the foregoing 30-day period. If the Company or its assigns elect to exercise its purchase rights under this Section 8(c), the closing for such purchase shall, in any event, take place within 45 days after the receipt by the Company of the initial notice from the Optionee (or Permitted Transferee). In the event that the Company or its assigns do not elect to exercise such purchase right, or in the event that the Company or its assigns do not pay the full purchase price within such 45-day period, the Optionee (or Permitted Transferee) may, within 60 days thereafter, sell the Offered Shares to the proposed transferee and at the same price and on the same terms as specified in the Optionee's (or Permitted Transferee's) notice. Any Shares purchased by such proposed transferee shall no longer be subject to the terms of this Agreement. Any Shares not sold to the proposed transferee shall remain subject to this Agreement. Notwithstanding the foregoing, the restrictions under this Section 8(c) shall terminate in accordance with Section 13(a).]

**9. Company's Right of Repurchase.**

(a) Right of Repurchase. The Company shall have the right (the "Repurchase Right") upon the occurrence of any of the events specified in Section 9(b) below (the "Repurchase Event") to repurchase from the Optionee (or any Permitted Transferee) some or all (as determined by the Company) of the Issued Shares held or subsequently acquired upon exercise of this Stock Option in accordance with the terms hereof by the Optionee (or any Permitted Transferee) at the price per share specified below. The Repurchase Right may be exercised by the Company within the later of (i) six months following the date of such event or (ii) seven months after the exercise of this Stock Option (the "Repurchase Period"). The Repurchase Right shall be exercised by the Company by giving the holder written notice on or before the last day of the Repurchase Period of its intention to exercise the Repurchase Right, and, together with such notice, tendering to the holder an amount equal to the Fair Market Value of the shares, determined as provided in Section 9(c). The Company may assign the Repurchase Right to one or more Persons. Upon such notification, the Optionee and any Permitted Transferees shall promptly surrender to the Company any certificates representing the Issued Shares being purchased, together with a duly executed stock power for the transfer of such Issued Shares to the Company or the Company's assignee or assignees. Upon the Company's or its assignee's receipt of the certificates from the Optionee or any Permitted Transferees, the Company or its assignee or assignees shall deliver to him, her or them a check for the Repurchase Price of the Issued Shares being purchased; provided, however, that the Company may pay the Repurchase Price for such shares by offsetting and canceling any indebtedness then owed by the Optionee to the Company. At such time, the Optionee and/or any holder of the

Issued Shares shall deliver to the Company the certificate or certificates representing the Issued Shares so repurchased, duly endorsed for transfer, free and clear of any liens or encumbrances. The Repurchase Right shall terminate in accordance with Section 13(a).

(b) Company's Right to Exercise Repurchase Right. The Company shall have the Repurchase Right in the event that any of the following events shall occur:

(i) The termination of the Optionee's employment with the Company and its Subsidiaries for any reason whatsoever, regardless of the circumstances thereof, and including without limitation upon death, disability, retirement, discharge or resignation for any reason, whether voluntarily or involuntarily; or

(ii) The Optionee's or Permitted Transferee's Bankruptcy.

(c) Determination of Fair Market Value. The fair market value of the Issued Shares shall be, for purposes of this Section 9, determined by the Board as of the date the Board elects to exercise its repurchase rights in connection with a Repurchase Event.

**10. Escrow Arrangement.**

(a) Escrow. In order to carry out the provisions of Sections 8, 9 and 11 of this Agreement more effectively, the Company shall hold any Issued Shares in escrow together with separate stock powers executed by the Optionee in blank for transfer, and any Permitted Transferee shall, as an additional condition to any transfer of Issued Shares, execute a like stock power as to such Issued Shares. The Company shall not dispose of the Issued Shares except as otherwise provided in this Agreement. In the event of any repurchase by the Company (or any of its assigns), the Company is hereby authorized by the Optionee and any Permitted Transferee, as the Optionee's and each such Permitted Transferee's attorney-in-fact, to date and complete the stock powers necessary for the transfer of the Issued Shares being purchased and to transfer such Issued Shares in accordance with the terms hereof. At such time as any Issued Shares are no longer subject to the Company's repurchase, first refusal and drag along rights, the Company shall, at the written request of the Optionee, deliver to the Optionee (or the relevant Permitted Transferee) a certificate representing such Issued Shares with the balance of the Issued Shares to be held in escrow pursuant to this Section 10.

(b) Remedy. Without limitation of any other provision of this Agreement or other rights, in the event that the Optionee, any Permitted Transferees or any other person or entity is required to sell the Optionee's Issued Shares pursuant to the provisions of Section 8, 9 and 11 of this Agreement and in the further event that he or she refuses or for any reason fails to deliver to the Company or its designated purchaser of such Issued Shares the certificate or certificates evidencing such Issued Shares together with a related stock power, the Company or such designated purchaser may deposit the applicable purchase price for such Issued Shares with a bank designated by the Company, or with the Company's independent public accounting firm, as agent or trustee, or in escrow, for the Optionee, any Permitted Transferees or other person or entity, to be held by such bank or accounting firm for the benefit of and for delivery to him, her, them or it, and/or, in its discretion, pay such purchase price by offsetting any indebtedness then owed by the Optionee as provided above. Upon any such deposit and/or offset by the Company

or its designated purchaser of such amount and upon notice to the person or entity who was required to sell the Issued Shares to be sold pursuant to the provisions of Sections 8, 9 and 11, such Issued Shares shall at such time be deemed to have been sold, assigned, transferred and conveyed to such purchaser, the holder thereof shall have no further rights thereto (other than the right to withdraw the payment thereof held in escrow, if applicable), and the Company shall record such transfer in its stock transfer book or in any appropriate manner.

**11.** **Drag Along Right.** In the event the holders of a majority of the Company's equity securities then outstanding (the "Majority Shareholders") determine to sell or otherwise dispose of all or substantially all of the assets of the Company or all or fifty percent (50%) or more of the capital stock of the Company in each case in a transaction constituting a change in control of the Company, to any non-Affiliate(s) of the Company or any of the Majority Shareholders, or to cause the Company to merge with or into or consolidate with any non-Affiliate(s) of the Company or any of the Majority Shareholders (in each case, the "Buyer") in a *bona fide* negotiated transaction (a "Sale"), the Optionee, including any Permitted Transferees, shall be obligated to and shall upon the written request of a Majority Shareholders (subject to Section 6): (a) sell, transfer and deliver, or cause to be sold, transferred and delivered, to the Buyer, his or her Issued Shares (including for this purpose all of such Optionee's or his or her Permitted Transferee's Issued Shares that presently or as a result of any such transaction may be acquired upon the exercise of options (following the payment of the exercise price therefor)) on substantially the same terms applicable to the Majority Shareholders (with appropriate adjustments to reflect the conversion of convertible securities, the redemption of redeemable securities and the exercise of exercisable securities as well as the relative preferences and priorities of preferred stock); and (b) execute and deliver such instruments of conveyance and transfer and take such other action, including voting such Issued Shares in favor of any Sale proposed by the Majority Shareholders and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents, as the Majority Shareholders or the Buyer may reasonably require in order to carry out the terms and provisions of this Section 11. The obligations under this Section 11 shall terminate in accordance with Section 13(a).

**12.** **Lockup Provision.** The Optionee, including any Permitted Transferees, agree, if requested by the Company and any underwriter engaged by the Company, not to sell or otherwise transfer or dispose of any Issued Shares (including, without limitation pursuant to Rule 144 under the Act) held by him or her for such period following the effective date of any registration statement of the Company filed under the Act as the Company or such underwriter shall specify reasonably and in good faith, not to exceed 180 days.

**13.** **Miscellaneous Provisions.**

(a) Termination. The Company's repurchase rights under Section 9, the restrictions on transfer of Issued Shares under Section 8(c) and the Drag Along obligations under Section 11 shall terminate upon the closing of the Company's Initial Public Offering or upon consummation of any Sale Event, in either case as a result of which shares of the Company (or successor entity) of the same class as the Issued Shares are registered under Section 12 of the Exchange Act and publicly traded on NASDAQ/NMS or any national security exchange.

(b) Equitable Relief. The parties hereto agree and declare that legal remedies may be inadequate to enforce the provisions of this Agreement and that equitable relief, including specific performance and injunctive relief, may be used to enforce the provisions of this Agreement.

(c) Adjustments for Changes in Capital Structure.

(i) Basic Adjustment Provisions. In the event of a stock dividend, stock split or combination of shares (including a reverse stock split), recapitalization or other change in the Company's capital structure, the Committee will make appropriate adjustments to the maximum number of Option Shares that may be delivered under the Plan and will also make appropriate adjustments to the number and kind of shares of stock or securities subject to Awards then outstanding or subsequently granted, any exercise prices relating to Awards and any other provision of Awards affected by such change.

(ii) Certain Other Adjustments. The Committee may also make adjustments of the type described in Section 13(c)(i) above to take into account distributions to stockholders other than those provided for in Section 6 and 13(c)(i), or any other event, if the Committee determines that adjustments are appropriate to avoid distortion in the operation of the Plan and to preserve the value of Awards made hereunder, having due regard for the qualification of ISOs under Section 422 of the Code, where applicable.

(iii) Continuing Application of Plan Terms. References in the Plan to shares of Stock will be construed to include any stock or securities resulting from an adjustment pursuant to this Section 13(c).

(d) Change and Modifications. This Agreement may not be orally changed, modified or terminated, nor shall any oral waiver of any of its terms be effective. This Agreement may be changed, modified or terminated only by an agreement in writing signed by the Committee and the Optionee.

(e) Governing Law. This Agreement shall be deemed a contract made under the laws of Delaware and this Agreement, and all disputes, claims or controversies arising out of or relating to this Agreement, or the negotiation, validity or performance hereof or the transactions contemplated herein, shall be construed under, governed and enforced by the laws of such state, without giving effect to its conflicts of laws principles.

(f) Headings. The headings are intended only for convenience in finding the subject matter and do not constitute part of the text of this Agreement and shall not be considered in the interpretation of this Agreement.

(g) Saving Clause. If any provision(s) of this Agreement shall be determined to be illegal or unenforceable, such determination shall in no manner affect the legality or enforceability of any other provision hereof.

(h) Notices. All notices, requests, consents and other communications shall be in writing and be deemed given when delivered personally, by telex or facsimile transmission

or when received if mailed by first class registered or certified mail, postage prepaid. Notices to the Company or the Optionee shall be addressed as set forth underneath their signatures below, or to such other address or addresses as may have been furnished by such party in writing to the other.

(i) Benefit and Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors, permitted assigns, and legal representatives. The Company has the right to assign this Agreement, and such assignee shall become entitled to all the rights of the Company hereunder to the extent of such assignment.

(j) Dispute Resolution.

(i) Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined exclusively by arbitration in the City of Boston, MA, before one arbitrator. The arbitration shall be administered by JAMS, or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The arbitration hearing shall commence within one hundred twenty (120) days after any party hereto has filed a written demand for arbitration with JAMS. The arbitrator may not award damages in excess of actual compensatory damages and shall not award punitive or multiple damages or any other damages expressly excluded under this Agreement, and the parties to this Agreement expressly waive any claim to any such damages. The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

(ii) The parties agree that any and all disputes, claims or controversies arising out of or relating to this Agreement shall be submitted to JAMS, or its successor, for mediation, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration pursuant to Section 13(j)(i). Any party may commence mediation by providing to JAMS and the other parties a written request for mediation, setting forth the subject of the dispute and the relief requested. The parties will cooperate with JAMS and with one another in selecting a mediator from the JAMS panel of neutrals, and in scheduling the mediation proceedings. The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation. Either party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time at least ten (10) days following the initial mediation session or sixty (60) days after the date of filing the written

request for mediation, whichever occurs first. The mediation may continue after the commencement of arbitration if the parties so desire. Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the case. The pendency of a mediation shall not preclude a party from seeking provisional remedies in aid of the arbitration from a court of appropriate jurisdiction, and the parties agree not to defend against any application for provisional relief on the ground that a mediation is pending.

(iii) The provisions of Section 13(e) may be enforced by any court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered. Service of process in any judicial proceeding to enforce any provision of this Section 13(j), or to enforce any arbitration award may be made upon any party by registered or certified mail to the address specified by that party in this Agreement, as well as by any other method of service of process authorized by applicable law.

(k) <u>Counterparts</u>. For the convenience of the parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

[SIGNATURE PAGE FOLLOWS]

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

GLOBAL RESCUE CORP.

By:______________________________
Name: Daniel L. Richards
Title: Chief Executive Officer

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

OPTIONEE:

______________________________
Name:

Address:

______________________________

______________________________

______________________________

**Appendix A**

**STOCK OPTION EXERCISE NOTICE**

Global Rescue Corp.
Attention: Chief Financial Officer

______________________________

______________________________

Pursuant to the terms of my stock option agreement dated __________ (the "Agreement") under the Global Rescue Corp. 2007 Stock Option and Grant Plan, I, [Insert Name] ________________, hereby [Circle One] partially/fully exercise such option by including herein payment in the amount of $______ representing the purchase price for [Fill in number of Option Shares] _______ option shares. I have chosen the following form(s) of payment:

[ ] 1. Cash
[ ] 2. Certified or bank check payable to Global Rescue Corp.
[ ] 3. Other (as described in the Agreement (please describe))
________________________________________.

In connection with my exercise of the option as set forth above, I hereby represent and warrant to Global Rescue Corp. as follows:

(i) I am purchasing the option shares for my own account for investment only, and not for resale or with a view to the distribution thereof.

(ii) I have had such an opportunity as I have deemed adequate to obtain from Global Rescue Corp. such information as is necessary to permit me to evaluate the merits and risks of my investment in Global Rescue Corp. and have consulted with my own advisers with respect to my investment in Global Rescue Corp.

(iii) I have sufficient experience in business, financial and investment matters to be able to evaluate the risks involved in the purchase of the option shares and to make an informed investment decision with respect to such purchase.

(iv) I can afford a complete loss of the value of the option shares and am able to bear the economic risk of holding such option shares for an indefinite period of time.

(v) I understand that the option shares may not be registered under the Securities Act of 1933 (it being understood that the option shares are being issued and sold in reliance on the exemption provided in Rule 701 thereunder) or any applicable state securities or "blue sky" laws and may not be sold or otherwise transferred or disposed of in the absence of an effective registration statement under the Securities Act of 1933 and under any applicable state securities or "blue sky" laws (or exemptions from the

registration requirement thereof). I further acknowledge that certificates representing option shares will bear restrictive legends reflecting the foregoing.

Sincerely yours,

______________________________

Name:

Address:

______________________________

______________________________

______________________________

Formatted: Left: 1", Right: 1", Footer distance from edge: 0.01"

GLOBAL rescue

# GLOBAL RESCUE LLC
# MASTER PARTNERSHIP AND SERVICES AGREEMENT

This Services Agreement (this "Agreement") is a legal agreement between Mark Cohon ("Partner"), whose principal place of business is 88 Cutter Mill Road STE 320, Great Neck, NY 11021 and Global Rescue LLC ("Global Rescue" or "GR"), whose principal place of business is 177 Milk Street, Suite 700, Boston, MA 02109 U.S.A. The Agreement shall be effective as of the date indicated in Section 5 below (the "Term") by both parties entering into the Agreement.

WHEREAS, Global Rescue provides emergency medical, advisory, aeromedical evacuation, security evacuation, transport, rescue and other services as detailed in Exhibit A ("Rescue Services"); and

WHEREAS, Partner provides consulting and other corporate services; and

WHEREAS, Partner and Global Rescue desire to market and provide Global Rescue's services in a coordinated manner to Partner clients and other individuals and groups identified by Partner.

NOW THEREFORE, the parties agree as follows:

**1. Definitions.**

*"GR Contractor"* – Any GR contractor, sub-contractor, or other outsourced provider that provides products or services pursuant to this Agreement.

*"Member"* – The individuals named in the enrollment material who have had the appropriate membership fees paid to GR to become members.

*"Membership Term"* – Shall have the meaning of the term specified by Partner as reported to and accepted by GR.

*"Term"* – Shall have the meaning specified in Section 5 of this Agreement.

*"Traveling Member"* – A GR Member who is traveling more than 160 miles from home.

**2. Interest Granted.**

2.1 Partner grants to Global Rescue a non-exclusive right and license among companies that offer the services outlined in **Exhibit A** to state that "Global Rescue is recommended by Partner" and to use Partner's name and trademarks as set forth in Exhibit B. Nothing in this Agreement shall limit Partner's ability to license to any other entity rights names, logos, and trademarks, not expressly granted herein to Global Rescue.

2.2 Global Rescue grants to Partner a limited, non-exclusive license to use Global Rescue's name and trademarks, as set forth in **Exhibit B**, in Partner's advertising, promotion, marketing and websites. Partner shall seek and obtain Global Rescue's approval prior to the posting of Global Rescue information on Partner websites or in Partner publications. Global Rescue shall have the right at any time to request modification or removal of Global Rescue's logo, services and products from Partner website and publications.

**3. Partner's Obligations.**

3.1 Partner shall market and shall allow Global Rescue to market Global Rescue's services to Partner's clients. The methods of sales and marketing of Global Rescue services shall be mutually determined by Partner and Global Rescue from time to time.

Deleted: October 21, 2011

Deleted: October 10, 2011

3.2 Partner shall not market to Partner clients any other provider of aeromedical evacuation, crisis response or rescue services for the term of this contract.

3.3 Partner agrees to disclose in writing to Global Rescue the amount of any other commissions or payments received or expected to be received from any purchasers of Global Rescue's services or any third parties with a financial interest in any transactions involving Global Rescue. Such disclosure is required no later than 60 days prior to the close of any contemplated transaction. If Partner fails to disclose such payments, Global Rescue shall not be required to pay the Partner the Commission.

4.2 For each Partner service sold to clients referred to Partner by Global Rescue, Partner shall pay Global Rescue 10% of the aggregate gross profit generated for new business by Global Rescue referred clients (the "Commission") who purchase Partner's services. Partner further agrees to pay Global Rescue 7.5% (the "Renewal Commission") of all renewal business referred to Partner by Global Rescue. Partner shall not be obligated to pay Global Rescue the Commission for clients who are existing clients of Partner. Commissions will be paid within 30 days of the close of any such transaction. Gross profit shall be calculated as 80% of revenue received by Partner on transactions unless the financial characteristics of the transaction indicate that actual percentage is lower than 80% in any such transaction. Should the gross profit percentage vary from 80%, Global Rescue shall be informed prior to the close of any such transaction what percentage will apply.

4. **Global Rescue's Obligations.**

4.1 Global Rescue shall market and shall allow Partner to market Partner's services to Global Rescue's clients. The methods of sales and marketing of Partner services shall be mutually determined by Partner and Global Rescue from time to time.

4.2 For each GR membership or service sold to Members or clients referred to Global Rescue by Partner, Global Rescue shall pay Partner 10% of the aggregate membership gross profit generated for new business by Partner referred Members or clients (the "Commission") who purchase Global Rescue's services. Global Rescue further agrees to pay Partner 7.5% (the "Renewal Commission") for all renewal business referred to Global Rescue by Partner. Global Rescue shall not be obligated to pay Partner the Commission for Members or clients who are existing clients of Global Rescue. Commissions will be paid within 30 days following the receipt of funds for each transaction. Gross profit shall be calculated as 80% of revenue received by Global Rescue on transactions unless the financial characteristics of the transaction indicate that actual percentage is lower than 80% in any such transaction. Should the gross profit percentage vary from 80%, Partner shall be informed prior to the close of any such transaction what percentage will apply.

5. **Term.**

The term (the "Term") of this Agreement shall commence at 12am EST on November 1, 2011 and expire at 12am EST on November 1, 2011. Upon expiration, this Agreement shall renew automatically for additional terms of one (1) year unless either party elects to terminate the agreement by giving notice in writing to the other party no later than thirty (30) days prior to the expiration of the then current term. Terms of the memberships provided to Partner clients shall be subject to the Membership Term, and may continue past the Term of this Agreement.

6. **Limitation of Liability.**

IN NO EVENT SHALL GR, GR'S OFFICERS, EMPLOYEES, DIRECTORS, MANAGERS, SHAREHOLDERS, AGENTS, LEGAL COUNSEL, ACCOUNTANTS, GUARANTORS OR GR CONTRACTORS BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, CONSEQUENTIAL LOSS OR DAMAGES WHATSOEVER AS A RESULT OF ANY ACTION OR OMISSION BY GR OR ANY GR CONTRACTOR, INCLUDING, WITHOUT LIMITATION, ANY PRODUCTS AND SERVICES DESCRIBED. GR'S MAXIMUM LIABILITY FOR ANY TYPE OF DAMAGES SHALL BE LIMITED TO THE FEE PAID FOR GR SERVICES IN THE MOST RECENT CALENDAR YEAR. PARTNER ACKNOWLEDGES AND MEMBER WILL ACKNOWLEDGE

**Deleted:** October 21, 2011

**Deleted:** October 10, 2011

PRIOR TO SERVICES BEING RENDERED THAT RECEIVING THE SERVICES CAN BE EXTREMELY RISKY AND AGREES TO ABSOLVE, INDEMNIFY AND HOLD GR HARMLESS SHOULD PARTNER OR ANY CLIENT OF PARTNER SUFFER ANY ADVERSE EFFECTS, INCLUDING BUT NOT LIMITED TO DEATH OR DISMEMBERMENT, AS A RESULT OF RECEIVING THE SERVICES. ANY SERVICES PROVIDED BY GR TO MEMBERS OR CLIENTS OF PARTNER SHALL BE BOUND BY THE GR LIABILITY RELEASE AND ALL OTHER TERMS STATED IN THE GLOBAL RESCUE MEMBER SERVICES AGREEMENT FOUND AT www.globalrescue.com/agreement.cfm.

7. **Force Majeure.**

GR shall not be liable for failure to provide or delay of services resulting from acts of God or other causes beyond GR's control.

8. **Survival of Claims.**

Any and all legal actions and claims arising under the Agreement against GR, its officers, directors, employees, or agents shall be barred unless written notice thereof is received by GR within one (1) year of the date of the event giving rise to such action or claim.

9. **Authorization to Share Information and Informed Consent.**

Either Partner shall obtain authorization or Traveling Member shall authorize the release to or from GR and any GR Contractor or Traveling Member's Designated Representative of any and all confidential Traveling Member information relevant for the successful performing of GR's services, including, but not limited to, financial information, patient medical records, histories, examinations and tests, medical images including photographs, x-rays or other images, output data from medical devices, and sound and video files ("Personal Information").

10. **Consent to Transport and Treatment.**

Partner and/or the Traveling Member shall provide consent prior to obtaining transportation and treatment by GR and/or GR Contractors. Member understands that medical care, including emergency care, may be initiated during transport by GR and/or GR Contractors should such care become necessary in the professional judgment of GR and/or the GR Contractors.

11. **Confidentiality Information.**

Each party (the "Receiving Party") acknowledges that by reason of its relationship to the other party (the "Disclosing Party") hereunder, the Receiving Party will have access to certain information and materials, including the terms of this Agreement, concerning the Disclosing Party's business, plans, technology, products, employees, clients, and services that are confidential and of substantial value to the Disclosing Party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The Receiving Party agrees that it shall not use in any way for its own account or the account of any third party, nor disclose to any third party, other than on a need to know basis consistent with performing the services contemplated in this Agreement, any such Confidential Information revealed to it by the Disclosing Party. The Receiving Party shall take every reasonable precaution to protect the confidentiality of Confidential Information. Upon request by the Receiving Party, the Disclosing Party shall advise whether or not it considers any particular information to be Confidential Information. The Receiving Party shall not publish any description of the Disclosing Party's Confidential Information beyond any descriptions published by the Disclosing Party. In the event of expiration or termination of this Agreement, there shall be no use or disclosure by the Receiving Party of any Confidential Information of the Disclosing Party, and the Receiving Party shall not develop services utilizing the Disclosing Party's Intellectual Property.

11.1 **Books and records.** During the term of this Agreement, Global Rescue and Partner shall maintain such books and records as are necessary to substantiate that all Members, payments and discounts set forth in this Agreement were provided in full compliance with this Agreement. At no time shall Global Rescue be obligated to share confidential information, including, but not

**Deleted:** October 21, 2011

**Deleted:** October 10, 2011

limited to, medical information, relating to individual Members, with Partner.

12. **General Exclusions.**

GR shall not be under any obligation to pay for or provide any items or services not explicitly set forth herein, including, but not limited to any hospital or medical expenses of any kind or nature. THE FINAL SELECTION AND PAYMENT FOR ANY SUCH SERVICES NOT ARRANGED OR PROVIDED BY GR SHALL BE THE SOLE RESPONSIBILITY OF THE TRAVELING MEMBER AND/OR PARTNER.

13. **Fraudulent Statement.**

Any fraud, misrepresentation, or concealment in the statements made by Traveling Member and/or Partner shall result in the suspension of GR services and payment in full to GR for services rendered to the Traveling Member by the Traveling Member and/or Partner. GR's failure to immediately suspend service and require payment shall not constitute a waiver nor preclude GR from doing so at a later time.

14. **Amendment.**

No modification, amendment, or waiver of any provision of this Agreement shall be effective unless in writing and signed by both parties. No failure or delay by either party in exercising any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy.

15. **Governing Law and Jurisdiction.**

This Agreement shall be governed by the laws of the State of Delaware and adjudicated in the Commonwealth of Massachusetts. In the event of legal action to enforce the terms of this Agreement the prevailing party shall be entitled to be reimbursed reasonable attorney's fees and other costs as decided by a court of competent jurisdiction.

16. **Entire Agreement.**

This Agreement represents the entire agreement between GR and Partner and supersedes any representation, written or oral, occurring before the date of this Agreement. This Agreement may only be changed in writing with the signature of GR and Partner.

17. **Time.**

Global Rescue and Partner mutually recognize that timing is important both for the providing and receiving of services. Both agree to use their best efforts to facilitate rapid provision and receipt of services by acting expeditiously.

18. **Emergency Contact Number.**

The 24/7 emergency contact number for GR is 617-459-4200. GR agrees to notify Partner a minimum of 7 days prior to modifying or changing this contact number.

19. **Successors and Assigns.**

This agreement is binding upon, and inures to the benefit of, the parties and their respective successors and assigns.

[Signature page to follow]

**Deleted:** October 21, 2011

**Deleted:** October 10, 2011

GLOBAL rescue

**Deleted:** October 21, 2011

**Deleted:** October 10, 2011

SIGNED,

GLOBAL RESCUE LLC, by its duly authorized agent:

By: ______________________________
Daniel L. Richards
Chief Executive Officer

Date: ______________________________

Mark Cohon, by his duly authorized agent:

By: ______________________________

Name: ______________________________

Title: ______________________________

Date: ______________________________

GLOBAL

Deleted: October 21, 2011

Deleted: October 10, 2011

EXHIBIT A

GLOBAL RESCUE MEMBERSHIP SERVICES

The following services summary list applies to Global Rescue Traveling Members. For a specific list of services and the rules associated with them, including limitations and restrictions, visit (www.globalrescue.com/agreement.cfm):

- 24 / 7 / 365 medical consultations by Global Rescue physicians, paramedics and Johns Hopkins physicians.
- Aeromedical evacuation via commercial or private aircraft to the U.S. or home country destination hospital of the patient's choice in the event of illness or injury requiring in-patient hospitalization more than 160 miles from home. Patient does not need to be hospitalized to qualify for transport.
- Non-medical evacuations for those members who purchase the GR Security Membership.
- Field rescue teams to be deployed, as necessary.
- Intelligence services to be provided, as shown on the Global Rescue website.
- Local medical referrals to Global Rescue's international network of hospitals, including hospitals affiliated with Johns Hopkins and other Global Rescue contracted providers.
- Medical teams to be deployed to the site of hospitalization, illness or injury as necessary.
- Full logistical and communication support for all consultative and evacuation missions.

Secondary Membership Services

- Security advisory services.
- Visa and passport assistance.
- Local legal referrals.
- Telephonic interpretation in 170+ languages.
- Emergency message relay.
- Transport of mortal remains.
- Pre-trip, mission and expedition planning.
- All other standard membership services.

GLOBAL RESCUE

Deleted: October 21, 2011

Deleted: October 10, 2011

EXHIBIT B
MARKS

**PARTNER**

**GLOBAL RESCUE**

1) Global Rescue
2) Global Rescue LLC

GLOBAL rescue

Formatted: Font: Times New Roman, 10 pt, Bold, Do not check spelling or grammar

GLOBAL rescue

Formatted: Font: Times New Roman, 10 pt, Bold, Do not check spelling or grammar

Deleted: October 21, 2011

Deleted: October 10, 2011

GLOBAL rescue

Deleted: October 21, 2011

Deleted: October 10, 2011

# EXHIBIT R

**From:** Daniel Richards <drichards@globalrescue.com>
**Sent:** Monday, October 31, 2011 8:13 AM
**To:** Stuart Richards; Melissa L. Roth
**Subject:** FW: What's new to Costco Services!

Cohon working with Tom and Ted. Sent email to Tom's old email address by accident....

---

Daniel L. Richards
Chief Executive Officer
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: 617-459-4198
F: 858-712-1295

---

**From:** Mark B. Cohon [mailto:mbcohon@aol.com]
**Sent:** Sunday, October 30, 2011 10:59 PM
**To:** tmuhlner@univops.com; Tom Bochnowski
**Subject:** Fwd: What's new to Costco Services!

Looks like we're in competition with Costco. They perform payroll as well.

Mark Cohon
917 584 3211

-----Original Message-----
From: Costco News <CostcoNews@online.costco.com>
To: MBCOHON <MBCOHON@AOL.COM>
Sent: Tue, Oct 25, 2011 3:40 am
Subject: What's new to Costco Services!

Save on Insurance | Costco Auto Program | View with Images

COSTCO SERVICES

Consumer | Insurance | Business

COSTCO WHOLESALE

Learn more about Services ▸

**What's New to Costco Services!**




## AUTO INSURANCE TAKING CARE OF COSTCO MEMBERS

After surviving a car fire, Auto Insurance customer and Costco member Galia Gur got back on the road with ease.

"I look up, and I see my hood is on fire.

Black and red fire, moving so fast. The next
minute, I didn't have a dashboard."

– Galia Gur, Costco member

Ameriprise Auto & Home Insurance

READ FULL ARTICLE ▸

## Boat & RV Loans

Rates as low as 4.44% APR. Receive a Costco Cash Card with every funded loan.



SEE FULL DETAILS ▸

## Auto & Home Insurance

Costco members are saving an average of $504.80 on auto insurance in the first year.




AUTO INSURANCE ▸
HOME INSURANCE ▸




APPLY NOW ▸

## Identity Protection

Just $3 for 30 days, then $9.99 or $11.49/month, depending on membership level.

IDENTITY GUARD.

LEARN MORE ▸

## Electronic Health Records

FOR HEALTHCARE PROVIDERS
Deploy an EHR and Practice Management solution. Just $499/month per physician for Executive Members. Exclusive Costco offer includes:

- Allscripts MyWay™ Comprehensive EHR & Integrated PM Software
- Customizable Patient Portal
- Maintenance, Support & Hosting




LEARN MORE ▸

## Intuit Small Business Services

Exclusive pricing for Costco members.

### QuickBooks Online

Organize your small business finances and save time. Free 30-day trial.




LEARN MORE ▸

### Online Payroll

Run payroll from anywhere in 3 easy steps. Try it free for 3 months.




LEARN MORE ▸

### 401(k) Plans

Surprisingly affordable 401(k) plans made for small businesses.

Intuit 401(k)




LEARN MORE ▸

## Online Investing

Buy stocks for $4. No account minimum or inactivity fees. Free mobile apps.

sharebuilder
ING DIRECT INVESTING

GET STARTED ▸

## Check Printing

Support the ASPCA and SAVE up to 50% on check printing. New styles available.




LEARN MORE ▸

## Costco Auto Program

Prearranged pricing on many makes and models plus special offers available.



LEARN MORE ▸

## Personal Health Insurance

The quality, value and extras you expect from Costco, with exclusive, negotiated rates.




GET A QUOTE ▸

## Business Phone Solutions

Get 2 lines FREE for the 1st year! Order by 10/31/11 for a $50 Costco Cash Card.



LEARN MORE ▸

## Kawasaki Special Offer

Prearranged pricing and a $250 Costco Cash Card.




SEE FULL DETAILS ▸

### Business Health and Dental Insurance

A high-quality health insurance option for businesses like yours. Negotiated exclusively for Costco Executive Members.



GET A QUOTE ▸

### Domains, Websites & Online Solutions

Save up to 80% on Go Daddy Web bundles!



LEARN MORE ▸

### Vehicle Warranty Expiring?

Protect yourself with a Vehicle Repair Protection Plan. Costco members can save up to $500.



LEARN MORE ▸

### Delta Dental

An affordable dental plan for individuals and families

(CA Executive Members only)



GET A QUOTE ▸

### Tax Forms

- IRS Approved
- Save up to 50% off typical retail prices
- Guaranteed 100% compatible with your software

LEARN MORE ▸

### Water Delivery

For Home and Office Exclusive Costco Member pricing on bottled water



LEARN MORE ▸

Coming soon, limited-time exclusive offer on select Chevrolet and GMC models

COSTCO AUTO PROGRAM



COSTCO AUTO PROGRAM ▸

### Insurance Services

- Auto & Home Insurance ▸
- Personal Health Insurance ▸
- Mexico Travel Auto Insurance ▸
- Business Health & Dental Insurance ▸ (CA, OR & WA Only)
- Business Prescription Insurance ▸
- Individual Dental Plan ▸ (CA Only)

### Business Services

- 401(k) Plans ▸
- Business Phone Services ▸
- Credit Card Processing ▸
- Checks & Forms ▸
- Payroll Services ▸
- Electronic Health Records ▸
- Domains, Websites & Online Solutions ▸
- Water Delivery ▸
- QuickBooks Online ▸
- Business Stationery ▸

### Consumer Services

- Costco Auto Program ▸
- Boat & RV Loans ▸
- Checks & Forms ▸
- Costco Member Prescription Program ▸
- Identity Protection ▸
- High-Yield Savings Account & CDs ▸
- Mortgage & Refinancing ▸
- Online Investing ▸
- Vehicle Repair Protection ▸
- Water Delivery ▸

All services provided by third parties. Terms and conditions apply and offers are subject to change without notice. See http://shop.costco.com/Services/Index for more information.

In the past you provided Costco with your email address [MBCOHON@AOL.COM]. Occasionally, you will receive brief advertising announcements regarding special items and services. If you do not wish to receive this weekly Costco Services Newsletter, simply unsubscribe here.

If you need assistance, please contact us by clicking customerservice@costco.com.
Costco Wholesale, Customer Service | P.O. Box 34535 – Seattle, WA 98124-1535
© 1998-2011 Costco Wholesale Corporation. All rights reserved.

Privacy Statement | Terms and Conditions | Update Email Preferences

# EXHIBIT S

**From:** Daniel Richards <drichards@globalrescue.com>
**Sent:** Wednesday, November 02, 2011 3:01 PM
**To:** Mark Cohon
**Attachments:** Executed Consultants Agreement.pdf

Mark,

Attached is the executed consultants agreement.

Dan

---

Daniel L. Richards
Chief Executive Officer
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: 617-459-4198
F: 858-712-1295

# EXHIBIT T

**From:** Mark B. Cohon <mbcohon@aol.com>
**Sent:** Thursday, November 03, 2011 6:38 PM
**Subject:** My Consulting Services to Global Rescue

Dan

After consideration of our call yesterday afternoon, I will not be providing any more consulting services to Global Rescue now or in the future. I have appreciated our past relationship and have enjoyed working with you. With respect to your request for information regarding my business activities with Ted and Tom, please send a written request for the information you are seeking, and I will ensure a timely response (although I cannot commit that the specific information you may request can or will necessarily be provided).

Thank you,

Mark Cohon
917 584 3211

# EXHIBIT U

ENDORSED
FILED
San Francisco County Superior Court

NOV 03 2011

CLERK OF THE COURT
BY: CAROLYN BALISTRERI
Deputy Clerk

Todd R. Wulffson (SBN 150377)
Alana R. Chimes (SBN 254730)
GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, California 92612

Counsel for Plaintiffs
UNIVERSAL OPERATIONS RISK MANAGEMENT, LLC, EDWARD MUHLNER, THOMAS BOCHNOWSKI and MARK COHON

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| UNIVERSAL OPERATIONS RISK MANAGEMENT, LLC, EDWARD MUHLNER, THOMAS BOCHNOWSKI and MARK COHON<br><br>Plaintiff,<br><br>vs.<br><br>GLOBAL RESCUE LLC and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. CGC-11-515553<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Complaint Filed: October 31, 2011 |

BY FAX

Plaintiffs Universal Operations Risk Management, LLC ("UnivOps"), Edward ("Ted") Muhlner ("Muhlner"), Thomas ("Tom") Bochnowski ("Bochnowski") and Mark ("Mark"Cohon ("Cohon") (together, "Plaintiffs") complain of Defendant Global Rescue LLC ("GR") and allege as follows:

## INTRODUCTION

1. This is an action for declaratory and injunctive relief wherein Plaintiffs seek a declaration that Muhlner, Bochnowski and Cohon's employment with UnivOps does not violate any enforceable contractual or legal obligation to GR. GR is Muhlner and Bochnowski's former employer, and Cohon formerly provided consulting services for GR. In particular, but without limitation, Muhlner, Bochnowski, and Cohon, together with UnivOps, seek a declaration that any purported restriction on UnivOps' hiring of Muhlner, Bochnowski or Cohon as a result of alleged proscriptions in Muhlner or Bochnowski's respective employment agreements with GR and in Cohon's consulting agreement with GR is invalid and unenforceable as violative of California Business and Professions Code Section 16600 *et seq.* and its interpretation by the California courts. Plaintiffs also seek a declaration that even assuming, *arguendo*, any restrictive covenants in Muhlner and Bochnowsi's employment agreements or Cohon's consulting agreement were lawful, Muhlner, Bochnowski and Cohon's continued work in their chosen field does not constitute competition under the agreements. Finally, Plaintiffs seek orders from the Court enjoining GR from interfering with UnivOps' employment of Muhlner, Bochnowski and Cohon.

## THE PARTIES

2. UnivOps is a limited liability company that manages client insurance, benefits and risk services, and provides expert consultative services for three main captive and risk pooling services: group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling. UnivOps is a limited liability company organized and existing under the laws of the State of Delaware, with a headquarters and principal place of business at 425 Market Street, Suite 2200, in San Francisco, California 94105.

3. Muhlner is a resident and citizen of the State of California, and resides at 416-B Washington Boulevard, San Francisco, California 94129. He is the Vice President of UnivOps, and works out of UnivOps' San Francisco, California office. At the time he entered into his employment

agreement with GR, which is the subject of this dispute, Muhlner resided at 2 61st Place, Long Beach, California 90803. Muhlner is a former employee of GR.

4. Bochnowski is the Vice President of UnivOps. He owns a home at 6400 West Lake Boulevard, Unit 25, Homewood, California 96141 and, beginning on November 5, 2011, will reside at 2091 Bent Creek Drive, San Ramon, California 94582. At the time he entered into his employment agreement with GR, which is the subject of this dispute, Bochnowski resided at 28 Camino Por Los Arboles, Atherton, California 94027. Bochnowski is a former employee of GR.

5. Cohon is a resident and citizen of the State of Connecticut. Cohon is the President of UnivOps. At the time he entered into his consulting agreement with GR, which is the subject of this dispute, Cohon resided in Connecticut. Cohon is a former consultant for GR.

6. Upon information and belief, Defendant GR is a provider of medical, security, and transport services based in Boston, Massachusetts. GR is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts. GR is authorized to do business in the State of California and is doing business in, without limitation, San Francisco, Mountain View, Santa Monica, Irvine, Squaw Valley, and Santa Rosa.

**JURISDICTION AND VENUE**

7. This Court has personal jurisdiction over GR because (a) GR does business within the State of California; (b) GR's clients include several large, California-based entities and hundreds of individual California citizens; (c) Muhlner and Bochnowski's employment agreements with GR were negotiated and signed in California; (d) GR's chief executive officer communicated with Muhlner and Bochnowski about their employment with GR while Muhlner and Bochnowski were located in California, and traveled to San Francisco to discuss Muhlner and Bochnowski's potential employment with GR; (e) GR promised Muhlner and Bochnowski – both of whom are from California, earned their undergraduate degrees from California universities, married California residents, and have immediate and extended family members in California – that GR would open an office in the San Francisco area within 4 to 7 years of the commencement of Muhlner and Bochnowski's employment; (f) GR sent offer letters to Muhlner and Bochnowski at their homes in California; (g) Bochnowski, while employed by

GR and on GR's behalf, traveled to California approximately once every two months; (h) Muhlner, while employed by GR and on GR's behalf, traveled to California approximately once every three months; (i) Cohon traveled to California on GR business several times; (j) GR corporate officer and Vice President of Medical Operations (Dr. Arnold Seid) resides in Santa Monica, California and is employed by GR from California; (k) GR owner and board member (Jordan Richards) resides in San Francisco, California; and (l) UnivOps will employ California residents, contract with California businesses, lease or purchase California property, and pay California taxes.

8. Venue is proper in this Court because a substantial part of the events giving rise to the claims herein occurred in San Francisco County; Muhlner and Bochnowski entered into the employment agreements that are the subject of this dispute in San Mateo and Los Angeles County; and GR is subject to personal jurisdiction in San Francisco County.

**FACTUAL ALLEGATIONS**

9. GR is a provider of medical, security, and transport services based in Boston, Massachusetts. It offers its clients travel assistant services, advice and information about medical care, and other emergency concierge services. According to its website, GR's mission is "to provide the highest quality medical, security, transport, and other critical services for our members anytime, anywhere in the world." Upon information and belief, GR's clients include several well-known California-based companies and hundreds of individual California citizens.

10. In early 2008, GR reached out to Muhlner and Bochnowski in California in connection with employment opportunities at GR. GR's chief executive officer communicated with Muhlner and Bochnowski by telephone and e-mail, and traveled to San Francisco to meet with Muhlner and Bochnowski to discuss their potential employment at GR. GR promised Muhlner and Bochnowski – both of whom are from California, earned their undergraduate degrees from California Universities, married California residents, and have immediate and extended family members in California – that GR would open an office in the San Francisco area within 4 to 7 years of the commencement of Muhlner and Bochnowski's employment.

11. GR sent offer letters dated April 21, 2008 to Muhlner and April 16, 2008 to Bochnowski at their respective homes in California. After further negotiation about the terms of Muhlner and

Bochnowski's employment with GR – all of which took place while Muhlner and Bochnowski were located in California – GR sent an "Employee Obligations Agreement" dated April 21, 2008 to Muhlner and an "Employee Obligations Agreement" dated April 16, 2008 to Bochnowski. Shortly thereafter, Muhlner executed his employment agreement (the "Muhlner Agreement," attached hereto as **Exhibit A**) and Bochnowski executed his employment agreement (the "Bochnowski Agreement," attached hereto as **Exhibit B**). The Muhlner Agreement and the Bochnowski Agreement are identical in all relevant respects.

12. Paragraph 8 of the Muhlner Agreement and the Bochnowski Agreement states, in pertinent part:

> Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world.

13. Muhlner commenced employment on July 7, 2008 with GR, where he was the Director of Global Operations. During the course of his employment with Global, Muhlner traveled to California approximately once every three months in order to meet with GR's California-based clients. After giving GR notice of his resignation on August 1, 2011, Muhlner resigned from GR on August 15, 2011 and subsequently commenced employment with UnivOps. Muhlner is informed and believes that GR intends to prevent UnivOps from employing him and/or intends to seek damages or other relief against UnivOps due to UnivOps' employment of him, based on the provisions of his employment agreement with GR.

14. Bochnowski commenced employment on June 15, 2008 with GR, where he was Director of Corporate Sales. During the course of his employment with GR, Bochnowski traveled to California approximately once every two months in order to meet with GR's California-based clients. After giving GR notice of his resignation on August 1, 2011, Bochnowski resigned from GR on August 15, 2011 and subsequently commenced employment with UnivOps. Bochnowski is informed and believes that GR intends to prevent UnivOps from employing him and/or intends to seek damages or

other relief against UnivOps due to UnivOps' employment of him, based on the provisions of his employment agreement with GR.

15. In 2010, Cohon commenced a consulting relationship with GR, whereby he provided consulting services for GR. Cohon, with only receiving reimbursement for expenses, introduced GR to long time clients, vendors, partners and relationships including, but not limited to: ACE Group, Alcoa Inc., AmerisourceBergen Corporation, Amgen Inc., Aon Captive Managers, Archer Daniels Midland Co., benefits Continuum Inc., The Bensman Group, CICA (Captive Insurance Consortium Association), Charles Schwab & Co., The Chubb Corporation, Cincinnati Bell Inc., Cisco Systems, Inc., Comcast Corporation, Dearborn National Life Insurance Company, The Walt Disney Company, Dow Chemical Company, FMR LLC (Fidelity Investments), H.J. Heinz Company, International Paper Company, Liberty Mutual Group, Lowe's Companies Inc., Mullin TBG, OneBeacon Insurance Group, PepsiCo Inc., Prudential Financial Inc., RIMS (Risk Insurance Management Society), Securian Financial Group, Inc. (Minnesota Life), Time Warner Cable Inc., Valero Energy Corp., Verizon Communications Inc., Vermont Captive Insurance Association, Wells Fargo & Company, Zurich Financial Services Group (includes all affiliates). On March 18, 2010, Cohon executed his consulting agreement (the "Cohon Agreement," attached hereto as **Exhibit C**) (the Muhlner Agreement, the Bochnowski Agreement and the Cohon Agreement are collectively referred to as the "Agreements").

16. Paragraph 8 of the Cohon Agreement states, in pertinent part:

> <u>Competitive Activities</u>. During the term of my relationship or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, Consultant, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world.

17. On November 3, 2011, Cohon gave GR notice of his termination of his consulting relationship with GR. Also on November 3, 2011, Cohon terminated his consulting relationship with GR. Cohon is informed and believes that GR intends to prevent UnivOps from employing him and/or intends to seek damages or other relief against UnivOps due to his employment with UnivOps, based on the provisions of his consulting agreement with GR.

18. UnivOps manages client insurance, benefits and risk services and provides expert consultative services for three main captive and risk pooling services: group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling. It does not provide any services currently provided by GR; UnivOps services will be complementary to services of medical and security response providers like GR. In fact, GR's chief executive officer has stated that GR has no intention or ability to provide the kinds of services provided by UnivOps, and that he is not interested in business that shares in client and partner financial risk.

19. Plaintiffs are informed and believe that, unless the declaratory relief requested herein is granted, GR will attempt to prevent UnivOps from employing Muhlner, Bochnowski and Cohon and/or will seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski and Cohon based on the provisions of the Agreements. On August 10, 2011, after Muhlner and Bochnowski resigned from GR, the CEO of GR asked Muhlner and Bochnowski to sign a blatantly one-sided "Separation Agreement and Release," which included numerous provisions demonstrating that GR intends to unfairly restrict Muhlner and Bochnowski's future employment. Among other things, the "Separation Agreement and Release" included a provision that would have prohibited Muhlner and Bochnowski from pursuing "other employment opportunities" or even posting a resume for almost two months after they resigned from GR, and would have deemed Muhlner and Bochnowski in breach of the proposed agreement if any "Company client, prospective client, employee, prospective employee, vendor, shareholder, option holder and/or contractor becomes aware" of any change in Muhlner or Bochnowski's employment status during that two-month period. The proposed agreement also would have prohibited Muhlner and Bochnowski from "full-time employment with any other entity prior to November 2, 2011," and would have required Muhlner and Bochnowski to notify GR, in writing, of any change in employment until December 31, 2013. Neither Muhlner nor Bochnowski signed the "Separation Agreement and Release."

20. Further, on August 16, 2011, as Muhlner and Bochnowski were removing their belongings from GR's office, GR's Senior Vice President threatened Bochnowski, declaring that Bochnowski's employment agreement (GR Employee Obligations Agreement) prohibited Bochnowski from communicating in any manner with GR clients, prospects, consultants or employees.

21. In addition, on November 2, 2011, during a conversation between Cohon and the CEO of GR, the CEO of GR threatened Cohon that GR was going to "enforce its rights" under the Agreements against Muhlner, Bochnowski and Cohon. As a result, Muhlner, Bochnowski and Cohon believe that GR intends to prevent UnivOps from employing them and/or intends to seek damages or other relief against UnivOps due to their employment with UnivOps, based on the provisions of their Agreements with GR.

## CAUSES OF ACTION

## COUNT I

**(Declaratory and Injunctive Relief)**

22. Plaintiffs re-allege and incorporate by reference Paragraphs 1-21 as if fully set forth herein.

23. An actual, present, and justiciable controversy now exists between Plaintiffs and GR with respect to the rights of UnivOps, Muhlner, Bochnowski and Cohon. Plaintiffs contend as follows:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements in order to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, and/or would attempt to seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Paragraph 8 is invalid and unenforceable as violative of California Business and Professions Code Section 16600 *et seq.*; and

(b) None of the Plaintiffs have any valid contractual or other legal obligation to GR that would prevent UnivOps from employing Muhlner, Bochnowski or Cohon at any time.

24. Plaintiffs are informed and believe, on the basis of such information and belief allege, that GR disputes the above contentions and contends otherwise.

25. Plaintiffs are now entitled to a declaration of their rights to avoid a multiplicity of actions and so that the parties will know their rights, duties, and obligations respecting the Agreements and Muhlner, Bochnowski and Cohon's employment with UnivOps. Specifically, Plaintiffs are entitled to a declaration that their contentions, as set forth in Paragraph 23 above, are correct.

26. Plaintiffs are further entitled to an order enjoining GR from interfering with UnivOps' employment of Muhlner, Bochnowski and Cohon.

**COUNT II**

**(Declaratory and Injunctive Relief)**

27. Plaintiffs re-allege and incorporate by reference Paragraphs 1-26 as if fully set forth herein.

28. An actual, present, and justiciable controversy now exists between Plaintiffs and GR with respect to the rights of UnivOps, Muhlner, Bochnowski and Cohon. Plaintiffs contend as follows:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements in order to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, and/or would attempt to seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Muhlner, Bochnowski and Cohon's work in their chosen field does not constitute competition under Paragraph 8.

29. Plaintiffs are informed and believe, on the basis of such information and belief allege, that GR disputes the above contentions and contends otherwise.

30. Plaintiffs are now entitled to a declaration of their rights to avoid a multiplicity of actions and so that the parties will know their rights, duties, and obligations respecting the Agreements and Muhlner, Bochnowski and Cohon's employment with UnivOps. Specifically, Plaintiffs are entitled to a declaration that their contentions, as set forth in Paragraph 28 above, are correct.

31. Plaintiffs are further entitled to an order enjoining GR from interfering with UnivOps' employment of Muhlner, Bochnowski and Cohon.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief against GR:

1. On the First Cause of Action, a declaration from the Court that:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, or would seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Paragraph 8 is invalid and unenforceable as violative of California Business and Professions Code Section 16600 *et seq.*; and

///

(b) None of the Plaintiffs have any valid contractual or other legal obligation to GR that would prevent UnivOps from employing Muhlner, Bochnowski or Cohon at any time;

2. On the Second Cause of Action, a declaration from the Court that:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements in order to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, and/or would attempt to seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Muhlner, Bochnowski and Cohon's work in their chosen field does not constitute competition under Paragraph 8.

3. Temporary, preliminary, and permanent injunctive relief; and

4. Such other and further relief as the Court may deem just and proper.

DATED: November 3, 2011

GREENBERG TRAURIG, LLP

By: [signature]
TODD R. WULFFSON
ALANA R. CHIMES
Counsel for Plaintiffs,
UNIVERSAL OPERATIONS RISK MANAGEMENT LLC, EDWARD MUHLNER, THOMAS BOCHNOWSKI and MARK COHON