# STATE COURT RECORD

## PART 5

# EXHIBIT M

**From:** Michael O'Malley <michael.omalley@srsmail.com>
**Sent:** Friday, March 25, 2011 2:10 PM
**To:** Daniel Richards
**Cc:** Melissa L. Roth
**Subject:** Emailing: AAC Reinsurance Agreement, Y-Bridge - CSC Policy Final Version
**Attachments:** AAC Reinsurance Agreement(RDW) (2).docx; AAC Reinsurance Agreement.pdf; Y-Bridge - CSC Policy Final Version.pdf

Dan,

Attached please find the reinsurance agreement and policy. I am comfortable with both documents. Please review reinsurance agreement as our internal counsel reviewed and edited. The last item we will need is a trust agreement which I will draft and forward for your review. I have attached the reinsurance agreement edits per our counsel. I will call to discuss. Thank you.

# EXHIBIT N

**From:** Bailey, Tina <CBailey@vsecorp.com>
**Sent:** Wednesday, May 18, 2011 10:17 AM
**To:** Mark Cohon
**Subject:** FW: VSE and Global Rescue
**Attachments:** 20110517121118.pdf

Good Morning Mark: This is a follow up to my voice mail messages.

We are delighted to partner with you in regards to cost-savings associated with our various insurance coverage/policies. Per your request, I am in the process of gathering the various policy information. Meanwhile, I am interested in specific examples of how GR has successfully leveraged their services with existing clients. This information will permit us to focus on relevant policies, carriers, and coverage. The policy/information that I will share with you is proprietary and confidential. For this reason, I will need you to sign a Non-Disclosure Agreement (see attached) before releasing the information. As we continue our partnership, and request proprietary information from Global Rescue we will sign a Non-Disclosure Agreement and offer you the same protections.

Again, I am looking forward to working with you.

Please call if you have any questions.

Regards,

*Tina*

Tina (Bowers) Bailey
VP of Human Resources
VSE Corporation
2550 Huntington Avenue
Alexandria, VA 22303
703 329-3214

VSE Human Resources
Delivering results that matter!

NOTICE: This communication may contain privileged or confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, recopy, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error and delete the copy you received. Thank you.

From: Mark B. Cohon [mailto:mcohon@globalrescue.com]
Sent: Monday, May 16, 2011 11:35 AM
To: Bailey, Tina
Cc: Tom Bochnowski; Rose, AJ; Gauthier, Maurice "Mo"; Daniel L. Richards
Subject:

Tina,
I am the head of Global Rescue's Risk Management and Services team. We have recently been able to leverage our services at existing clients to help them reduce various insurance and benefits costs.
As you may be aware, last week, VSE and GR's CEOs discussed GR's Risk Services team preparing a proposal to be used as a basis for discussing how VSE may be able to reduce the cost of some of your current commercial insurance and benefits while possibly improving service levels to VSE and your employees. Mr. Gauthier suggested we contact you to get the necessary information to prepare the proposal.
Would you please send me the following:
· Copies of the actual policies or agreements for the insurance of any corporate or group accident program, group life, VSE's various liability programs, workers compensation, expatriate medial and welfare as well as short term out of country medical and welfare programs and corporate or bodily hazard programs
· Covered population with employment definitions of the insureds for each policy and/or agreement
Please let me know if you'd like to discuss our request further by phone. We look forward to working with you.
Regards.
Mark
Mark B. Cohon
Global Rescue Risk Services
917-584-3211
203-291-9073
Sent from my Verizon Wireless BlackBerry

# EXHIBIT O

**From:** Ted Muhlner <tmuhlner@globalrescue.com>
**Sent:** Thursday, August 11, 2011 9:41 PM
**To:** Daniel Richards
**Subject:** Agreement
**Attachments:** Ted Muhlner - Resignation Letter 110811.pdf

Dan,

After a review of the "Separation Agreement and Release" dated 10 August 2011, my attorney advised me not to sign the agreement. The agreement does not reflect the good faith discussions and negotiations that Tom and I entered into at your request in order to assist Global Rescue in finding our replacements and in transitioning our responsibilities.

As Tom and I discussed with you on 1 August 2011, as an "at will employee" and in accordance with my Employee Obligation Agreement, I am terminating my employment with Global Rescue effective 15 August 2011 due to personal reasons and the need to relocate my family to California. I have enclosed my resignation letter for your records.

I am willing to entertain cash payment offers for my vested Global Rescue restrictive stock and options.

I wish Global Rescue and its employees well and look forward to maintaining as positive a relationship outside of Global Rescue as while I was employed at Global Rescue.

Best regards,

Ted

---

Ted Muhlner
Vice President, Operations
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: (617) 459-4208
M: (858) 204-6363
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

August 11, 2011

Please accept this letter as my official resignation from Global Rescue. As we discussed on August 1, I am resigning for personal reasons and the last day of my employment at Global Rescue will be August 15, 2011.

I have enjoyed my time at Global Rescue and am thankful to have had the opportunity to work with such a talented team.

Sincerely,

Ted Mühlner

**From:** Tom Bochnowski <tbochnowski@globalrescue.com>
**Sent:** Thursday, August 11, 2011 9:57 PM
**To:** Daniel Richards
**Subject:** Agreement / Resignation Letter
**Attachments:** GR Resignation Letter 110811.pdf

Dan,

After a review of your draft "Separation Agreement and Release" dated 10 August 2011, and discussion with my attorney, please be advised that your proposed agreement is not acceptable. Indeed, your proposal does not reflect the good faith discussions and negotiations that Ted and I entered into at your request in order to assist Global Rescue find our replacements and transition our responsibilities. I have concluded based on your proposed draft agreement that we will be unable to reach any agreement with you on terms that would be acceptable.

As I discussed with you on 1 August 2011, I, as an "at will employee" and in accordance with my Employee Obligation Agreement, am terminating my employment with Global Rescue effective 15 August 2011 due to personal reasons and the need to relocate my family to California. I have enclosed my resignation letter for your records.

I am willing to entertain cash payment offers for my vested Global Rescue restrictive stock and options.

I wish Global Rescue and its employees well going forward and look forward to maintaining as positive a relationship outside of Global Rescue as while employed at Global Rescue.

Regards,

Tom

---

Tom Bochnowski
Vice President, Response Services
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
W: (617) 459-4213
M: (415) 710-6990
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200.**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

August 11, 2011

Please accept this letter as my official resignation from Global Rescue. As we discussed on August 1, I am resigning for personal reasons and the last day of my employment at Global Rescue will be August 15, 2011.

I have enjoyed my time at Global Rescue and am thankful to have had the opportunity to work with such a talented team.

Sincerely,

Thomas Bochnowski

# EXHIBIT P

**From:** Daniel Richards <drichards@globalrescue.com>
**Sent:** Thursday, August 11, 2011 10:52 PM
**To:** Ted Muhlner; Tom Bochnowski
**Cc:** Stuart Richards; Melissa L. Roth
**Subject:** Re: Agreement

YTed + Tom,

Your accusation that we have negotiated with you in bad faith is perplexing since it appears the agreement we sent you represents all of the things we discussed. If there were issues you had with the document, good faith on your part would have resulted in a discussion regarding your issues. I'm disappointed that this didn't happen and frankly don't understand.

However, your motives are your own and it isn't for me to know them. I am open to further discussions if that is what you would like. Neither of you should come to work tomorrow while you consider your course.

Dan

---

**From**: Ted Muhlner
**To**: Daniel Richards
**Sent**: Thu Aug 11 21:40:53 2011
**Subject**: Agreement
Dan,

After a review of the "Separation Agreement and Release" dated 10 August 2011, my attorney advised me not to sign the agreement. The agreement does not reflect the good faith discussions and negotiations that Tom and I entered into at your request in order to assist Global Rescue in finding our replacements and in transitioning our responsibilities.

As Tom and I discussed with you on 1 August 2011, as an "at will employee" and in accordance with my Employee Obligation Agreement, I am terminating my employment with Global Rescue effective 15 August 2011 due to personal reasons and the need to relocate my family to California. I have enclosed my resignation letter for your records.

I am willing to entertain cash payment offers for my vested Global Rescue restrictive stock and options.

I wish Global Rescue and its employees well and look forward to maintaining as positive a relationship outside of Global Rescue as while I was employed at Global Rescue.

Best regards,

Ted

---

Ted Muhlner
Vice President, Operations
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: (617) 459-4208
M: (858) 204-6363
Fx: (617) 507-1050
www.globalrescue.com

**In the event of an emergency, please contact the Global Rescue Operations Center at 617-459-4200**

CONFIDENTIALITY & PRIVACY NOTICE
The information transmitted in this email is intended only for the person or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, retransmission, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please advise the sender and permanently delete this message, all copies and any attachments from your records immediately.

# EXHIBIT Q

REDACTED

**From:** Daniel Richards
**Sent:** Friday, October 21, 2011 8:15 PM
**To:** Mark Cohon
**Subject:** Docs - v2

Mark,

Apologies for the slow response on this. Busy week. Attached are:

1) Revised partner agreement – pls review marked version and let me know of this works.
2) GR NQSO stock option agreement
3) GR consultants agreement

Let's discuss any q's you have next week.

Thanks

Dan

---

Daniel L. Richards
Chief Executive Officer
Global Rescue LLC

177 Milk St. STE 700
Boston, MA 02109
P: 617-459-4198
F: 858-712-1295

**Stock Option Agreement**
**under the Global Rescue Corp.**
**2007 Stock Option and Grant Plan**

| | |
|---|---|
| **Name of Optionee:** | Mark Cohon (the "Optionee") |
| **No. of Option Shares:** | 10,000 Shares of Common Stock |
| **Grant Date:** | September 30, 2011 (the "Grant Date") |
| **Expiration Date:** | September 30, 2021 (the "Expiration Date") |
| **Option Exercise Price/Share:** | $0.25 (the "Option Exercise Price") |

Pursuant to the Global Rescue Corp. 2007 Stock Option and Grant Plan (the "Plan"), Global Rescue Corp., a Delaware corporation (together with all successors thereto, the "Company"), hereby grants to the Optionee, who is an officer, director, employee, consultant or other key person of the Company or any of its Subsidiaries, an option (the "Stock Option") to purchase on or prior to the Expiration Date, or such earlier date as is specified herein, all or any part of the number of shares of Common Stock, par value $0.001 per share ("Common Stock"), of the Company indicated above (the "Option Shares," and such shares once issued shall be referred to as the "Issued Shares"), at the Option Exercise Price per share, subject to the terms and conditions set forth in this Non-Qualified Stock Option Agreement (this "Agreement") and in the Plan. This Stock Option is intended to qualify as an "incentive stock option" as defined in Section 422(b) of the Internal Revenue Code of 1986, as amended from time to time (the "Code").

1. **Definitions.** For the purposes of this Agreement, the following terms shall have the following respective meanings. All capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Plan.

An "Affiliate" of any Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the first mentioned Person. A Person shall be deemed to control another Person if such first Person possesses directly or indirectly the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

"Bankruptcy" shall mean (i) the filing of a voluntary petition under any bankruptcy or insolvency law, or a petition for the appointment of a receiver or the making of an assignment for the benefit of creditors, with respect to the Optionee or any Permitted Transferee, or (ii) the Optionee or any Permitted Transferee being subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to the Optionee's or such Permitted Transferee's assets, which involuntary petition or assignment or attachment is not discharged within 60 days after its date, and (iii) the Optionee or any Permitted

Transferee being subject to a transfer of the Stock Option or the Issued Shares by operation of law (including by divorce, even if not insolvent), except by reason of death.

"Cause" shall mean a vote of the Board resolving that the Optionee should be dismissed as a result of (i) the commission of any act by the Optionee constituting financial dishonesty against the Company (which act would be chargeable as a crime under applicable law); (ii) the Optionee's engaging in any other act of dishonesty, fraud, intentional misrepresentation, moral turpitude, illegality or harassment which, as determined in good faith by the Board, would: (A) materially adversely affect the business or the reputation of the Company with its current or prospective customers, suppliers, lenders and/or other third parties with whom it does or might do business; or (B) expose the Company to a risk of civil or criminal legal damages, liabilities or penalties; (iii) the repeated failure by the Optionee to follow the directives of the Company's chief executive officer or Board or (iv) any material misconduct, violation of the Company's policies, or willful and deliberate non-performance of duty by the Optionee in connection with the business affairs of the Company.

"Permitted Transferees" shall mean any of the following to whom the Optionee may transfer Issued Shares hereunder (as set forth in Section 8): the Optionee's spouse, children (natural or adopted), stepchildren or a trust for their sole benefit of which the Optionee is the settlor; provided, however, that any such trust does not require or permit distribution of any Issued Shares during the term of this Agreement unless subject to its terms. Upon the death of the Optionee (or a Permitted Transferee to whom shares have been transferred hereunder), the term Permitted Transferees shall also include such deceased Optionee's (or such deceased Permitted Transferee's) estate, executions, administrations, personal representations, heirs, legatees and distributees, as the case may be.

"Person" shall mean any individual, corporation, partnership (limited or general), limited liability company, limited liability partnership, association, trust, joint venture, unincorporated organization or any similar entity.

"Sale Event" shall mean, regardless of form thereof, consummation of (i) the dissolution or liquidation of the Company, (ii) the sale of all or substantially all of the assets of the Company on a consolidated basis to an unrelated person or entity, (iii) a merger, reorganization or consolidation in which the outstanding shares of Stock are converted into or exchanged for securities of the successor entity and the holders of the Company's outstanding voting power immediately prior to such transaction do not own a majority of the outstanding voting power of the successor entity immediately upon completion of such transaction, (iv) the sale of all or a majority of the outstanding capital stock of the Company to an unrelated person or entity or (v) any other transaction in which the owners of the Company's outstanding voting power immediately prior to such transaction do not own at least a majority of the outstanding voting power of the successor entity immediately upon completion of the transaction.

"Subsidiary" shall mean any corporation (other than the Company) in any unbroken chain of corporations or other entities beginning with the Company if each of the corporations (other than the last corporation in the unbroken chain) owns stock or other interests possessing 50 percent or more of the total combined voting power of all classes of stock or in one of the other corporations in the chain.

2. **Vesting, Exercisability and Termination.**

(a) No portion of this Stock Option may be exercised until such portion shall have vested.

(b) Except as set forth below and in Section 6, and subject to the determination of the Committee in its sole discretion to accelerate the vesting schedule hereunder, this Stock Option shall be vested and exercisable with respect to the Option Shares on the respective dates indicated below:

| Incremental (Aggregate Number) of Option Shares Exercisable | Vesting Date |
|---|---|
| 1,000 (20.00%) | 1 Year Anniversary of Grant Date |
| 250 (5.00%) | Per Quarter Thereafter |

Subject to Section 6 hereof, all of the Option Shares shall be deemed fully vested and exercisable on the five year anniversary of the Grant Date if Optionee is employed on such date.

(c) Termination. Except as may otherwise be provided by the Committee, if the Optionee's employment with the Company or a Subsidiary is terminated, the period within which to exercise this Stock Option may be subject to earlier termination as set forth below:

(i) Termination Due to Death or Disability. If the Optionee's employment terminates by reason of such Optionee's death or disability (as defined in Section 422(c)(6) of the Code), this Stock Option may be exercised, to the extent exercisable on the date of such termination, by the Optionee, the Optionee's legal representative or legatee for a period of 12 months from the date of death or disability (as defined in Section 422(c)(6) of the Code) or until the Expiration Date, if earlier, subject in any event to Section 6.

(ii) Other Termination. If the Optionee's employment terminates for any reason other than death or disability (as defined in Section 422(c)(6) of the Code), and unless otherwise determined by the Committee, this Stock Option may be exercised, to the extent exercisable on the date of termination, for a period of 90 days from the date of termination or until the Expiration Date, if earlier; provided however, if the Optionee's employment is terminated for Cause, this Stock Option shall terminate immediately upon the date of such termination.

For purposes hereof, the Committee's determination of the reason for termination of the Optionee's employment shall be conclusive and binding on the Optionee and his or her representatives or legatees or Permitted Transferees. Any portion of this Stock Option that is not exercisable on the date of termination of the employment shall terminate immediately and be null and void.

3. **Exercise of Stock Option.**

(a) The Optionee may exercise this Stock Option only in the following manner: Prior to the Expiration Date (subject to Section 6), the Optionee may deliver a Stock Option exercise notice (an "Exercise Notice") in the form of Appendix A hereto indicating his or her election to purchase some or all of the Option Shares with respect to which this Stock Option is exercisable at the time of such notice. Such notice shall specify the number of Option Shares to be purchased. Payment of the purchase price may be made by any one of the methods described below, and subject to Committee approval, more than one method of payment may be used.

(i) In cash, by certified or bank check, or other instrument acceptable to the Committee in U.S. funds payable to the order of the Company in an amount equal to the Option Exercise Price multiplied by the number of shares subject to the Exercise Notice (the "Option Purchase Price");

(ii) By the Optionee delivering to the Company a promissory note if the Board has expressly authorized the loan of funds to the Optionee for the purpose of enabling or assisting the Optionee to effect the exercise of his or her Stock Option; provided that at least so much of the exercise price as represents the par value of the Stock shall be paid other than with a promissory note if otherwise required by the Committee or applicable law; or

(iii) If the Initial Public Offering has occurred, then (A) through the delivery (or attestation to ownership) of shares of Common Stock that have been purchased by the Optionee on the open market or that have been held by the Optionee for at least six months and are not subject to restrictions under any plan of the Company and in any event with an aggregate Fair Market Value (as of the date of such exercise) equal to the Option Purchase Price, (B) by the Optionee delivering to the Company a properly executed Exercise Notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the Option Purchase Price, provided that in the event the Optionee chooses to pay the Option Purchase Price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Committee shall prescribe as a condition of such payment procedure, or (C) a combination of (i), (ii), (iii)(A) and (iii)(B) above.

(b) Certificates for the Option Shares so purchased will not be issued until: (i) the Company is satisfied that all legal matters in connection with the issuance and delivery of such shares have been addressed and resolved; (ii) if the outstanding Stock is at the time of delivery listed on any stock exchange or national market system, the shares to be delivered have been listed or authorized to be listed on such exchange or system upon official notice of issuance; and (iii) all requirements of the Plan have been satisfied or waived. The determination of the Committee as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to this Stock Option unless and until this Stock Option shall have been exercised pursuant to the terms hereof, the Company shall have issued

3. **Exercise of Stock Option.**

(a) The Optionee may exercise this Stock Option only in the following manner: Prior to the Expiration Date (subject to Section 6), the Optionee may deliver a Stock Option exercise notice (an "Exercise Notice") in the form of Appendix A hereto indicating his or her election to purchase some or all of the Option Shares with respect to which this Stock Option is exercisable at the time of such notice. Such notice shall specify the number of Option Shares to be purchased. Payment of the purchase price may be made by any one of the methods described below, and subject to Committee approval, more than one method of payment may be used.

(i) In cash, by certified or bank check, or other instrument acceptable to the Committee in U.S. funds payable to the order of the Company in an amount equal to the Option Exercise Price multiplied by the number of shares subject to the Exercise Notice (the "Option Purchase Price");

(ii) By the Optionee delivering to the Company a promissory note if the Board has expressly authorized the loan of funds to the Optionee for the purpose of enabling or assisting the Optionee to effect the exercise of his or her Stock Option; provided that at least so much of the exercise price as represents the par value of the Stock shall be paid other than with a promissory note if otherwise required by the Committee or applicable law; or

(iii) If the Initial Public Offering has occurred, then (A) through the delivery (or attestation to ownership) of shares of Common Stock that have been purchased by the Optionee on the open market or that have been held by the Optionee for at least six months and are not subject to restrictions under any plan of the Company and in any event with an aggregate Fair Market Value (as of the date of such exercise) equal to the Option Purchase Price, (B) by the Optionee delivering to the Company a properly executed Exercise Notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the Option Purchase Price, provided that in the event the Optionee chooses to pay the Option Purchase Price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Committee shall prescribe as a condition of such payment procedure, or (C) a combination of (i), (ii), (iii)(A) and (iii)(B) above.

(b) Certificates for the Option Shares so purchased will not be issued until: (i) the Company is satisfied that all legal matters in connection with the issuance and delivery of such shares have been addressed and resolved; (ii) if the outstanding Stock is at the time of delivery listed on any stock exchange or national market system, the shares to be delivered have been listed or authorized to be listed on such exchange or system upon official notice of issuance; and (iii) all requirements of the Plan have been satisfied or waived. The determination of the Committee as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to this Stock Option unless and until this Stock Option shall have been exercised pursuant to the terms hereof, the Company shall have issued

and delivered the Issued Shares to the Optionee, and the Optionee's name shall have been entered as a stockholder of record on the books of the Company. Thereupon, the Optionee shall have full dividend and other ownership rights with respect to such Issued Shares, subject to the terms of this Agreement.

(c) Notwithstanding any other provision hereof or of the Plan, neither this Stock Option, nor any portion of this Stock Option, shall be exercisable after the Expiration Date.

4. **Incorporation of Plan**. Notwithstanding anything herein to the contrary, this Stock Option shall be subject to and governed by all the terms and conditions of the Plan.

5. **Transferability of Stock Option**. This Agreement is personal to the Optionee and is not transferable by the Optionee in any manner other than by will or by the laws of descent and distribution. The Stock Option may be exercised during the Optionee's lifetime only by the Optionee (or by the Optionee's guardian or personal representative in the event of the Optionee's incapacity). The Optionee may elect to designate a beneficiary by providing written notice of the name of such beneficiary to the Company, and may revoke or change such designation at any time by filing written notice of revocation or change with the Company; such beneficiary may exercise the Optionee's Stock Option in the event of the Optionee's death to the extent provided herein. If the Optionee does not designate a beneficiary, or if the designated beneficiary predeceases the Optionee, the legal representative of the Optionee may exercise this Stock Option to the extent provided herein in the event of the Optionee's death.

6. **Effect of Certain Transactions**.

(a) Assumption or Substitution. If the Company engages in a Sale Event and such Sale Event is one in which there is an acquiring or surviving entity, the Committee may provide for the assumption of some or all outstanding Awards or for the grant of new awards in substitution therefor by the acquiror or survivor or an affiliate of the acquiror or survivor.

(b) Termination of Awards Upon Consummation of Covered Transaction. Each Award (unless assumed pursuant to Section 6(a) above), will terminate upon consummation of the Sale Event unless the Company, with the approval of the Committee, elects to treat such awards as continuing under as provided in the Sale Event. If the Sale Event (whether or not there is an acquiring or surviving entity) is one in which there is no assumption, substitution or cash-out, each Stock Option will become fully exercisable, and the delivery of shares of Stock deliverable under each outstanding Award of Stock Options will be accelerated and such shares will be delivered, prior to the Sale Event, in each case on a basis that gives the grantee of the Award a reasonable opportunity, as determined by the Committee, following exercise of the Award or the delivery of the shares, as the case may be, to participate as a stockholder in the Sale Event.

7. **Withholding Taxes**. The Optionee shall, not later than the date as of which the exercise of this Stock Option becomes a taxable event for federal income tax purposes, pay to the Company or make arrangements satisfactory to the Committee for payment of any federal, state and local taxes required by law to be withheld on account of such taxable event. Subject to

approval by the Committee, the Optionee may elect to have the minimum tax withholding obligation satisfied, in whole or in part, by authorizing the Company to withhold from shares of Common Stock to be issued or transferring to the Company, a number of shares of Common Stock with an aggregate Fair Market Value that would satisfy the minimum withholding amount due. The Optionee acknowledges and agrees that the Company or any Subsidiary of the Company has the right to deduct from payments of any kind otherwise due to the Optionee, or from the Option Shares to be issued in respect of an exercise of this Stock Option, any federal, state or local taxes of any kind required by law to be withheld with respect to the issuance of Option Shares to the Optionee.

**8. Restrictions on Transfer of Issued Shares.** None of the Issued Shares acquired upon exercise of the Stock Option shall be sold, assigned, transferred, pledged, hypothecated, given away or in any other manner disposed of or encumbered, whether voluntarily or by operation of law, unless such transfer is in compliance with all applicable securities laws (including, without limitation, the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "Act")), and such disposition is in accordance with the terms and conditions of Sections 8 and 9 and such disposition does not cause the Company to become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended. In connection with any transfer of Issued Shares, the Company may require the transferor to provide at the Optionee's own expense an opinion of counsel to the transferor, satisfactory to the Company, that such transfer is in compliance with all foreign, federal and state securities laws (including, without limitation, the Act). Any attempted disposition of Issued Shares not in accordance with the terms and conditions of Sections 8 and 9 shall be null and void, and the Company shall not reflect on its records any change in record ownership of any Issued Shares as a result of any such disposition, shall otherwise refuse to recognize any such disposition and shall not in any way give effect to any such disposition of any Issued Shares. Subject to the foregoing general provisions, Issued Shares may be transferred pursuant to the following specific terms and conditions:

(a) Transfers to Permitted Transferees. The Optionee may sell, assign, transfer or give away any or all of the Issued Shares to Permitted Transferees; provided, however, that such Permitted Transferee(s) shall, as a condition to any such transfer, agree to be subject to the provisions of this Agreement to the same extent as the Optionee (including, without limitation, the provisions of Sections 8, 9, 11 and 12) and shall have delivered a written acknowledgment to that effect to the Company. Further, the Optionee or any Permitted Transferee pursuant to this Section 8, may be required to enter into certain agreements as are reasonably requested by the Company, including but not limited to a stockholders agreement or similar agreement, prior to receipt of the Issued Shares.

(b) Transfers Upon Death. Upon the death of the Optionee, any Issued Shares then held by the Optionee at the time of such death and any Issued Shares acquired thereafter by the Optionee's legal representative pursuant to this Agreement shall be subject to the provisions of Sections 8, 9, 11 and 12, if applicable, and the Optionee's estate, executors, administrators, personal representatives, heirs, legatees and distributees shall be obligated to convey such Issued Shares to the Company or its assigns under the terms contemplated hereby.

(c) Company's Right of First Refusal. In the event that the Optionee (or any Permitted Transferee holding Issued Shares subject to this Section 8(c)) desires to sell or otherwise transfer all or any part of the Issued Shares, the Optionee (or Permitted Transferee) first shall give written notice to the Company of the Optionee's (or Permitted Transferee's) intention to make such transfer. Such notice shall state the number of Issued Shares which the Optionee (or Permitted Transferee) proposes to sell (the "Offered Shares"), the price and the terms at which the proposed sale is to be made and the name and address of the proposed transferee. At any time within 30 days after the receipt of such notice by the Company, the Company or its assigns may elect to purchase all or any portion of the Offered Shares at the price and on the terms offered by the proposed transferee and specified in the notice. The Company or its assigns shall exercise this right by mailing or delivering written notice to the Optionee (or Permitted Transferee) within the foregoing 30-day period. If the Company or its assigns elect to exercise its purchase rights under this Section 8(c), the closing for such purchase shall, in any event, take place within 45 days after the receipt by the Company of the initial notice from the Optionee (or Permitted Transferee). In the event that the Company or its assigns do not elect to exercise such purchase right, or in the event that the Company or its assigns do not pay the full purchase price within such 45-day period, the Optionee (or Permitted Transferee) may, within 60 days thereafter, sell the Offered Shares to the proposed transferee and at the same price and on the same terms as specified in the Optionee's (or Permitted Transferee's) notice. Any Shares purchased by such proposed transferee shall no longer be subject to the terms of this Agreement. Any Shares not sold to the proposed transferee shall remain subject to this Agreement. Notwithstanding the foregoing, the restrictions under this Section 8(c) shall terminate in accordance with Section 13(a).]

**9. Company's Right of Repurchase.**

(a) Right of Repurchase. The Company shall have the right (the "Repurchase Right") upon the occurrence of any of the events specified in Section 9(b) below (the "Repurchase Event") to repurchase from the Optionee (or any Permitted Transferee) some or all (as determined by the Company) of the Issued Shares held or subsequently acquired upon exercise of this Stock Option in accordance with the terms hereof by the Optionee (or any Permitted Transferee) at the price per share specified below. The Repurchase Right may be exercised by the Company within the later of (i) six months following the date of such event or (ii) seven months after the exercise of this Stock Option (the "Repurchase Period"). The Repurchase Right shall be exercised by the Company by giving the holder written notice on or before the last day of the Repurchase Period of its intention to exercise the Repurchase Right, and, together with such notice, tendering to the holder an amount equal to the Fair Market Value of the shares, determined as provided in Section 9(c). The Company may assign the Repurchase Right to one or more Persons. Upon such notification, the Optionee and any Permitted Transferees shall promptly surrender to the Company any certificates representing the Issued Shares being purchased, together with a duly executed stock power for the transfer of such Issued Shares to the Company or the Company's assignee or assignees. Upon the Company's or its assignee's receipt of the certificates from the Optionee or any Permitted Transferees, the Company or its assignee or assignees shall deliver to him, her or them a check for the Repurchase Price of the Issued Shares being purchased; provided, however, that the Company may pay the Repurchase Price for such shares by offsetting and canceling any indebtedness then owed by the Optionee to the Company. At such time, the Optionee and/or any holder of the

Issued Shares shall deliver to the Company the certificate or certificates representing the Issued Shares so repurchased, duly endorsed for transfer, free and clear of any liens or encumbrances. The Repurchase Right shall terminate in accordance with Section 13(a).

(b) Company's Right to Exercise Repurchase Right. The Company shall have the Repurchase Right in the event that any of the following events shall occur:

(i) The termination of the Optionee's employment with the Company and its Subsidiaries for any reason whatsoever, regardless of the circumstances thereof, and including without limitation upon death, disability, retirement, discharge or resignation for any reason, whether voluntarily or involuntarily; or

(ii) The Optionee's or Permitted Transferee's Bankruptcy.

(c) Determination of Fair Market Value. The fair market value of the Issued Shares shall be, for purposes of this Section 9, determined by the Board as of the date the Board elects to exercise its repurchase rights in connection with a Repurchase Event.

**10. Escrow Arrangement.**

(a) Escrow. In order to carry out the provisions of Sections 8, 9 and 11 of this Agreement more effectively, the Company shall hold any Issued Shares in escrow together with separate stock powers executed by the Optionee in blank for transfer, and any Permitted Transferee shall, as an additional condition to any transfer of Issued Shares, execute a like stock power as to such Issued Shares. The Company shall not dispose of the Issued Shares except as otherwise provided in this Agreement. In the event of any repurchase by the Company (or any of its assigns), the Company is hereby authorized by the Optionee and any Permitted Transferee, as the Optionee's and each such Permitted Transferee's attorney-in-fact, to date and complete the stock powers necessary for the transfer of the Issued Shares being purchased and to transfer such Issued Shares in accordance with the terms hereof. At such time as any Issued Shares are no longer subject to the Company's repurchase, first refusal and drag along rights, the Company shall, at the written request of the Optionee, deliver to the Optionee (or the relevant Permitted Transferee) a certificate representing such Issued Shares with the balance of the Issued Shares to be held in escrow pursuant to this Section 10.

(b) Remedy. Without limitation of any other provision of this Agreement or other rights, in the event that the Optionee, any Permitted Transferees or any other person or entity is required to sell the Optionee's Issued Shares pursuant to the provisions of Section 8, 9 and 11 of this Agreement and in the further event that he or she refuses or for any reason fails to deliver to the Company or its designated purchaser of such Issued Shares the certificate or certificates evidencing such Issued Shares together with a related stock power, the Company or such designated purchaser may deposit the applicable purchase price for such Issued Shares with a bank designated by the Company, or with the Company's independent public accounting firm, as agent or trustee, or in escrow, for the Optionee, any Permitted Transferees or other person or entity, to be held by such bank or accounting firm for the benefit of and for delivery to him, her, them or it, and/or, in its discretion, pay such purchase price by offsetting any indebtedness then owed by the Optionee as provided above. Upon any such deposit and/or offset by the Company

(b) Equitable Relief. The parties hereto agree and declare that legal remedies may be inadequate to enforce the provisions of this Agreement and that equitable relief, including specific performance and injunctive relief, may be used to enforce the provisions of this Agreement.

(c) Adjustments for Changes in Capital Structure.

(i) Basic Adjustment Provisions. In the event of a stock dividend, stock split or combination of shares (including a reverse stock split), recapitalization or other change in the Company's capital structure, the Committee will make appropriate adjustments to the maximum number of Option Shares that may be delivered under the Plan and will also make appropriate adjustments to the number and kind of shares of stock or securities subject to Awards then outstanding or subsequently granted, any exercise prices relating to Awards and any other provision of Awards affected by such change.

(ii) Certain Other Adjustments. The Committee may also make adjustments of the type described in Section 13(c)(i) above to take into account distributions to stockholders other than those provided for in Section 6 and 13(c)(i), or any other event, if the Committee determines that adjustments are appropriate to avoid distortion in the operation of the Plan and to preserve the value of Awards made hereunder, having due regard for the qualification of ISOs under Section 422 of the Code, where applicable.

(iii) Continuing Application of Plan Terms. References in the Plan to shares of Stock will be construed to include any stock or securities resulting from an adjustment pursuant to this Section 13(c).

(d) Change and Modifications. This Agreement may not be orally changed, modified or terminated, nor shall any oral waiver of any of its terms be effective. This Agreement may be changed, modified or terminated only by an agreement in writing signed by the Committee and the Optionee.

(e) Governing Law. This Agreement shall be deemed a contract made under the laws of Delaware and this Agreement, and all disputes, claims or controversies arising out of or relating to this Agreement, or the negotiation, validity or performance hereof or the transactions contemplated herein, shall be construed under, governed and enforced by the laws of such state, without giving effect to its conflicts of laws principles.

(f) Headings. The headings are intended only for convenience in finding the subject matter and do not constitute part of the text of this Agreement and shall not be considered in the interpretation of this Agreement.

(g) Saving Clause. If any provision(s) of this Agreement shall be determined to be illegal or unenforceable, such determination shall in no manner affect the legality or enforceability of any other provision hereof.

(h) Notices. All notices, requests, consents and other communications shall be in writing and be deemed given when delivered personally, by telex or facsimile transmission

or when received if mailed by first class registered or certified mail, postage prepaid. Notices to the Company or the Optionee shall be addressed as set forth underneath their signatures below, or to such other address or addresses as may have been furnished by such party in writing to the other.

(i) Benefit and Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors, permitted assigns, and legal representatives. The Company has the right to assign this Agreement, and such assignee shall become entitled to all the rights of the Company hereunder to the extent of such assignment.

(j) Dispute Resolution.

(i) Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined exclusively by arbitration in the City of Boston, MA, before one arbitrator. The arbitration shall be administered by JAMS, or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The arbitration hearing shall commence within one hundred twenty (120) days after any party hereto has filed a written demand for arbitration with JAMS. The arbitrator may not award damages in excess of actual compensatory damages and shall not award punitive or multiple damages or any other damages expressly excluded under this Agreement, and the parties to this Agreement expressly waive any claim to any such damages. The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

(ii) The parties agree that any and all disputes, claims or controversies arising out of or relating to this Agreement shall be submitted to JAMS, or its successor, for mediation, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration pursuant to Section 13(j)(i). Any party may commence mediation by providing to JAMS and the other parties a written request for mediation, setting forth the subject of the dispute and the relief requested. The parties will cooperate with JAMS and with one another in selecting a mediator from the JAMS panel of neutrals, and in scheduling the mediation proceedings. The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation. Either party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time at least ten (10) days following the initial mediation session or sixty (60) days after the date of filing the written

request for mediation, whichever occurs first. The mediation may continue after the commencement of arbitration if the parties so desire. Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the case. The pendency of a mediation shall not preclude a party from seeking provisional remedies in aid of the arbitration from a court of appropriate jurisdiction, and the parties agree not to defend against any application for provisional relief on the ground that a mediation is pending.

(iii) The provisions of Section 13(e) may be enforced by any court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered. Service of process in any judicial proceeding to enforce any provision of this Section 13(j), or to enforce any arbitration award may be made upon any party by registered or certified mail to the address specified by that party in this Agreement, as well as by any other method of service of process authorized by applicable law.

(k) Counterparts. For the convenience of the parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

[SIGNATURE PAGE FOLLOWS]

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

GLOBAL RESCUE CORP.

By:______________________________
Name: Daniel L. Richards
Title: Chief Executive Officer

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

OPTIONEE:

______________________________
Name:

Address:

______________________________

______________________________

______________________________

**Appendix A**

**STOCK OPTION EXERCISE NOTICE**

Global Rescue Corp.
Attention: Chief Financial Officer

________________________________
________________________________

Pursuant to the terms of my stock option agreement dated ___________ (the "Agreement") under the Global Rescue Corp. 2007 Stock Option and Grant Plan, I, [Insert Name] _________________, hereby [Circle One] partially/fully exercise such option by including herein payment in the amount of $______ representing the purchase price for [Fill in number of Option Shares] _______ option shares. I have chosen the following form(s) of payment:

[ ] 1. Cash
[ ] 2. Certified or bank check payable to Global Rescue Corp.
[ ] 3. Other (as described in the Agreement (please describe))
______________________________________________________.

In connection with my exercise of the option as set forth above, I hereby represent and warrant to Global Rescue Corp. as follows:

(i) I am purchasing the option shares for my own account for investment only, and not for resale or with a view to the distribution thereof.

(ii) I have had such an opportunity as I have deemed adequate to obtain from Global Rescue Corp. such information as is necessary to permit me to evaluate the merits and risks of my investment in Global Rescue Corp. and have consulted with my own advisers with respect to my investment in Global Rescue Corp.

(iii) I have sufficient experience in business, financial and investment matters to be able to evaluate the risks involved in the purchase of the option shares and to make an informed investment decision with respect to such purchase.

(iv) I can afford a complete loss of the value of the option shares and am able to bear the economic risk of holding such option shares for an indefinite period of time.

(v) I understand that the option shares may not be registered under the Securities Act of 1933 (it being understood that the option shares are being issued and sold in reliance on the exemption provided in Rule 701 thereunder) or any applicable state securities or "blue sky" laws and may not be sold or otherwise transferred or disposed of in the absence of an effective registration statement under the Securities Act of 1933 and under any applicable state securities or "blue sky" laws (or exemptions from the

registration requirement thereof). I further acknowledge that certificates representing option shares will bear restrictive legends reflecting the foregoing.

Sincerely yours,

____________________________________

Name:

Address:

____________________________________

____________________________________

____________________________________

GLOBAL rescue

Formatted: Left: 1", Right: 1", Footer distance from edge: 0.01"

GLOBAL RESCUE LLC
MASTER PARTNERSHIP AND SERVICES AGREEMENT

This Services Agreement (this "Agreement") is a legal agreement between Mark Cohon ("Partner"), whose principal place of business is 88 Cutter Mill Road STE 320, Great Neck, NY 11021 and Global Rescue LLC ("Global Rescue" or "GR"), whose principal place of business is 177 Milk Street, Suite 700, Boston, MA 02109 U.S.A. The Agreement shall be effective as of the date indicated in Section 5 below (the "Term") by both parties entering into the Agreement.

WHEREAS, Global Rescue provides emergency medical, advisory, aeromedical evacuation, security evacuation, transport, rescue and other services as detailed in Exhibit A ("Rescue Services"); and

WHEREAS, Partner provides consulting and other corporate services; and

WHEREAS, Partner and Global Rescue desire to market and provide Global Rescue's services in a coordinated manner to Partner clients and other individuals and groups identified by Partner.

NOW THEREFORE, the parties agree as follows:

1. **Definitions.**

"*GR Contractor*" – Any GR contractor, sub-contractor, or other outsourced provider that provides products or services pursuant to this Agreement.

"*Member*" – The individuals named in the enrollment material who have had the appropriate membership fees paid to GR to become members.

"*Membership Term*" – Shall have the meaning of the term specified by Partner as reported to and accepted by GR.

"*Term*" – Shall have the meaning specified in Section 5 of this Agreement.

"*Traveling Member*" – A GR Member who is traveling more than 160 miles from home.

2. **Interest Granted.**

2.1 Partner grants to Global Rescue a non-exclusive right and license among companies that offer the services outlined in **Exhibit A** to state that "Global Rescue is recommended by Partner" and to use Partner's name and trademarks as set forth in Exhibit B. Nothing in this Agreement shall limit Partner's ability to license to any other entity rights names, logos, and trademarks, not expressly granted herein to Global Rescue.

2.2 Global Rescue grants to Partner a limited, non-exclusive license to use Global Rescue's name and trademarks, as set forth in **Exhibit** B, in Partner's advertising, promotion, marketing and websites. Partner shall seek and obtain Global Rescue's approval prior to the posting of Global Rescue information on Partner websites or in Partner publications. Global Rescue shall have the right at any time to request modification or removal of Global Rescue's logo, services and products from Partner website and publications.

3. **Partner's Obligations.**

3.1 Partner shall market and shall allow Global Rescue to market Global Rescue's services to Partner's clients. The methods of sales and marketing of Global Rescue services shall be mutually determined by Partner and Global Rescue from time to time.

Deleted: October 21, 2011

Deleted: October 10, 2011

3.2 Partner shall not market to Partner clients any other provider of aeromedical evacuation, crisis response or rescue services for the term of this contract.

3.3 Partner agrees to disclose in writing to Global Rescue the amount of any other commissions or payments received or expected to be received from any purchasers of Global Rescue's services or any third parties with a financial interest in any transactions involving Global Rescue. Such disclosure is required no later than 60 days prior to the close of any contemplated transaction. If Partner fails to disclose such payments, Global Rescue shall not be required to pay the Partner the Commission.

4.2 For each Partner service sold to clients referred to Partner by Global Rescue, Partner shall pay Global Rescue 10% of the aggregate gross profit generated for new business by Global Rescue referred clients (the "Commission") who purchase Partner's services. Partner further agrees to pay Global Rescue 7.5% (the "Renewal Commission") of all renewal business referred to Partner by Global Rescue. Partner shall not be obligated to pay Global Rescue the Commission for clients who are existing clients of Partner. Commissions will be paid within 30 days of the close of any such transaction. Gross profit shall be calculated as 80% of revenue received by Partner on transactions unless the financial characteristics of the transaction indicate that actual percentage is lower than 80% in any such transaction. Should the gross profit percentage vary from 80%, Global Rescue shall be informed prior to the close of any such transaction what percentage will apply.

4. **Global Rescue's Obligations.**

4.1 Global Rescue shall market and shall allow Partner to market Partner's services to Global Rescue's clients. The methods of sales and marketing of Partner services shall be mutually determined by Partner and Global Rescue from time to time.

4.2 For each GR membership or service sold to Members or clients referred to Global Rescue by Partner, Global Rescue shall pay Partner 10% of the aggregate membership gross profit generated for new business by Partner referred Members or clients (the "Commission") who purchase Global Rescue's services. Global Rescue further agrees to pay Partner 7.5% (the "Renewal Commission") for all renewal business referred to Global Rescue by Partner. Global Rescue shall not be obligated to pay Partner the Commission for Members or clients who are existing clients of Global Rescue. Commissions will be paid within 30 days following the receipt of funds for each transaction. Gross profit shall be calculated as 80% of revenue received by Global Rescue on transactions unless the financial characteristics of the transaction indicate that actual percentage is lower than 80% in any such transaction. Should the gross profit percentage vary from 80%, Partner shall be informed prior to the close of any such transaction what percentage will apply.

5. **Term.**

The term (the "Term") of this Agreement shall commence at 12am EST on November 1, 2011 and expire at 12am EST on November 1, 2011. Upon expiration, this Agreement shall renew automatically for additional terms of one (1) year unless either party elects to terminate the agreement by giving notice in writing to the other party no later than thirty (30) days prior to the expiration of the then current term. Terms of the memberships provided to Partner clients shall be subject to the Membership Term, and may continue past the Term of this Agreement.

6. **Limitation of Liability.**

IN NO EVENT SHALL GR, GR'S OFFICERS, EMPLOYEES, DIRECTORS, MANAGERS, SHAREHOLDERS, AGENTS, LEGAL COUNSEL, ACCOUNTANTS, GUARANTORS OR GR CONTRACTORS BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, CONSEQUENTIAL LOSS OR DAMAGES WHATSOEVER AS A RESULT OF ANY ACTION OR OMISSION BY GR OR ANY GR CONTRACTOR, INCLUDING, WITHOUT LIMITATION, ANY PRODUCTS AND SERVICES DESCRIBED. GR'S MAXIMUM LIABILITY FOR ANY TYPE OF DAMAGES SHALL BE LIMITED TO THE FEE PAID FOR GR SERVICES IN THE MOST RECENT CALENDAR YEAR. PARTNER ACKNOWLEDGES AND MEMBER WILL ACKNOWLEDGE

**Deleted:** October 21, 2011

**Deleted:** October 10, 2011

PRIOR TO SERVICES BEING RENDERED THAT RECEIVING THE SERVICES CAN BE EXTREMELY RISKY AND AGREES TO ABSOLVE, INDEMNIFY AND HOLD GR HARMLESS SHOULD PARTNER OR ANY CLIENT OF PARTNER SUFFER ANY ADVERSE EFFECTS, INCLUDING BUT NOT LIMITED TO DEATH OR DISMEMBERMENT, AS A RESULT OF RECEIVING THE SERVICES. ANY SERVICES PROVIDED BY GR TO MEMBERS OR CLIENTS OF PARTNER SHALL BE BOUND BY THE GR LIABILITY RELEASE AND ALL OTHER TERMS STATED IN THE GLOBAL RESCUE MEMBER SERVICES AGREEMENT FOUND AT www.globalrescue.com/agreement.cfm.

7. **Force Majeure.**

GR shall not be liable for failure to provide or delay of services resulting from acts of God or other causes beyond GR's control.

8. **Survival of Claims.**

Any and all legal actions and claims arising under the Agreement against GR, its officers, directors, employees, or agents shall be barred unless written notice thereof is received by GR within one (1) year of the date of the event giving rise to such action or claim.

9. **Authorization to Share Information and Informed Consent.**

Either Partner shall obtain authorization or Traveling Member shall authorize the release to or from GR and any GR Contractor or Traveling Member's Designated Representative of any and all confidential Traveling Member information relevant for the successful performing of GR's services, including, but not limited to, financial information, patient medical records, histories, examinations and tests, medical images including photographs, x-rays or other images, output data from medical devices, and sound and video files ("Personal Information").

10. **Consent to Transport and Treatment.**

Partner and/or the Traveling Member shall provide consent prior to obtaining transportation and treatment by GR and/or GR Contractors. Member understands that medical care, including emergency care, may be initiated during transport by GR and/or GR Contractors should such care become necessary in the professional judgment of GR and/or the GR Contractors.

11. **Confidentiality Information.**

Each party (the "Receiving Party") acknowledges that by reason of its relationship to the other party (the "Disclosing Party") hereunder, the Receiving Party will have access to certain information and materials, including the terms of this Agreement, concerning the Disclosing Party's business, plans, technology, products, employees, clients, and services that are confidential and of substantial value to the Disclosing Party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The Receiving Party agrees that it shall not use in any way for its own account or the account of any third party, nor disclose to any third party, other than on a need to know basis consistent with performing the services contemplated in this Agreement, any such Confidential Information revealed to it by the Disclosing Party. The Receiving Party shall take every reasonable precaution to protect the confidentiality of Confidential Information. Upon request by the Receiving Party, the Disclosing Party shall advise whether or not it considers any particular information to be Confidential Information. The Receiving Party shall not publish any description of the Disclosing Party's Confidential Information beyond any descriptions published by the Disclosing Party. In the event of expiration or termination of this Agreement, there shall be no use or disclosure by the Receiving Party of any Confidential Information of the Disclosing Party, and the Receiving Party shall not develop services utilizing the Disclosing Party's Intellectual Property.

11.1 Books and records. During the term of this Agreement, Global Rescue and Partner shall maintain such books and records as are necessary to substantiate that all Members, payments and discounts set forth in this Agreement were provided in full compliance with this Agreement. At no time shall Global Rescue be obligated to share confidential information, including, but not

**Deleted:** October 21, 2011

**Deleted:** October 10, 2011

limited to, medical information, relating to individual Members, with Partner.

12. **General Exclusions.**

GR shall not be under any obligation to pay for or provide any items or services not explicitly set forth herein, including, but not limited to any hospital or medical expenses of any kind or nature. THE FINAL SELECTION AND PAYMENT FOR ANY SUCH SERVICES NOT ARRANGED OR PROVIDED BY GR SHALL BE THE SOLE RESPONSIBILITY OF THE TRAVELING MEMBER AND/OR PARTNER.

13. **Fraudulent Statement.**

Any fraud, misrepresentation, or concealment in the statements made by Traveling Member and/or Partner shall result in the suspension of GR services and payment in full to GR for services rendered to the Traveling Member by the Traveling Member and/or Partner. GR's failure to immediately suspend service and require payment shall not constitute a waiver nor preclude GR from doing so at a later time.

14. **Amendment.**

No modification, amendment, or waiver of any provision of this Agreement shall be effective unless in writing and signed by both parties. No failure or delay by either party in exercising any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy.

15. **Governing Law and Jurisdiction.**

This Agreement shall be governed by the laws of the State of Delaware and adjudicated in the Commonwealth of Massachusetts. In the event of legal action to enforce the terms of this Agreement the prevailing party shall be entitled to be reimbursed reasonable attorney's fees and other costs as decided by a court of competent jurisdiction.

16. **Entire Agreement.**

This Agreement represents the entire agreement between GR and Partner and supersedes any representation, written or oral, occurring before the date of this Agreement. This Agreement may only be changed in writing with the signature of GR and Partner.

17. **Time.**

Global Rescue and Partner mutually recognize that timing is important both for the providing and receiving of services. Both agree to use their best efforts to facilitate rapid provision and receipt of services by acting expeditiously.

18. **Emergency Contact Number.**

The 24/7 emergency contact number for GR is 617-459-4200. GR agrees to notify Partner a minimum of 7 days prior to modifying or changing this contact number.

19. **Successors and Assigns.**

This agreement is binding upon, and inures to the benefit of, the parties and their respective successors and assigns.

[Signature page to follow]

**Deleted:** October 21, 2011

**Deleted:** October 10, 2011

Deleted: October 21, 2011

Deleted: October 10, 2011

SIGNED,

GLOBAL RESCUE LLC, by its duly authorized agent:

By: ______________________________
Daniel L. Richards
Chief Executive Officer

Date: ______________________________

Mark Cohon, by his duly authorized agent:

By: ______________________________

Name: ______________________________

Title: ______________________________

Date: ______________________________

Deleted: October 21, 2011

Deleted: October 10, 2011

EXHIBIT A

GLOBAL RESCUE MEMBERSHIP SERVICES

The following services summary list applies to Global Rescue Traveling Members. For a specific list of services and the rules associated with them, including limitations and restrictions, visit (www.globalrescue.com/agreement.cfm):

- 24 / 7 / 365 medical consultations by Global Rescue physicians, paramedics and Johns Hopkins physicians.
- Aeromedical evacuation via commercial or private aircraft to the U.S. or home country destination hospital of the patient's choice in the event of illness or injury requiring in-patient hospitalization more than 160 miles from home. Patient does not need to be hospitalized to qualify for transport.
- Non-medical evacuations for those members who purchase the GR Security Membership.
- Field rescue teams to be deployed, as necessary.
- Intelligence services to be provided, as shown on the Global Rescue website.
- Local medical referrals to Global Rescue's international network of hospitals, including hospitals affiliated with Johns Hopkins and other Global Rescue contracted providers.
- Medical teams to be deployed to the site of hospitalization, illness or injury as necessary.
- Full logistical and communication support for all consultative and evacuation missions.

Secondary Membership Services

- Security advisory services.
- Visa and passport assistance.
- Local legal referrals.
- Telephonic interpretation in 170+ languages.
- Emergency message relay.
- Transport of mortal remains.
- Pre-trip, mission and expedition planning.
- All other standard membership services.

Deleted: October 21, 2011

Deleted: October 10, 2011

EXHIBIT B
MARKS

PARTNER

GLOBAL RESCUE

1) Global Rescue
2) Global Rescue LLC

GLOBAL rescue

Formatted: Font: Times New Roman, 10 pt, Bold, Do not check spelling or grammar

GLOBAL rescue

Formatted: Font: Times New Roman, 10 pt, Bold, Do not check spelling or grammar

Deleted: October 21, 2011

Deleted: October 10, 2011

Deleted: October 21, 2011

Deleted: October 10, 2011

# EXHIBIT R

**From:** Daniel Richards <drichards@globalrescue.com>
**Sent:** Monday, October 31, 2011 8:13 AM
**To:** Stuart Richards; Melissa L. Roth
**Subject:** FW: What's new to Costco Services!

Cohon working with Tom and Ted. Sent email to Tom's old email address by accident....

---

Daniel L. Richards
Chief Executive Officer
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: 617-459-4198
F: 858-712-1295

**From:** Mark B. Cohon [mailto:mbcohon@aol.com]
**Sent:** Sunday, October 30, 2011 10:59 PM
**To:** tmuhlner@univops.com; Tom Bochnowski
**Subject:** Fwd: What's new to Costco Services!

Looks like we're in competition with Costco. They perform payroll as well.

Mark Cohon
917 584 3211

-----Original Message-----
From: Costco News <CostcoNews@online.costco.com>
To: MBCOHON <MBCOHON@AOL.COM>
Sent: Tue, Oct 25, 2011 3:40 am
Subject: What's new to Costco Services!

Save on Insurance | Costco Auto Program | View with Images

COSTCO WHOLESALE

COSTCO SERVICES
Consumer | Insurance | Business

**What's New to Costco Services!** Learn more about Services ▸

## AUTO INSURANCE TAKING CARE OF COSTCO MEMBERS

After surviving a car fire, Auto Insurance customer and Costco member Galia Gur got back on the road with ease.

I look up, and I see my hood is on fire.

**Mortgage Services**
We've done the hard work for you. Check out historically low rates.



LEARN MORE ▸

Black and red fire, moving so fast. The next
minute, I didn't have a dashboard.

– Galia Gur, Costco member

Ameriprise
Auto & Home Insurance

READ FULL ARTICLE ›

## Boat & RV Loans

Rates as low as 4.44% APR. Receive a Costco Cash Card with every funded loan.



SEE FULL DETAILS ›

## Auto & Home Insurance

Costco members are saving an average of $504.80 on auto insurance in the first year.




AUTO INSURANCE ›
HOME INSURANCE ›

## Merchant Credit Card Processing

Outstanding Rates!
Exclusive Savings for Members



APPLY NOW ›

Elavon

## Identity Protection

Just $3 for 30 days, then $9.99 or $11.49/month, depending on membership level.

IDENTITY GUARD.

LEARN MORE ›

## Electronic Health Records

FOR HEALTHCARE PROVIDERS
Deploy an EHR and Practice Management solution. Just $499/month per physician for Executive Members. Exclusive Costco offer includes:

- Allscripts MyWay™ Comprehensive EHR & Integrated PM Software
- Customizable Patient Portal
- Maintenance, Support & Hosting



LEARN MORE ›

## Intuit Small Business Services

Exclusive pricing for Costco members.

### QuickBooks Online

Organize your small business finances and save time. Free 30-day trial.



LEARN MORE ›

### Online Payroll

Run payroll from anywhere in 3 easy steps. Try it free for 3 months.



LEARN MORE ›

### 401(k) Plans

Surprisingly affordable 401(k) plans made for small businesses.




LEARN MORE ›

## Online Investing

Buy stocks for $4. No account minimum or inactivity fees. Free mobile apps.

sharebuilder
ING DIRECT INVESTING

GET STARTED ›

## Check Printing

Support the ASPCA and SAVE up to 50% on check printing. New styles available.



LEARN MORE ›

## Costco Auto Program

Prearranged pricing on many makes and models plus special offers available.



LEARN MORE ›

## Personal Health Insurance

The quality, value and extras you expect from Costco, with exclusive, negotiated rates.



GET A QUOTE ›

## Business Phone Solutions

Get 2 lines FREE for the 1st year! Order by 10/31/11 for a $50 Costco Cash Card.



LEARN MORE ›

## Kawasaki Special Offer

Prearranged pricing and a $250 Costco Cash Card.



SEE FULL DETAILS ›

### Business Health and Dental Insurance

A high-quality health insurance option for businesses like yours. Negotiated exclusively for Costco Executive Members.



GET A QUOTE ▸

### Domains, Websites & Online Solutions

Save up to 80% on Go Daddy Web bundles!



LEARN MORE ▸

### Vehicle Warranty Expiring?

Protect yourself with a Vehicle Repair Protection Plan. Costco members can save up to $500.



LEARN MORE ▸

### Delta Dental

An affordable dental plan for individuals and families.

(CA Executive Members only)



GET A QUOTE ▸

### Tax Forms

- IRS Approved
- Save up to 50% off typical retail prices
- Guaranteed 100% compatible with your software



LEARN MORE ▸

### Water Delivery

For Home and Office
Exclusive Costco Member pricing on bottled water.



LEARN MORE ▸

Coming soon, limited-time exclusive offer on select Chevrolet and GMC models

COSTCO AUTO PROGRAM



COSTCO AUTO PROGRAM ▸

### Insurance Services

Auto & Home Insurance ▸
Personal Health Insurance ▸
Mexico Travel Auto Insurance ▸
Business Health & Dental Insurance ▸ (CA, OR & WA Only)
Business Prescription Insurance ▸
Individual Dental Plan ▸ (CA Only)

### Business Services

401(k) Plans ▸
Business Phone Services ▸
Credit Card Processing ▸
Checks & Forms ▸
Payroll Services ▸
Electronic Health Records ▸
Domains, Websites & Online Solutions ▸
Water Delivery ▸
QuickBooks Online ▸
Business Stationery ▸

### Consumer Services

Costco Auto Program ▸
Boat & RV Loans ▸
Checks & Forms ▸
Costco Member Prescription Program ▸
Identity Protection ▸
High-Yield Savings Account & CDs ▸
Mortgage & Refinancing ▸
Online Investing ▸
Vehicle Repair Protection ▸
Water Delivery ▸

All services provided by third parties. Terms and conditions apply and offers are subject to change without notice. See http://shop.costco.com/Services/Index for more information.

In the past you provided Costco with your email address [MBCOHON@AOL.COM]. Occasionally, you will receive brief advertising announcements regarding special items and services. If you do not wish to receive this weekly Costco Services Newsletter, simply unsubscribe here.

If you need assistance, please contact us by clicking customerservice@costco.com.
Costco Wholesale, Customer Service | P.O. Box 34535 – Seattle, WA 98124-1535
© 1998-2011 Costco Wholesale Corporation. All rights reserved.

Privacy Statement | Terms and Conditions | Update Email Preferences

# EXHIBIT S

**GLOBAL RESCUE LLC**

**CONSULTANT AGREEMENT**

**Consultant's Name:** Mark Cohon
**Address:** C/o Mellon Bean LLC 79 West Monroe St. Ste 1119, Chicago, IL 60603

In consideration of my independent consulting relationship with Global Rescue LLC (the "Company"), whose address is 115 Broad St., Suite 350, Boston, MA 02110, I, the above-named Consultant, hereby agree with the Company as follows:

1. Definitions.

(a) Proprietary Information. As used in this Agreement, "Proprietary Information" means information belonging to the Company which is of value to the Company in the course of conducting its business. Proprietary Information includes without limitation trade secrets, product ideas, inventions, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials and other intellectual property, marketing plans and strategies, marketing or sales information, sales opportunities and strategies, reports, forecasts and plans, customer lists, financial information, reports, plans and forecasts, and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or assets, or proposed business affiliations) which have been discussed or considered by the management of the Company. Proprietary Information also includes information developed by me in the course of my relationship with the Company relating to the Company or otherwise relating to Inventions which belong to the Company under Section 5 below, as well as other information to which I may have access in connection with the Company.

(b) Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all any inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulas, data, techniques, know-how, secret or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection). Inventions and Developments include, by way of example and without limitation, discoveries and improvements which consist of or relate to any form of Proprietary Information.

(c) Company-Related Inventions and Developments. For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either (i) relate at the time of conception or development to the actual or demonstrably anticipated business of the Company or to its actual or demonstrably anticipated research and development, (ii) relate to any work performed for the Company, whether or not

during normal business hours, (iii) are developed on Company time or (iv) are developed primarily through or in substantial reliance on the use of the Company's Proprietary Information, equipment and software, or other facilities or resources.

(d) Company. For purposes of this Agreement, all references to the "Company" will be deemed to include the Company, its direct or indirect subsidiaries, whether currently in existence or hereafter acquired or created, and its affiliates.

(e) Company-Related Equipment. All equipment, including but not limited to computers, Blackberries, telephonic instruments or any other instrument or device purchased or furnished by the Company for the use, direct or indirect, of the above-named Consultant.

2. Return of Company-Related Equipment. Company-Related Equipment shall remain the property of and be returned to the Company when the Consultant's relationship with the Company ceases. Consultants who fail to immediately return Company equipment shall reimburse the Company 1.5 times the replacement cost of any such equipment. Company keys, IDs and keycards shall be returned immediately. Consultants who fail to return company keys, IDs or keycards immediately upon separation from the Company shall reimburse the Company $250 per key, ID or keycard not returned to cover the replacement costs of locks and the reprogramming cost of card readers.

3. Confidentiality. I understand and agree that my relationship creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my relationship with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

4. Documents, Records, etc. All documents, records, apparatus, information, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company or are produced by me in connection with my relationship will be and remain the sole property of the Company. I will return to the Company all such materials and property as and when requested by the Company. In any event, I will return all such materials and property immediately upon termination of my relationship for any reason. I will certify in writing the destruction of all electronic records, documents and other material that cannot be returned to the Company. I will not take with me any such material or

property or any copies thereof upon such termination.

5. Ownership of Inventions and Developments. I agree that all Company-Related Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during the term of my relationship with the Company will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Company any proprietary rights which I may have or acquire in any such Company-Related Inventions and Developments without further compensation, and I waive any moral rights or other special rights which I may have or accrue therein. At the request and cost of the Company, I agree to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. The provisions of this Section 5 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my relationship with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after termination of my relationship, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my relationship were conceived during the term of my relationship with the Company unless I am able to establish a later conception date by clear and convincing evidence. The provisions of this Section 5 will not apply, however, to any Inventions and Developments which may be disclosed in Schedule A hereto, prior to its acceptance by the Company, representing Inventions and Developments made by me prior to my relationship with the Company.

6. Disclosure of Inventions and Developments. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 5.

7. Obtaining and Enforcing Proprietary Rights. I agree to assist the Company, at the Company's request from time to time and at the Company's expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my relationship, provided that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, but only for the purpose of executing and filing any such document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by me.

8. Competitive Activities. During the term of my relationship or other similar

relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, Consultant, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

9. Nonsolicitation of Customers. During the term of any relationship or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

(a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

(b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an Consultant of the Company), or

(e) refer a Customer or supplier to another provider of Services.

10. Nonsolicitation of Employees. During the term of my relationship or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:

(a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or

(b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any Consultant, prospective

Consultant, consultant or prospective consultant of the Company to terminate his or her relationship or other relationship with the Company or provide services to any entity other than the Company.

11. Non-Disparagement. At all times, both during my relationship with the Company and after its termination, I will not, directly or indirectly, make, solicit, or confirm any public or private statements or communications that are or that may reasonably be considered to be harmful to, disparaging of, or reflect negatively upon (a) the Company or any Consultant or affiliate thereof, (b) the Company's business and (b) the Company's past, present or future Members and Consultants.

12. Acknowledgments and Agreements. I acknowledge and agree that the terms and restrictions set forth in this Agreement are intended to protect the Company's interest in Confidential Information and its commercial relationships and goodwill (with its Customers, prospective customers, vendors, consultants and Consultants), including, without limitation, Confidential Information, commercial relationships and are reasonable and appropriate for these purposes and that my failure to strictly adhere to the terms of this agreement will constitute a breach of this agreement and be harmful to the Company.

13. Disclosure of Agreement. I will disclose the existence and terms of this Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an relationship, partnership or other business relationship with such person or entity.

14. Third-Party Agreements and Rights. I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business. I represent to the Company that my execution of this Agreement, my relationship with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous relationship or other party.

15. Other Consultant Income. Consultant shall not receive payment for relationship, services rendered, or other activities from sources that represent a potential conflict of interest tothe Company unless such activities are approved in advance in writing by the Company. Consultant shall immediately disclose any and all other sources of such income to the Company.

16. Injunction. I agree that it would be difficult to measure any damages caused to the Company which might result from any breach by me of the promises set forth in this Agreement, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or