# STATE COURT RECORD

## PART 6

# EXHIBIT T

**From:** Mark B. Cohon <mbcohon@aol.com>
**Sent:** Thursday, November 03, 2011 6:38 PM
**Subject:** My Consulting Services to Global Rescue

Dan

After consideration of our call yesterday afternoon, I will not be providing any more consulting services to Global Rescue now or in the future. I have appreciated our past relationship and have enjoyed working with you. With respect to your request for information regarding my business activities with Ted and Tom, please send a written request for the information you are seeking, and I will ensure a timely response (although I cannot commit that the specific information you may request can or will necessarily be provided).

Thank you,

Mark Cohon
917 584 3211

# EXHIBIT U

Todd R. Wulffson (SBN 150377)
Alana R. Chimes (SBN 254730)
GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, California 92612

Counsel for Plaintiffs
UNIVERSAL OPERATIONS RISK MANAGEMENT, LLC, EDWARD MUHLNER, THOMAS BOCHNOWSKI and MARK COHON

ENDORSED
FILED
San Francisco County Superior Court

NOV 03 2011

CLERK OF THE COURT
BY: CAROLYN BALISTRERI
Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

UNIVERSAL OPERATIONS RISK MANAGEMENT, LLC, EDWARD MUHLNER, THOMAS BOCHNOWSKI and MARK COHON

Plaintiff,

vs.

GLOBAL RESCUE LLC and DOES 1 through 10, inclusive,

Defendants.

CASE NO. CGC-11-515553

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Complaint Filed: October 31, 2011

BY FAX

Plaintiffs Universal Operations Risk Management, LLC ("UnivOps"), Edward ("Ted") Muhlner ("Muhlner"), Thomas ("Tom") Bochnowski ("Bochnowski") and Mark ("Mark"Cohon ("Cohon") (together, "Plaintiffs") complain of Defendant Global Rescue LLC ("GR") and allege as follows:

**INTRODUCTION**

1. This is an action for declaratory and injunctive relief wherein Plaintiffs seek a declaration that Muhlner, Bochnowski and Cohon's employment with UnivOps does not violate any enforceable contractual or legal obligation to GR. GR is Muhlner and Bochnowski's former employer, and Cohon formerly provided consulting services for GR. In particular, but without limitation, Muhlner, Bochnowski, and Cohon, together with UnivOps, seek a declaration that any purported restriction on UnivOps' hiring of Muhlner, Bochnowski or Cohon as a result of alleged proscriptions in Muhlner or Bochnowski's respective employment agreements with GR and in Cohon's consulting agreement with GR is invalid and unenforceable as violative of California Business and Professions Code Section 16600 *et seq.* and its interpretation by the California courts. Plaintiffs also seek a declaration that even assuming, *arguendo*, any restrictive covenants in Muhlner and Bochnowsi's employment agreements or Cohon's consulting agreement were lawful, Muhlner, Bochnowski and Cohon's continued work in their chosen field does not constitute competition under the agreements. Finally, Plaintiffs seek orders from the Court enjoining GR from interfering with UnivOps' employment of Muhlner, Bochnowski and Cohon.

**THE PARTIES**

2. UnivOps is a limited liability company that manages client insurance, benefits and risk services, and provides expert consultative services for three main captive and risk pooling services: group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling. UnivOps is a limited liability company organized and existing under the laws of the State of Delaware, with a headquarters and principal place of business at 425 Market Street, Suite 2200, in San Francisco, California 94105.

3. Muhlner is a resident and citizen of the State of California, and resides at 416-B Washington Boulevard, San Francisco, California 94129. He is the Vice President of UnivOps, and works out of UnivOps' San Francisco, California office. At the time he entered into his employment

agreement with GR, which is the subject of this dispute, Muhlner resided at 2 61st Place, Long Beach, California 90803. Muhlner is a former employee of GR.

4. Bochnowski is the Vice President of UnivOps. He owns a home at 6400 West Lake Boulevard, Unit 25, Homewood, California 96141 and, beginning on November 5, 2011, will reside at 2091 Bent Creek Drive, San Ramon, California 94582. At the time he entered into his employment agreement with GR, which is the subject of this dispute, Bochnowski resided at 28 Camino Por Los Arboles, Atherton, California 94027. Bochnowski is a former employee of GR.

5. Cohon is a resident and citizen of the State of Connecticut. Cohon is the President of UnivOps. At the time he entered into his consulting agreement with GR, which is the subject of this dispute, Cohon resided in Connecticut. Cohon is a former consultant for GR.

6. Upon information and belief, Defendant GR is a provider of medical, security, and transport services based in Boston, Massachusetts. GR is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts. GR is authorized to do business in the State of California and is doing business in, without limitation, San Francisco, Mountain View, Santa Monica, Irvine, Squaw Valley, and Santa Rosa.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over GR because (a) GR does business within the State of California; (b) GR's clients include several large, California-based entities and hundreds of individual California citizens; (c) Muhlner and Bochnowski's employment agreements with GR were negotiated and signed in California; (d) GR's chief executive officer communicated with Muhlner and Bochnowski about their employment with GR while Muhlner and Bochnowski were located in California, and traveled to San Francisco to discuss Muhlner and Bochnowski's potential employment with GR; (e) GR promised Muhlner and Bochnowski – both of whom are from California, earned their undergraduate degrees from California universities, married California residents, and have immediate and extended family members in California – that GR would open an office in the San Francisco area within 4 to 7 years of the commencement of Muhlner and Bochnowski's employment; (f) GR sent offer letters to Muhlner and Bochnowski at their homes in California; (g) Bochnowski, while employed by

GR and on GR's behalf, traveled to California approximately once every two months; (h) Muhlner, while employed by GR and on GR's behalf, traveled to California approximately once every three months; (i) Cohon traveled to California on GR business several times; (j) GR corporate officer and Vice President of Medical Operations (Dr. Arnold Seid) resides in Santa Monica, California and is employed by GR from California; (k) GR owner and board member (Jordan Richards) resides in San Francisco, California; and (l) UnivOps will employ California residents, contract with California businesses, lease or purchase California property, and pay California taxes.

8. Venue is proper in this Court because a substantial part of the events giving rise to the claims herein occurred in San Francisco County; Muhlner and Bochnowski entered into the employment agreements that are the subject of this dispute in San Mateo and Los Angeles County; and GR is subject to personal jurisdiction in San Francisco County.

## FACTUAL ALLEGATIONS

9. GR is a provider of medical, security, and transport services based in Boston, Massachusetts. It offers its clients travel assistant services, advice and information about medical care, and other emergency concierge services. According to its website, GR's mission is "to provide the highest quality medical, security, transport, and other critical services for our members anytime, anywhere in the world." Upon information and belief, GR's clients include several well-known, California-based companies and hundreds of individual California citizens.

10. In early 2008, GR reached out to Muhlner and Bochnowski in California in connection with employment opportunities at GR. GR's chief executive officer communicated with Muhlner and Bochnowski by telephone and e-mail, and traveled to San Francisco to meet with Muhlner and Bochnowski to discuss their potential employment at GR. GR promised Muhlner and Bochnowski – both of whom are from California, earned their undergraduate degrees from California Universities, married California residents, and have immediate and extended family members in California – that GR would open an office in the San Francisco area within 4 to 7 years of the commencement of Muhlner and Bochnowski's employment.

11. GR sent offer letters dated April 21, 2008 to Muhlner and April 16, 2008 to Bochnowski at their respective homes in California. After further negotiation about the terms of Muhlner and

Bochnowski's employment with GR – all of which took place while Muhlner and Bochnowski were located in California – GR sent an "Employee Obligations Agreement" dated April 21, 2008 to Muhlner and an "Employee Obligations Agreement" dated April 16, 2008 to Bochnowski. Shortly thereafter, Muhlner executed his employment agreement (the "Muhlner Agreement," attached hereto as **Exhibit A**) and Bochnowski executed his employment agreement (the "Bochnowski Agreement," attached hereto as **Exhibit B**). The Muhlner Agreement and the Bochnowski Agreement are identical in all relevant respects.

12. Paragraph 8 of the Muhlner Agreement and the Bochnowski Agreement states, in pertinent part:

> <u>Competitive Activities</u>. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world.

13. Muhlner commenced employment on July 7, 2008 with GR, where he was the Director of Global Operations. During the course of his employment with Global, Muhlner traveled to California approximately once every three months in order to meet with GR's California-based clients. After giving GR notice of his resignation on August 1, 2011, Muhlner resigned from GR on August 15, 2011 and subsequently commenced employment with UnivOps. Muhlner is informed and believes that GR intends to prevent UnivOps from employing him and/or intends to seek damages or other relief against UnivOps due to UnivOps' employment of him, based on the provisions of his employment agreement with GR.

14. Bochnowski commenced employment on June 15, 2008 with GR, where he was Director of Corporate Sales. During the course of his employment with GR, Bochnowski traveled to California approximately once every two months in order to meet with GR's California-based clients. After giving GR notice of his resignation on August 1, 2011, Bochnowski resigned from GR on August 15, 2011 and subsequently commenced employment with UnivOps. Bochnowski is informed and believes that GR intends to prevent UnivOps from employing him and/or intends to seek damages or

other relief against UnivOps due to UnivOps' employment of him, based on the provisions of his employment agreement with GR.

15. In 2010, Cohon commenced a consulting relationship with GR, whereby he provided consulting services for GR. Cohon, with only receiving reimbursement for expenses, introduced GR to long time clients, vendors, partners and relationships including, but not limited to: ACE Group, Alcoa Inc., AmerisourceBergen Corporation, Amgen Inc., Aon Captive Managers, Archer Daniels Midland Co., benefits Continuum Inc., The Bensman Group, CICA (Captive Insurance Consortium Association), Charles Schwab & Co., The Chubb Corporation, Cincinnati Bell Inc., Cisco Systems, Inc., Comcast Corporation, Dearborn National Life Insurance Company, The Walt Disney Company, Dow Chemical Company, FMR LLC (Fidelity Investments), H.J. Heinz Company, International Paper Company, Liberty Mutual Group, Lowe's Companies Inc., Mullin TBG, OneBeacon Insurance Group, PepsiCo Inc., Prudential Financial Inc., RIMS (Risk Insurance Management Society), Securian Financial Group, Inc. (Minnesota Life), Time Warner Cable Inc., Valero Energy Corp., Verizon Communications Inc., Vermont Captive Insurance Association, Wells Fargo & Company, Zurich Financial Services Group (includes all affiliates). On March 18, 2010, Cohon executed his consulting agreement (the "Cohon Agreement," attached hereto as **Exhibit C**) (the Muhlner Agreement, the Bochnowski Agreement and the Cohon Agreement are collectively referred to as the "Agreements").

16. Paragraph 8 of the Cohon Agreement states, in pertinent part:

> <u>Competitive Activities</u>. During the term of my relationship or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, Consultant, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world.

17. On November 3, 2011, Cohon gave GR notice of his termination of his consulting relationship with GR. Also on November 3, 2011, Cohon terminated his consulting relationship with GR. Cohon is informed and believes that GR intends to prevent UnivOps from employing him and/or intends to seek damages or other relief against UnivOps due to his employment with UnivOps, based on the provisions of his consulting agreement with GR.

18. UnivOps manages client insurance, benefits and risk services and provides expert consultative services for three main captive and risk pooling services: group personal lines, international and expatriate welfare benefits, and reinsurance and risk pooling. It does not provide any services currently provided by GR; UnivOps services will be complementary to services of medical and security response providers like GR. In fact, GR's chief executive officer has stated that GR has no intention or ability to provide the kinds of services provided by UnivOps, and that he is not interested in business that shares in client and partner financial risk.

19. Plaintiffs are informed and believe that, unless the declaratory relief requested herein is granted, GR will attempt to prevent UnivOps from employing Muhlner, Bochnowski and Cohon and/or will seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski and Cohon based on the provisions of the Agreements. On August 10, 2011, after Muhlner and Bochnowski resigned from GR, the CEO of GR asked Muhlner and Bochnowski to sign a blatantly one-sided "Separation Agreement and Release," which included numerous provisions demonstrating that GR intends to unfairly restrict Muhlner and Bochnowski's future employment. Among other things, the "Separation Agreement and Release" included a provision that would have prohibited Muhlner and Bochnowski from pursuing "other employment opportunities" or even posting a resume for almost two months after they resigned from GR, and would have deemed Muhlner and Bochnowski in breach of the proposed agreement if any "Company client, prospective client, employee, prospective employee, vendor, shareholder, option holder and/or contractor becomes aware" of any change in Muhlner or Bochnowski's employment status during that two-month period. The proposed agreement also would have prohibited Muhlner and Bochnowski from "full-time employment with any other entity prior to November 2, 2011," and would have required Muhlner and Bochnowski to notify GR, in writing, of any change in employment until December 31, 2013. Neither Muhlner nor Bochnowski signed the "Separation Agreement and Release."

20. Further, on August 16, 2011, as Muhlner and Bochnowski were removing their belongings from GR's office, GR's Senior Vice President threatened Bochnowski, declaring that Bochnowski's employment agreement (GR Employee Obligations Agreement) prohibited Bochnowski from communicating in any manner with GR clients, prospects, consultants or employees.

21. In addition, on November 2, 2011, during a conversation between Cohon and the CEO of GR, the CEO of GR threatened Cohon that GR was going to "enforce its rights" under the Agreements against Muhlner, Bochnowski and Cohon. As a result, Muhlner, Bochnowski and Cohon believe that GR intends to prevent UnivOps from employing them and/or intends to seek damages or other relief against UnivOps due to their employment with UnivOps, based on the provisions of their Agreements with GR.

## CAUSES OF ACTION

## COUNT I

### (Declaratory and Injunctive Relief)

22. Plaintiffs re-allege and incorporate by reference Paragraphs 1-21 as if fully set forth herein.

23. An actual, present, and justiciable controversy now exists between Plaintiffs and GR with respect to the rights of UnivOps, Muhlner, Bochnowski and Cohon. Plaintiffs contend as follows:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements in order to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, and/or would attempt to seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Paragraph 8 is invalid and unenforceable as violative of California Business and Professions Code Section 16600 *et seq.*; and

(b) None of the Plaintiffs have any valid contractual or other legal obligation to GR that would prevent UnivOps from employing Muhlner, Bochnowski or Cohon at any time.

24. Plaintiffs are informed and believe, on the basis of such information and belief allege, that GR disputes the above contentions and contends otherwise.

25. Plaintiffs are now entitled to a declaration of their rights to avoid a multiplicity of actions and so that the parties will know their rights, duties, and obligations respecting the Agreements and Muhlner, Bochnowski and Cohon's employment with UnivOps. Specifically, Plaintiffs are entitled to a declaration that their contentions, as set forth in Paragraph 23 above, are correct.

26. Plaintiffs are further entitled to an order enjoining GR from interfering with UnivOps' employment of Muhlner, Bochnowski and Cohon.

**COUNT II**

**(Declaratory and Injunctive Relief)**

27. Plaintiffs re-allege and incorporate by reference Paragraphs 1-26 as if fully set forth herein.

28. An actual, present, and justiciable controversy now exists between Plaintiffs and GR with respect to the rights of UnivOps, Muhlner, Bochnowski and Cohon. Plaintiffs contend as follows:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements in order to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, and/or would attempt to seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Muhlner, Bochnowski and Cohon's work in their chosen field does not constitute competition under Paragraph 8.

29. Plaintiffs are informed and believe, on the basis of such information and belief allege, that GR disputes the above contentions and contends otherwise.

30. Plaintiffs are now entitled to a declaration of their rights to avoid a multiplicity of actions and so that the parties will know their rights, duties, and obligations respecting the Agreements and Muhlner, Bochnowski and Cohon's employment with UnivOps. Specifically, Plaintiffs are entitled to a declaration that their contentions, as set forth in Paragraph 28 above, are correct.

31. Plaintiffs are further entitled to an order enjoining GR from interfering with UnivOps' employment of Muhlner, Bochnowski and Cohon.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief against GR:

1. On the First Cause of Action, a declaration from the Court that:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, or would seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Paragraph 8 is invalid and unenforceable as violative of California Business and Professions Code Section 16600 *et seq.*; and

///

(b) None of the Plaintiffs have any valid contractual or other legal obligation to GR that would prevent UnivOps from employing Muhlner, Bochnowski or Cohon at any time;

2. On the Second Cause of Action, a declaration from the Court that:

(a) To the extent GR would attempt to invoke Paragraph 8 of the Agreements in order to prevent UnivOps from employing Muhlner, Bochnowski or Cohon, and/or would attempt to seek damages or other relief against UnivOps due to UnivOps' employment of Muhlner, Bochnowski or Cohon, Muhlner, Bochnowski and Cohon's work in their chosen field does not constitute competition under Paragraph 8.

3. Temporary, preliminary, and permanent injunctive relief; and

4. Such other and further relief as the Court may deem just and proper.

DATED: November 3, 2011

GREENBERG TRAURIG, LLP

By: ______________________
TODD R. WULFFSON
ALANA R. CHIMES
Counsel for Plaintiffs,
UNIVERSAL OPERATIONS RISK MANAGEMENT LLC, EDWARD MUHLNER, THOMAS BOCHNOWSKI and MARK COHON

# Exhibit "A"

**GLOBAL RESCUE LLC**

**EMPLOYEE OBLIGATIONS AGREEMENT**

Employee's Name: **Edward Muhlner** Employee's Address: **2 61st Place**
**Long Beach, CA 90803**

Date: April 21, 2008

In consideration of my employment by or other relationship with Global Rescue LLC (the "Company"), whose address is 115 Broad St., Suite 350, Boston, MA 02110, I, the above-named Employee, hereby agree with the Company as follows:

1. Definitions.

(a) Proprietary Information. As used in this Agreement, "Proprietary Information" means information belonging to the Company which is of value to the Company in the course of conducting its business. Proprietary Information includes without limitation trade secrets, product ideas, inventions, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials and other intellectual property, marketing plans and strategies, marketing or sales information, sales opportunities and strategies, reports, forecasts and plans, customer lists, financial information, reports, plans and forecasts, and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or assets, or proposed business affiliations) which have been discussed or considered by the management of the Company. Proprietary Information also includes information developed by me in the course of my employment by the Company or otherwise relating to Inventions which belong to the Company under Section 5 below, as well as other information to which I may have access in connection with my employment.

(b) Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all any inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulas, data, techniques, know-how, secret or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection). Inventions and Developments include, by way of example and without limitation, discoveries and improvements which consist of or relate to any form of Proprietary Information.

(c) Company-Related Inventions and Developments. For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either (i) relate at the time of conception or development to the actual or

demonstrably anticipated business of the Company or to its actual or demonstrably anticipated research and development, (ii) relate to any work performed for the Company, whether or not during normal business hours, (iii) are developed on Company time or (iv) are developed primarily through or in substantial reliance on the use of the Company's Proprietary Information, equipment and software, or other facilities or resources.

(d) Company. For purposes of this Agreement, all references to the "Company" will be deemed to include the Company, its direct or indirect subsidiaries, whether currently in existence or hereafter acquired or created, and its affiliates.

(e) Company-Related Equipment. All equipment, including but not limited to computers, Blackberries, telephonic instruments or any other instrument or device purchased or furnished by the Company for the use, direct or indirect, of the above-named Employee.

2. Return of Company-Related Equipment. Company-Related Equipment shall remain the property of and be returned to the Company when the Employee's employment by the Company ceases. Employees who fail to immediately return Company equipment shall reimburse the Company the replacement cost of any such equipment. Company keys, IDs and keycards shall be returned immediately. Employees who fail to return company keys, IDs or keycards immediately upon separation from the Company shall reimburse the Company $250 per key, ID or keycard not returned to cover the replacement costs of locks and the reprogramming cost of card readers.

3. Confidentiality. I understand and agree that my employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me; but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

4. Documents, Records, etc. All documents, records, apparatus, information, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company or are produced by me in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such materials and property as and when requested by the Company. In any event, I will

return all such materials and property immediately upon termination of my employment for any reason. I will certify in writing the destruction of all electronic records, documents and other material that cannot be returned to the Company. I will not take with me any such material or property or any copies thereof upon such termination.

5. Ownership of Inventions and Developments. I agree that all Company-Related Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during the term of my employment with the Company will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Company any proprietary rights which I may have or acquire in any such Company-Related Inventions and Developments without further compensation, and I waive any moral rights or other special rights which I may have or accrue therein. At the request and cost of the Company, I agree to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. The provisions of this Section 5 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my employment with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after termination of my employment, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my employment were conceived during the term of my employment with the Company unless I am able to establish a later conception date by clear and convincing evidence. The provisions of this Section 5 will not apply, however, to any Inventions and Developments which may be disclosed in Schedule A hereto, prior to its acceptance by the Company, representing Inventions and Developments made by me prior to my employment by the Company.

6. Disclosure of Inventions and Developments. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 5.

7. Obtaining and Enforcing Proprietary Rights. I agree to assist the Company, at the Company's request from time to time and at the Company's expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my employment, provided that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, but only for the purpose of executing and filing any such

document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by me.

8. Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

9. Nonsolicitation of Customers. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

(a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

(b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an employee of the Company), or

(e) refer a Customer or supplier to another provider of Services.

10. Nonsolicitation of Employees. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:

(a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any

individual who had been employed by or served as a consultant to the Company within one (1) year preceding my termination, or

(b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee, prospective employee, consultant or prospective consultant of the Company to terminate his or her employment or other relationship with the Company or provide services to any entity other than the Company.

11. <u>Non-Disparagement.</u> At all times, both during my employment with the Company and after its termination, I will not, directly or indirectly, make, solicit, or confirm any public or private statements or communications that are or that may reasonably be considered to be harmful to, disparaging of, or reflect negatively upon (a) the Company or any employee or affiliate thereof, (b) the Company's business and (b) the Company's past, present or future Members and employees.

12. <u>Acknowledgments and Agreements</u>. I acknowledge and agree that the terms and restrictions set forth in this Agreement are intended to protect the Company's interest in Confidential Information and its commercial relationships and goodwill (with its Customers, prospective customers, vendors, consultants and employees), including, without limitation, Confidential Information, commercial relationships and are reasonable and appropriate for these purposes and that my failure to strictly adhere to the terms of this agreement will constitute a breach of this agreement and be harmful to the Company.

13. <u>Disclosure of Agreement</u>. I will disclose the existence and terms of this Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an employment, partnership or other business relationship with such person or entity.

14. <u>Third-Party Agreements and Rights</u>. I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business. I represent to the Company that my execution of this Agreement, my employment with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party.

15. <u>Other Employee Income</u>. Employee shall not receive payment for employment, services rendered, or other activities from entities other than the Company unless such activities are approved in advance in writing by the Company. Employee shall immediately disclose any and all other sources of income to the Company.

16. Injunction. I agree that it would be difficult to measure any damages caused to the Company which might result from any breach by me of the promises set forth in this Agreement, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to the Company.

17. Binding Effect. This Agreement will be binding upon me and my heirs, executors, administrators and legal representatives and will inure to the benefit of the Company, any subsidiary of the Company, and its and their respective successors and assigns.

18. Enforceability. If any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable.

19. Entire Agreement. This Agreement constitutes the entire agreement between the Company and myself with respect to the subject matter hereof, and supersedes all prior representations and agreements, with respect to such subject matter. This Agreement may not be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification or waiver is sought. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, in any particular case will not prevent any subsequent enforcement of such term or obligation or to be deemed a waiver of any separate or subsequent breach.

20. Notices. Any notices, requests, demands and other communications provided for by this Agreement will be sufficient if in writing and delivered in person or sent by registered or certified mail, postage prepaid, to me at the last address which I have filed in writing with the Company or, in the case of any notice to the Company, at its main offices, to the attention of the undersigned officer.

21. Governing Law; Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related

SCHEDULE A
CONTRIBUTED INVENTIONS AND DEVELOPMENTS

Employee Name: EDWARD MUHLNER

Date: 29 APR 2008

Name: EDWARD MUHLNER

thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process for any action, suit or proceeding brought against it in any such court.

22. Attorney's Fees. The prevailing party in any legal action shall be entitled to reasonable attorney's fees.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

Accepted and Agreed to:

Name: Edward Muhlner, Employee

Accepted and Agreed to:

Global Rescue LLC

By:
Name: Daniel L. Richards
Title: Chief Executive Officer

Exhibit "B"

**GLOBAL RESCUE LLC**

**EMPLOYEE OBLIGATIONS AGREEMENT**

Employee's Name: **Thomas Bochnowski** Employee's Address: **28 Camino Por Los Arboles Atherton, CA 94027**

Date: April 16, 2008

In consideration of my employment by or other relationship with Global Rescue LLC (the "Company"), whose address is 115 Broad St., Suite 350, Boston, MA 02110, I, the above-named Employee, hereby agree with the Company as follows:

1. Definitions.

(a) Proprietary Information. As used in this Agreement, "Proprietary Information" means information belonging to the Company which is of value to the Company in the course of conducting its business. Proprietary Information includes without limitation trade secrets, product ideas, inventions, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials and other intellectual property, marketing plans and strategies, marketing or sales information, sales opportunities and strategies, reports, forecasts and plans, customer lists, financial information, reports, plans and forecasts, and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or assets, or proposed business affiliations) which have been discussed or considered by the management of the Company. Proprietary Information also includes information developed by me in the course of my employment by the Company or otherwise relating to Inventions which belong to the Company under Section 5 below, as well as other information to which I may have access in connection with my employment.

(b) Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all any inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulas, data, techniques, know-how, secret or intellectual property rights whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection). Inventions and Developments include, by way of example and without limitation, discoveries and improvements which consist of or relate to any form of Proprietary Information.

(c) Company-Related Inventions and Developments. For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either (i) relate at the time of conception or development to the actual or demonstrably anticipated business of the Company or to its actual or demonstrably anticipated

research and development, (ii) relate to any work performed for the Company, whether or not during normal business hours, (iii) are developed on Company time or (iv) are developed primarily through or in substantial reliance on the use of the Company's Proprietary Information, equipment and software, or other facilities or resources.

(d) Company. For purposes of this Agreement, all references to the "Company" will be deemed to include the Company, its direct or indirect subsidiaries, whether currently in existence or hereafter acquired or created, and its affiliates.

(e) Company-Related Equipment. All equipment, including but not limited to computers, Blackberries, telephonic instruments or any other instrument or device purchased or furnished by the Company for the use, direct or indirect, of the above-named Employee.

2. Return of Company-Related Equipment. Company-Related Equipment shall remain the property of and be returned to the Company when the Employee's employment by the Company ceases. Employees who fail to immediately return Company equipment shall reimburse the Company the replacement cost of any such equipment. Company keys, IDs and keycards shall be returned immediately. Employees who fail to return company keys, IDs or keycards immediately upon separation from the Company shall reimburse the Company $250 per key, ID or keycard not returned to cover the replacement costs of locks and the reprogramming cost of card readers.

3. Confidentiality. I understand and agree that my employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "Confidential Information." At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company. The restrictions set forth in this Section 3 will not apply to (i) information which is generally known to the public or in the trade or (ii) which becomes known to third parties or communicated from such third parties other than as a result of a breach by me of this Agreement, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provision of this Agreement to such information in accordance with the terms of such provision.

4. Documents, Records, etc. All documents, records, apparatus, information, equipment and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company or are produced by me in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such materials and property as and when requested by the Company. In any event, I will return all such materials and property immediately upon termination of my employment for any

reason. I will certify in writing the destruction of all electronic records, documents and other material that cannot be returned to the Company. I will not take with me any such material or property or any copies thereof upon such termination.

5. Ownership of Inventions and Developments. I agree that all Company-Related Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during the term of my employment with the Company will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Company any proprietary rights which I may have or acquire in any such Company-Related Inventions and Developments without further compensation, and I waive any moral rights or other special rights which I may have or accrue therein. At the request and cost of the Company, I agree to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. The provisions of this Section 5 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my employment with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after termination of my employment, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my employment were conceived during the term of my employment with the Company unless I am able to establish a later conception date by clear and convincing evidence. The provisions of this Section 5 will not apply, however, to any Inventions and Developments which may be disclosed in Schedule A hereto, prior to its acceptance by the Company, representing Inventions and Developments made by me prior to my employment by the Company.

6. Disclosure of Inventions and Developments. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 5.

7. Obtaining and Enforcing Proprietary Rights. I agree to assist the Company, at the Company's request from time to time and at the Company's expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my employment, provided that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, but only for the purpose of executing and filing any such document and doing all other lawfully permitted acts to accomplish the foregoing purposes with

the same legal force and effect as if executed by me.

8. Competitive Activities. During the term of my employment or other similar relationship with the Company, and for a period of two (2) years thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any non-government, private sector business activity anywhere in the world with respect to any services or products currently provided by, or intended to be provided by, the Company, including, without limitation, providing global medical consultation, evacuation, rescue, personnel recovery, travel assistance, telemedicine, security and other services throughout the world (the "Services"). The prohibition set forth in this Section 8 shall not restrict me from owning or holding up to one percent (1%) of the shares of stock of any company registered or sold on any recognized stock exchange or sold in the over-the-counter market. I understand and agree that the restrictions set forth in this Section 8 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

9. Nonsolicitation of Customers. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly:

(a) solicit the business or patronage of any Customer for any other person, myself, or any other entity for the purpose of providing Services,

(b) divert, entice, or otherwise take away from the Company the business or patronage of any Customer or prospective customer, or attempt to do so,

(c) solicit or induce any Customer, prospective customer, supplier, prospective supplier, prospective vendor or vendor to terminate or reduce its relationship with the Company,

(d) provide or assist with the provision of Services to a Customer (except in his capacity as an employee of the Company), or

(e) refer a Customer or supplier to another provider of Services.

10. Nonsolicitation of Employees. During the term of my employment or other similar relationship with the Company and for two (2) years thereafter, regardless of reason for termination, I will not:

(a) hire or employ, directly or indirectly through any enterprise with which I am associated, any current employee or consultant of the Company or any individual who had been employed by or served as a consultant to the

Company within one (1) year preceding my termination, or

(b) recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee, prospective employee, consultant or prospective consultant of the Company to terminate his or her employment or other relationship with the Company or provide services to any entity other than the Company.

11. Non-Disparagement. At all times, both during my employment with the Company and after its termination, I will not, directly or indirectly, make, solicit, or confirm any public or private statements or communications that are or that may reasonably be considered to be harmful to, disparaging of, or reflect negatively upon (a) the Company or any employee or affiliate thereof, (b) the Company's business and (b) the Company's past, present or future Members and employees.

12. Acknowledgments and Agreements. I acknowledge and agree that the terms and restrictions set forth in this Agreement are intended to protect the Company's interest in Confidential Information and its commercial relationships and goodwill (with its Customers, prospective customers, vendors, consultants and employees), including, without limitation, Confidential Information, commercial relationships and are reasonable and appropriate for these purposes and that my failure to strictly adhere to the terms of this agreement will constitute a breach of this agreement and be harmful to the Company.

13. Disclosure of Agreement. I will disclose the existence and terms of this Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an employment, partnership or other business relationship with such person or entity.

14. Third-Party Agreements and Rights. I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business. I represent to the Company that my execution of this Agreement, my employment with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party.

15. Other Employee Income. Employee shall not receive payment for employment, services rendered, or other activities from entities other than the Company unless such activities are approved in advance in writing by the Company. Employee shall immediately disclose any and all other sources of income to the Company.

16. Injunction. I agree that it would be difficult to measure any damages caused to

the Company which might result from any breach by me of the promises set forth in this Agreement, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to the Company.

17. Binding Effect. This Agreement will be binding upon me and my heirs, executors, administrators and legal representatives and will inure to the benefit of the Company, any subsidiary of the Company, and its and their respective successors and assigns.

18. Enforceability. If any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable.

19. Entire Agreement. This Agreement constitutes the entire agreement between the Company and myself with respect to the subject matter hereof, and supersedes all prior representations and agreements, with respect to such subject matter. This Agreement may not be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification or waiver is sought. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, in any particular case will not prevent any subsequent enforcement of such term or obligation or to be deemed a waiver of any separate or subsequent breach.

20. Notices. Any notices, requests, demands and other communications provided for by this Agreement will be sufficient if in writing and delivered in person or sent by registered or certified mail, postage prepaid, to me at the last address which I have filed in writing with the Company or, in the case of any notice to the Company, at its main offices, to the attention of the undersigned officer.

21. Governing Law; Consent to Jurisdiction. The validity, interpretation, performance and enforcement of this agreement shall be governed by the laws of Massachusetts. The parties hereto hereby irrevocably and unconditionally consent to the sole and exclusive jurisdiction of the courts of Massachusetts and the United States District Court located in Massachusetts for any action, suit or proceeding arising out of or relating to this agreement or the Proposed Transaction, and agree not to commence any action, suit or proceeding related thereto except in such courts. The parties hereto further hereby irrevocably and unconditionally

waive any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this agreement in the courts of Massachusetts and the United States District Court located in Massachusetts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process for any action, suit or proceeding brought against it in any such court.

22. Attorney's Fees. The prevailing party in any legal action shall be entitled to reasonable attorney's fees.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

Accepted and Agreed to:

Name: Thomas Bochnowski, Employee

Accepted and Agreed to:

Global Rescue LLC

By:

Name: Daniel L. Richards
Title: Chief Executive Officer

SCHEDULE A
CONTRIBUTED INVENTIONS AND DEVELOPMENTS

Employee Name: ____________

Date: ____________

____________
Name:

# Exhibit "C"

# EXHIBIT V

-----Original Message-----
**From:** wulffsont@gtlaw.com [wulffsont@gtlaw.com]
**Received:** Thursday, 01 Dec 2011, 8:40pm
**To:** Whitney, Mark [mwhitney@morganbrown.com]
**Subject:** FW: Shipment Notification from THE UPS STORE #4377

Please see below

Thanks

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at mailto:postmaster@gtlaw.com, and do not use or disseminate such information. Pursuant to IRS Circular 230, any tax advice in this email may not be used to avoid tax penalties or to promote, market or recommend any matter herein.

---

From: <iShip_Services@iship.com>
Date: Thu, 1 Dec 2011 13:30:44
To:
Subject: Shipment Notification from THE UPS STORE #4377

A carrier shipping label has been generated for the shipment to
GLOBAL RESCUE and is at THE UPS STORE #4377 awaiting carrier pickup.

It will be picked up from THE UPS STORE #4377 by UPS on Thursday,
December 1, 2011.

==========================================

SHIPMENT INFORMATION

==========================================

SENDER
COHON
--
(Sender's street address omitted intentionally from this email)
US, NY

RECIPIENT
GLOBAL RESCUE
DANIEL RICHARDS
(Recipient's street address omitted intentionally from this email)

BOSTON, MA 02109-3418 US

SHIPPED THROUGH
THE UPS STORE #4377
(516) 681-9222

MESSAGE FROM SENDER
--

CARRIER & SERVICE
UPS Ground

TRACKING & REFERENCE
Carrier Trk: 1Z296V6E0345850664
Shipment ID: MM98GEB5BCYGR
Order/Item #: DA
Reference #: --

SHIP DATE
Thursday, December 1, 2011

EXPECTED DELIVERY DATE
Friday, December 2, 2011 End of Day

---

TRACKING INFORMATION

---

To get complete tracking information, click the following link:

https://iship.com/trackit/track.aspx?t=1&Track=MM98GEB5BCYGR&src=_e

NOTE: Tracking information may not be available until several hours after the carrier picks up the packages. Carriers normally pick up in the late afternoon.

---

QUESTIONS OR CONCERNS ABOUT THIS SHIPMENT?

---

If you have questions regarding this shipment, contact the facility listed in the SHIPPED THROUGH section above.

---

DO NOT REPLY DIRECTLY TO THIS E-MAIL

---

Questions or Comments: mailto:customerrelations@mbe.com
Technical Support: mailto:customerrelations@mbe.com

*******************************************
On-Line manifesting and tracking technologies powered by iShip(r).
Shipping Insight.(r)

Thursday, December 1, 2011 01:33 PM Pacific Standard Time

Todd R. Wulffson
Greenberg Traurig, LLP | 3161 Michelson Drive | Suite 1000 | Irvine, CA 92612
Tel 949.732.6596 * Cell 949.874.8633 * Efax 949.266.9551

wulffsont@gtlaw.com | www.gtlaw.com

Greenberg Traurig

USA LAW FIRM OF THE YEAR, CHAMBERS GLOBAL AWARDS 2007
ALBANY * AMSTERDAM * ATLANTA * AUSTIN * BOSTON * CHICAGO * DALLAS * DELAWARE * DENVER * FORT LAUDERDALE * HOUSTON * LAS VEGAS * LONDON* * LOS ANGELES * MEXICO CITY+ * MIAMI * NEW JERSEY * NEW YORK * ORANGE COUNTY * ORLANDO * PALM BEACH COUNTY * PHILADELPHIA * PHOENIX * SACRAMENTO * SAN FRANCISCO * SHANGHAI * SILICON VALLEY * TALLAHASSEE * TAMPA * TYSONS CORNER * WASHINGTON, D.C. * WHITE PLAINS
*OPERATES AS GREENBERG TRAURIG MAHER LLP +OPERATES AS GREENBERG TRAURIG, S.C.

-----Original Message-----
http://www.gtlaw.com/

**From:** Daniel Richards <drichards@globalrescue.com>
**Sent:** Wednesday, November 02, 2011 3:01 PM
**To:** Mark Cohon
**Attachments:** Executed Consultants Agreement.pdf

Mark,

Attached is the executed consultants agreement.

Dan

Daniel L. Richards
Chief Executive Officer
Global Rescue LLC
177 Milk St. STE 700
Boston, MA 02109
P: 617-459-4198
F: 858-712-1295